WILMER CUTLER PICKERING
 HALE AND DORR LLP
Andrew N. Goldman
Nancy L. Manzer
Benjamin W. Loveland (*pro hac vice* pending)
Christopher D. Hampson (*pro hac vice* pending)
7 World Trade Center
250 Greenwich Street
New York, New York  10007
Telephone:    (212) 230-8800
Facsimile:    (212) 230-8888

*Proposed Counsel to the Debtors*
*and Debtors in Possession*


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| COLLECTIVE, INC., *et al.*, | ) |
| | ) Case No. 18-_____ (___) |
| Debtors.[1] | ) |
| | ) (Joint Administration Requested) |
| | ) |
| | ) |

**DECLARATION OF KERRY BIANCHI**
**PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

I, Kerry Bianchi, make this declaration under 28 U.S.C. § 1746:

1.      I am the President and Chief Executive Officer ("**CEO**") of Collective, Inc.

("**Collective**") and its affiliate, CME Co-Op, LLC, the debtors and debtors in possession in the

above captioned chapter 11 cases (collectively, the "**Debtors**").  I have served as Collective's

President and CEO since 2017.  Prior to becoming President and CEO of Collective, I held the

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, include: Collective, Inc. (2024) and CME Co-Op, LLC (N/A). The location of the Debtors'
corporate headquarters and the Debtors' service address is: 72 Madison Ave, 3rd Floor, New York, NY 10016.

role of Chief Operating Officer from 2015 to 2016 and the role of President from 2016 to 2017.

In my capacity as President and CEO, I am generally familiar with the Debtors' day-to-day

operations, business and financial affairs, and books and records.  I am above 18 years of age and

I am competent to testify.

2.      I submit this declaration (this "**Declaration**") in accordance with Rule 1007-2 of

the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy**

**Rules**"): (a) to assist this court (the "**Court**") and parties in interest in understanding the Debtors,

their operations, their capital structure, and the circumstances related to the commencement of

the chapter 11 cases; and (b) in support of: (i) the Debtors' petitions for relief under chapter 11 of

title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the

"**Petition Date**"); (ii) the relief requested by the Debtors pursuant to the pleadings described

herein (collectively, the "**First Day Motions**"), and (iii) the relief requested by the Debtors

pursuant to the *Debtors' Motion, Pursuant to 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr.*

*P. 2002, 6004, and 6006, for Approval of (I) (A) Bidding Procedures, (B) Stalking Horse Asset*

*Purchase Agreement and Bid Protections, (C) Form and Manner of Notice of Auction, Sale*

*Transaction, and Sale Hearing, and (D) Assumption and Assignment Procedures; and (II) (A)*

*Purchase Agreement, (B) Sale of Substantially all of Debtors' Assets Free and Clear of Liens,*

*Claims, and Interests, and (C) Assumption and Assignment of Certain Executory Contracts and*

*Unexpired Leases* (the "**Sale Motion**").

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon

my personal knowledge, my discussions with other members of the Debtors' management team

and the Debtors' advisors, my review of relevant documents and information concerning the

Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon

2

my experience and knowledge.  If called as a witness, I would testify competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

## Overview

4.      Collective, known in the marketplace by its trade name—Visto—is primarily a software-as-a-service provider that, through its Enterprise Advertising Hub platform, allows brands, advertising agencies, and advertisers to purchase and place advertising and monitor and evaluate data with respect thereto.  Collective also offers managed services to media and publisher clients, where Collective employees provide proposals to clients, and then implement and monitor advertising campaigns for those clients.

5.      Since transitioning to a primarily software-based business, however, Collective has struggled to build its sales pipeline, as the sales cycle of implementing this transition has turned out to be extensive and longer than anticipated, which in turn has been a strain on cash flow.  As of September 30, 2018, Collective reported total assets of approximately $39.9 million and total liabilities of approximately $23 million.

6.      The Debtors have commenced these chapter 11 cases on a consensual basis with the support of their prepetition secured lender, which holds a properly perfected "all asset" lien on substantially all of the Debtors' assets, to pursue an auction process and going-concern sale of substantially all of the Debtors' assets.  The sale of the Debtors' assets is the primary purpose of these chapter 11 cases and is critical to maximizing the value of the assets for the benefit of the Debtors' estates.

7.      Prior to the Petition Date, Collective, with the assistance of its investment banker, Oaklins DeSilva & Phillips LLC, engaged in an extensive marketing process for a going concern sale.  I was actively involved in and am familiar with that process.  Approximately 70 potential acquirers were contacted; 15 executed non-disclosure agreements as part of the diligence process

and received a Confidential Information Memorandum; and three submitted non-binding indications of interest for Collective's assets.  Unfortunately, none of those indications of interest were at a price that would satisfy the Debtors' secured creditor's claims in full or provide a meaningful benefit to the Debtors' estates.  Accordingly, the Debtors began preparations to file these chapter 11 cases, initially planning to conduct a "naked" auction, in the belief that a sale process through chapter 11, with the benefit of Bankruptcy Code section 363's "free and clear" provisions, would offer the opportunity to attract concrete and meaningful bids from parties not otherwise previously interested in pursuing an acquisition "outside of bankruptcy" that would inure to the benefit of the Debtors' stakeholders.

8.      On October 30, 2018, Zeta Global Holdings Corp. ("**Zeta**" or the "**Stalking Horse Bidder**") submitted a formal letter of intent for the purchase of substantially all of the Debtors' assets.  Following significant negotiations with Zeta, and in the absence of any competing bids, Collective and its board concluded that they had received the best possible bid for the Purchased Assets (as defined in the Stalking Horse APA) as a going concern that would maximize value for all of the Debtors' stakeholders, and the parties executed the letter of intent on November 2, 2018.  Following further negotiations, Collective decided to proceed with Zeta's bid, as reflected in the asset purchase agreement attached to the Sale Motion as Exhibit B (the "**Stalking Horse APA**"), as a stalking horse bid (the "**Stalking Horse Bid**").

9.      Collective has concluded in the exercise of its business judgment and as a fiduciary for all of Collective's stakeholders that the best path to maximize the value of its business is a chapter 11 filing to facilitate the pursuit of a going concern sale of its assets to the Stalking Horse Bidder or other bidder that submits a higher or otherwise better offer through the sale process described in the Sale Motion.  The sale process will also afford bidders the

4

opportunity to bid for assets that are not included in the Stalking Horse Bid, including certain assets related to Collective's legacy managed services business, certain contracts, and equity in the Debtors' foreign subsidiaries.  It is Collective's judgment that if it cannot achieve a free and clear sale of its assets within the time periods prescribed by the Sale Motion, Collective will face a certain foreclosure on its assets by Collective's secured creditor.

10.     In furtherance of the Debtors' objectives during these chapter 11 cases, the Debtors' secured creditor has agreed to extend debtor in possession financing in the form of a $4 million first-priority secured term loan (the "**DIP Facility**"), and has consented to the use of its cash collateral, to fund the post-petition auction and sale process.  The Debtors anticipate that they will have sufficient liquidity to support their working capital needs during the initial stages of these chapter 11 cases and to consummate a going concern sale of their assets, to the benefit of all of their stakeholders.

### Collective's Current Business, Corporate History, and Restructuring Initiatives

**A.      Collective's Legacy Business**

11.     Collective was formed in 2007 under the name Collective Media, Inc.  At that point, Collective operated a managed services online advertising network, which primarily purchased and placed digital advertising on behalf of agencies, marketers, and publishers on an order by order basis.

12.     Collective experienced considerable growth through 2013, with revenues peaking at $174 million in that year.  Collective did several equity fundraises through 2013, as well as a $5 million investment in the form of a convertible note from a strategic investor affiliated with an affiliate of Samsung Venture Investment Corporation (the "**Samsung Note**").

13.     As a result of this growth, Collective began substantial preparation for an initial public offering in 2013. However, within the next twelve months and before any IPO went to

market, Collective began experiencing a downturn in its traditional managed service business due to a significant decrease in buys from large advertising agency holding companies who were beginning to build their own internal advertising trading desks to buy digital ads themselves instead of using companies like Collective to buy it for them.  As a result, the IPO was pulled.

**B.      Collective Transitions to Visto**

14.      As part of initial realignment efforts to respond to this downturn in its traditional business and rebrand as a software-as-a-service (SaaS) provider, Collective began to heavily invest in the technology side of its business.  Throughout 2016 and 2017, Collective engaged in an internal business restructuring whereby the historic managed services business pertaining to advertising agencies was transferred to a newly-created, wholly-owned subsidiary named Compass IQ, Inc. ("**Compass**").  The SaaS business remained with Collective and was rebranded as "Visto".

15.      In contrast with its legacy managed service business, which relied on Collective employees to purchase and place advertising, Visto would emphasize the provision of software services through a single, digital ad buying software platform that would allow clients to place advertising themselves.  The Visto software platform combines in one interface the ability to push out advertising to a variety of platforms and to pull in data for centralized analytics and would capitalize on the trend of more enterprises—agencies, media companies and brand marketers considering bringing these buying capabilities in house and requiring a technology platform like Visto to do so.

**C.      Collective Seeks Sources of Funding**

16.      In early 2016, Collective began seeking additional sources of funding to meet its capital needs.  In February-April 2016, Collective raised $8 million in the form of convertible notes (the "**Bridge Notes**").  Concurrently, Collective continued to seek alternative capital

sources and explore strategic alternatives through a potential sale of all or a portion of its business.

17.    In June 2016, Collective refinanced its then-outstanding secured credit facility with Comerica Bank through a $26 million credit facility (the "**Credit Facility**") with Collective's current secured lender, National Electrical Benefit Fund ("**NEBF**").[2]  Of the original $26 million principal amount under the Credit Facility, $20 million was intended for long-term capital needs and was to mature on June 9, 2020.  The remaining $6 million was intended as a short-term bridge facility to be repaid upon the consummation of a then-in-process sale of certain of Collective's United Kingdom-based media business (the "**UK Sale**")

18.    In July 2016, Collective consummated the UK Sale with Time, Inc.  However, as Collective's legacy managed services business continued deteriorating, Collective defaulted under the Credit Facility by failing to repay the $6 million then due.  NEBF and Collective entered into a series of forbearance arrangements with respect to Collective's obligations under the Credit Facility, and Collective obtained extensions of its repayment obligations under other debt obligations, including the Samsung Note.

19.    During 2017, Collective continued seeking alternative sources of capital and exploring strategic alternatives.  To allow Collective to meet its short-term liquidity needs, on November 3, 2017, NEBF extended an additional $1 million to be due on November 30, 2017 and agreed to further forbear from exercising remedies, and extend the maturity of certain obligations, under the Credit Facility.[3]

---

[2] NEBF and RCP Advisors 2, LLC, as successor-in-interest to Columbia Partners, L.L.C. Investment Management ("**RCP**"), in their respective capacities as lender and agent under the Credit Facility, are referred to as the "Prepetition Secured Parties," and in their capacities as lender and investment manager under the DIP Facility as the "Postpetition Secured Parties."

[3]    In December 2017, to further enhance its ability to meet its short-term liquidity needs, Collective entered into an accounts receivable factoring agreement with Fast Pay Partners LLC.  All obligations under that arrangement were satisfied in full in January 2018.

20.     On December 31, 2017, in an effort to raise capital to facilitate the development of its Visto software platform business, Collective consummated the sale of its Compass managed services business relating to advertising agencies (the "**Compass Sale**") through an asset sale to Zeta.  The consideration paid by Zeta consisted of (a) preferred and common stock of Zeta, valued at $25.3 million in the aggregate,[4] and (b) the potential for contingent earnout payments of up to $9 million to Collective, payable based on Compass's post-closing performance.[5]  As part of the Compass Sale, Collective also entered into a Master Services Agreement with Zeta, pursuant to which Zeta agreed to annual spend of $1.5 million per year for the 3 years following the closing of the Compass Sale (for a total of $4.5 million).

21.     In lieu of payment to Collective, the stock consideration was paid directly to NEBF as a pay down under the Credit Agreement, in the amount of $21.6 million.

22.     On January 3, 2018, Collective received $5 million in cash through the sale of Series D Preferred Stock to Zeta and concurrent therewith converted all outstanding obligations under the Bridge Notes to Series D-1 Preferred Stock.  Zeta presently holds approximately 46% of Collective's Series D Preferred Stock.

23.     As 2018 unfolded, Collective's sales pipeline did not materialize as quickly as forecasted, creating continued cash burn.  In order to provide Collective time to stabilize its financial condition, in June 2018, NEBF extended an additional $3.5 million, agreed to convert all outstanding obligations to "on demand" maturity, and agreed to continue to forbear from exercising remedies under the Credit Facility.

---

[4]     A portion of the secured stock compensation in the aggregate deemed amount of $3.4 million was held back by Zeta as security for certain indemnity obligations by Collective.  NEBF agreed, upon the expiration of the holdback period, to accept any shares released and to apply such amounts to the outstanding obligations under the Credit Facility at a deemed share value.
[5]     At the Closing of the Compass Sale, Zeta made a prepayment of $1.5 million for contingent earnout amounts due in the second and third quarters of 2018.

24.     On August 13, 2018, Samsung converted the Samsung Note in exchange for shares of Series D Preferred Stock, thereby retiring approximately $8,183,541 in principal and accrued interest, and leaving the Credit Facility as the only remaining funded debt.

25.     On September 13, 2018, NEBF and Collective entered into a Forbearance Agreement, pursuant to which NEBF and RCP agreed to continue to forbear from exercising remedies under the Credit Facility through October 31, 2018 based on the defaults existing under the Credit Facility at the time.

26.     On November 9, 2018, NEBF extended an additional $600,000 to allow the Debtors to finalize preparations for these chapter 11 cases and pursue a sale to the Stalking Horse Bidder or any other bidder that submits a higher or otherwise better offer for the Debtors' assets through the auction and sale process contemplated by the Sale Motion.

**D.      Collective Attempts to Sell Its Business**

27.     Throughout 2018 and until the Petition Date, Collective continued to seek additional capital and explore strategic opportunities.  Collective's investment banker Oaklins DeSilva & Phillips LLC assisted in these efforts, including by contacting approximately 70 potential acquirers.  15 potentially interested parties executed non-disclosure agreements as part of the diligence process and received a Confidential Information Memorandum.  As a result of these marketing efforts, Collective received three non-binding indications of interest. Nevertheless, as of late October 2018, Collective had received no written offers for the acquisition of all or a portion of its business at a price that would satisfy its secured creditor's claims in full or provide a meaningful benefit to the Debtors.

28.     With its remaining cash (the collateral of its secured creditor) continuing to diminish as cash burn exceeded revenue, the board of directors of Collective, Inc. (the "**Board**")

took into consideration Collective's financial situation and—after considering advice from its financial and legal advisors—concluded that, while a sale of the Debtors' assets was in the best interests of all relevant parties, a sale as part of a bankruptcy proceeding would be the most likely to procure the highest and best price for the Debtors' assets. Accordingly, on October 5, 2018, the Board authorized Collective, and its subsidiary CME Co-Op, LLC, to begin preparations to file voluntary petitions in bankruptcy and pursue a "naked" auction and sale process for their assets. NEBF and RCP supported that path forward.

**E.      The Stalking Horse Bid**

29.      On October 30, 2018, Zeta submitted a formal letter of intent for the purchase of substantially all of the Debtors' assets. Following significant negotiations with Zeta, and in the absence of any competing bids, Collective and its Board concluded that they had received the best possible bid for a sale of its assets as a going concern that would maximize value for all of the Debtors' stakeholders, and Collective executed the letter of intent on November 2, 2018. Following further negotiations, Collective decided to proceed with Zeta's bid, as reflected in the Stalking Horse APA, as the Stalking Horse Bid.

30.      The Stalking Horse APA represents a binding bid for substantially all of the Debtors' assets. The total value consideration to be received by the Debtors, which consists of 1,150,307 shares of Series F-2 Preferred Stock of Zeta, is estimated at $15 million based in part on the value that the Debtors believe NEBF would attribute to the equity in light of the previous recent transaction between Zeta and Collective where equity was the consideration, and in which NEBF agreed to reduce Collective's debt in exchange for the equity at a deemed share value of $13.04 per share. In the absence of any material changes in Zeta's share value, which Collective is not aware of, Collective believes the same deemed value of $13.04 per share can be ascribed

to the consideration offered under the Stalking Horse APA.  The consideration also includes the assumption of certain liabilities and the payment of any cure costs associated with executory contracts and unexpired leases to be assumed and assigned to the Stalking Horse Bidder.

31.     The Stalking Horse Bid constitutes the best offer available for the Debtors' assets at this time.  I believe that subjecting the Stalking Horse bid to the competitive bidding and auction process established by the Sale Motion will enable the Debtors to realize the highest and best value available for their assets.  The procedures described in the Sale Motion are also flexible enough to allow bidders the opportunity to bid for assets that are not included in the Stalking Horse Bid, including certain assets related to Collective's legacy managed services business, certain contracts, and equity in the Debtors' foreign subsidiaries.

32.     The Bidding Procedures and the Stalking Horse APA contain certain bid protections, including the Breakup Fee and the Expense Reimbursement (as defined in the Stalking Horse APA).  These protections were heavily negotiated by the Stalking Horse Bidder and the Debtors and their respective advisors at arms' length and in good faith and were necessary to obtain the Stalking Horse Bidder's commitment to purchase the Debtors' assets.  I believe that the bid protections are fair and reasonable, will not chill bidding, and will enable the Debtors to maximize value through a sale process.

33.     Given the Debtors' financial condition and declining cash position, a prompt sale is necessary to realize the maximum value of the Debtors' asset for the benefit of all stakeholders.  In addition, the Stalking Horse APA and the DIP Facility contain milestones

related to the auction and sale process.  Accordingly, Collective believes that the proposed

timeline in the Bidding Procedures is in the bests interests of the Debtors' estates.

## A.      Collective's Current Business

34.      The Board believes in its prudent business judgment that a sale to the Stalking

Horse Bidder or other bidder that submits a higher or otherwise better offer as part of an orderly

bankruptcy process is the best way to maximize the value of Collective's assets.

35.      Through its proprietary software platform (Visto Enterprise Ad Hub) Collective

offers individual brands, advertising agencies, and advertisers the ability to purchase and place

advertising, monitor advertising placement, and track return on advertising investment.

Collective presently has direct and indirect relationships with over 50 advertising vendors,

including companies like Amazon, Facebook, and Google, that allow customers enrolled in the

Visto platform to variously place, monitor and report on digital advertising.

36.      Collective currently employs 25 employees, including 22 employees out of its

home office in New York City.  In addition to its senior management, Collective's employees

work primarily in sales, customer account management, and software engineering roles.  The

linchpin of Collective's business is its software and related intellectual property portfolio.  To

maintain the operation of its software platform and provide support to its customers, Collective

contracts with its indirect nondebtor subsidiary in India, Collective (India) Private Limited

("**Collective India**"), which employs engineers and technical personnel to provide technical

support and maintenance for Collective's advertising platform.[6]  As described above, Collective

---

[6] Before the Petition Date, with the consent of its secured creditor, Collective paid Collective India sufficient
amounts to ensure that it will be able to continue providing services to Collective—to maintain the value of the
Debtors' assets—through the duration of the sale process.

also continues to operate a managed services business with respect to publishing and media clients.

37.     For the 12 months ended December 2017, the unaudited financial statements of the Debtors reflected total revenues of approximately $8,472,000 and a net loss of approximately $15,734,000.[7]  As of September 30, 2018, Collective reported total assets of approximately $39.9 million and total liabilities of approximately $23 million.

## Corporate and Capital Structure

### A.    Corporate Structure

38.     The Debtors are privately-held companies and do not have any publicly-traded equity.  A number of entities hold 10% or more of the various classes of Collective's preferred and common equity.[8]  Collective is the sole member of CME Co-Op, LLC, which is an entity formed to hold a portion of the equity in Collective Europe Holding Coöperatief U.A., a Dutch holding company (the "**Collective Europe Holding**").  The Debtors, collectively, own 100% of the equity in Collective Europe Holding, which in turn owns 100% of the equity in Collective India.[9]  Neither Collective Europe Holding nor Collective India is a debtor in these chapter 11 cases nor has any substantial assets.  An organizational chart illustrating the corporate structure of the Debtors and their non-debtor foreign subsidiaries is attached as **Exhibit A** to the Debtors' Consolidated Corporate Ownership Statement.

---

[7] These revenue and loss figures are adjusted to account for the Compass Sale.
[8] *See Debtors' Consolidated Corporate Ownership Statement Pursuant to Fed. R. Bankr. P. 1007(a)(1) and 7007.7 and Local Bankruptcy Rule 1007-3*, filed contemporaneously herewith.
[9] Collective directly owns .000667% of the equity in Collective India.

**B.      Capital Structure**

39.      As of the Petition Date, the outstanding obligations under the Credit Facility equal

$17,285,686.79.  Collective's obligations under the Credit Facility are guaranteed by CME Co-

Op, LLC, pursuant to that certain Unconditional Guaranty dated as of June 9, 2016.

40.      Pursuant to security agreements dated as of June 9, 2016 with each of Collective

and CME Co-Op, LLC (together with all related documents, the "**Security Documents**"), the

Debtors' obligations under the Credit Facility are secured by properly perfected first-priority

liens on all of the Debtors' assets (with certain specified exceptions) as described in the Security

Documents.

## First-Day Motions

**A.      First Day Motions Generally**

41.      It is critical that, upon the Debtors' transition into chapter 11, sales and operations

continue in the ordinary course of business to preserve the value of the Debtors' business and

allow for the implementation of the sale process with respect to the Debtors' assets.

Accordingly, the Debtors have filed a number of First Day Motions designed to facilitate their

transition into these chapter 11 cases.  The Debtors anticipate that the Court will conduct a

hearing soon after the Petition Date at which many of the First Day Motions will be considered.

The First Day Motions include:

    **A.**      **Joint Administration Motion** – Debtors' Motion Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of an Order (i) Directing Joint Administration of Chapter 11 Cases, and (ii) Granting Related Relief

    **B.**      **Creditor List Motion** – Debtors' Motion for Entry of an Order (i) Authorizing Debtors to File Consolidated List of 30 Largest Unsecured Creditors; (ii) Waiving the Matrix Requirements; (iii) Authorizing Debtors to Establish Procedures for Notifying Creditors of Commencement of Cases; (iv) Establishing Requirements for Filing and Serving Notices, Motions and Other Papers Filed in These Chapter 11 Cases; and (v) Granting Related Relief

14

C.    **Motion to Extend Time** – Debtors' Motion for Order Pursuant to 11 U.S.C. §
105 and Fed. R. Bankr. P. 1007(c) and 9006(b), Extending Time for Debtors to
File Certain Schedules, Lists, and Financial Statements

D.    **Noticing Agent Retention** – Application of Debtors (i) for an Order Appointing
Epiq Corporate Restructuring, LLC as Noticing Agent for the Debtors and (ii) for
an Order Authorizing Debtors to Retain and Employ Epiq Corporate
Restructuring, LLC as Administrative Agent, Effective as of the Petition Date

E.    **Cash Management Motion** – Debtors' Motion for Entry of an Order Authorizing
Debtors to Continue Using Existing Cash Management System, Bank Accounts
and Business Forms and to Implement Ordinary Course Changes to Cash
Management System and Granting Related Relief

F.    **Wage Motion** – Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363, and
507(a) for Entry of an Order Authorizing the Debtors to Make Payments
Associated with Prepetition Wages, Employee Benefit Plans, Insurance, Savings
Plans, and Other Employee Obligations

G.    **DIP Financing Motion** – Motion for Entry of Interim and Final Orders Pursuant
to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, and 552, Bankruptcy Rules 2002,
4001, and 9014, and Local Rules 4001-1 and 4001-2 (i) Authorizing Debtors to
Obtain Postpetition Financing, (ii) Authorizing Debtors to Use Cash Collateral,
(iii) Granting Adequate Protection, (iv) Scheduling a Final Hearing, and (v)
Granting Related Relief

H.    **Motion to Shorten Time** – Motion of Debtors Pursuant to Fed. R. Bankr. P.
9006(c) for Order Shortening Notice with Respect to Debtors' Motion, Pursuant
to 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006,
for Approval of (I) (A) Bidding Procedures, (B) Stalking Horse Asset Purchase
Agreement and Bid Protections, (C) Form and Manner of Notice of Auction, Sale
Transaction, and Sale Hearing, and (D) Assumption and Assignment Procedures;
and (II) (A) Purchase Agreement, (B) Sale of Substantially all of Debtors' Assets
Free and Clear of Liens, Claims, Interests, and Encumbrances, and (C)
Assumption and Assignment of Certain Executory Contracts and Unexpired
Leases

42.    The First Day Motions seek authority to, among other matters, obtain postpetition

financing, continue using cash collateral, honor employee-related wages and benefits obligations,

and ensure the continuation of the Debtors' cash management systems and other business

operations without interruption. I believe that the relief requested in the First Day Motions is

necessary to give the Debtors an opportunity to work towards successful chapter 11 cases and

implement a sale process that will benefit the Debtors' estates.

43.      Some of these First Day Motions request authority to pay certain prepetition

claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in

relevant part, that the Court shall not consider motions to pay prepetition claims during the first

20 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to

avoid immediate an irreparable harm." In light of this requirement, the Debtors have narrowly

tailored their requests for immediate authority to pay certain prepetition claims to those

circumstances where the failure to pay such claims would cause immediate and irreparable harm

to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

44.      I am familiar with the content and substance of the First Day Motions.  I adopt

and affirm the factual representations contained in each of the First Day Motions.  I believe

approval of the relief sought in each of the motions is critical to successfully implementing the

Debtors' chapter 11 strategy, including a going concern sale process, efficiently, and is in the

best interests of the Debtors' estates and creditors and with minimal disruption to their business

operations, thereby permitting the Debtors to preserve and maximize value for the benefit of all

stakeholders.

**C.      Motion for Authority to Obtain Postpetition Financing and Use Cash Collateral**

45.      Pursuant to the DIP Financing Motion, the Debtors request approval of and

authority to enter into the DIP Facility—a first-priority secured postpetition multiple-draw term

loan facility of up to $4 million with their prepetition secured lender, NEBF—and to use cash

collateral to fund their operations through the completion of the auction and sale process.  The

proposed DIP Facility and consensual use of cash collateral represents a flexible, interim solution

16

to the Debtors' near-term liquidity needs.  It preserves the status quo and provides the Debtors with more than sufficient liquidity to fund their business and the to pursue and consummate a successful asset sale.  It was negotiated in good faith and at arms' length.

46.    The Debtors believe that the DIP Facility is the Debtors' best postpetition financing option available.   The Debtors do not believe that any other lender would provide financing to the Debtors at this stage, and would be unable to demonstrate that a priming DIP loan made by a third party would satisfy the showings necessary under section 364 with respect to the Credit Facility.  The DIP Facility is a limited loan for a short duration (approximately eight (8) weeks), intended to provide the Debtors with the minimal cash needed to proceed with the auction and sale process.  The lender under the DIP Facility, NEBF, because it is also the prepetition secured lender, has a unique interest in allowing the Debtors to operate through this process.  It is also unlikely that any other lender would agree, as NEBF has, to accept repayment of the DIP Facility (and the Credit Facility) in the form of the stock consideration being offered by the Stalking Horse Bidder.  Finally, NEBF has made clear that it will not agree to be primed by any third-party lender, and the Debtors do not have the cash resources to sustain a "priming litigation" in court.

47.    The Debtors' ability to access and use cash is essential to ensuring continued operations during these chapter 11 cases.  Absent access to the DIP Facility and the use of cash collateral, the Debtors will not have adequate unencumbered cash on hand to pay critical expenses.  Ensuring the Debtors have sufficient working capital will allow the Debtors to preserve and maintain the going concern value of the business, thus enhancing the prospects for a successful sale process.  Accordingly, the relief requested in the DIP Financing Motion is

intended to prevent any disruption or damage to the Debtors and their estates, while providing

adequate protection and security to NEBF in its capacities as prepetition and postpetition lender.

### Information Required by Local Bankruptcy Rule 1007-2

48.     In accordance with Local Bankruptcy Rule 1007-2, the schedules submitted

herewith provide certain information related to the Debtors:

49.     Pursuant to Local Bankruptcy Rule 1007-2(a)(3), **Schedule 1** hereto lists the

names and addresses of the members of, and attorneys for, any committee organized prior to the

Petition Date and a brief description of the circumstances surrounding the formation of the

committee and the date of its formation.

50.     Pursuant to Local Bankruptcy Rule 1007-2(a)(4), **Schedule 2** hereto lists the

holders of the Debtors' 30 largest unsecured claims on a consolidated basis, excluding claims of

insiders.

51.     Pursuant to Local Bankruptcy Rule 1007-2(a)(5), **Schedule 3** hereto lists the

holders of the largest secured claims against the Debtors on a consolidated basis.

52.     Pursuant to Local Bankruptcy Rule 1007-2(a)(6), **Schedule 4** hereto provides a

summary of the (unaudited) consolidated assets and liabilities for the Debtors.

53.     Pursuant to Local Bankruptcy Rule 1007-2(a)(7), **Schedule 5** hereto provides the

following information: the number and classes of shares of stock, debentures, and other

securities of the Debtors that are publicly held and the number of record holders thereof; and the

number and classes of shares of stock, debentures, and other securities of the Debtors that are

held by the Debtors' directors and officers, and the amounts so held.

54.     Pursuant to Local Bankruptcy Rule 1007-2(a)(8), **Schedule 6** hereto provides a

list of all of the Debtors' property in the possession or custody of any custodian, public officer,

mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the

name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

55.     Pursuant to Local Bankruptcy Rule 1007-2(a)(9), **Schedule 7** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

56.     Pursuant to Local Bankruptcy Rule 1007-2(a)(10), **Schedule 8** hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

57.     Pursuant to Local Bankruptcy Rule 1007-2(a)(11), **Schedule 9** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.[10]

58.     Pursuant to Local Bankruptcy Rule 1007-2(a)(12), **Schedule 10** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

59.     Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), **Schedule 11** hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants

---

[10] Collective received a grand jury subpoena for documents from the U.S. Attorney's Office in the Southern District of New York and has cooperated and produced responsive documents.  Collective believes the investigation relates to a report issued by the Association of National Advertisers in 2016 concerning media-buying practices in the advertising industry.

retained by the Debtors for the 30-day period following the filing of these chapter 11 cases as the Debtors intend to continue to operate their business.

60.     Pursuant to Local Bankruptcy Rule 1007-2(b)(3), **<u>Schedule 12</u>** hereto provides, for the 30-day period following the filing of these chapter 11 cases, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

*[Remainder of page intentionally left blank.]*

## **Conclusion**

61. This Declaration illustrates the factors that have precipitated the commencement

of these chapter 11 cases and the critical need for the Debtors to obtain the relief sought in the

First Day Motions and the Sale Motion.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable

inquiry, the foregoing is true and correct.

Dated:  November 19, 2018
      New York, New York

/s/ Kerry Bianchi
Kerry Bianchi
President and Chief Executive Officer
Collective, Inc.

WILMER CUTLER PICKERING
  HALE AND DORR LLP
Andrew N. Goldman
Nancy L. Manzer
Benjamin W. Loveland (*pro hac vice* pending)
Christopher D. Hampson (*pro hac vice* pending)
7 World Trade Center
250 Greenwich Street
New York, New York  10007
Telephone:     (212) 230-8800
Facsimile:     (212) 230-8888

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| COLLECTIVE, INC., *et al.*, | Case No. 18-_____ (____) |
| Debtors.[1] | (Joint Administration Requested) |

**SCHEDULES TO DECLARATION OF KERRY BIANCHI**
**PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Collective, Inc. (2024) and CME Co-Op, LLC (N/A). The location of the Debtors' corporate headquarters and the Debtors' service address is: 72 Madison Ave, 3rd Floor, New York, NY 10016.

## **Schedule 1**

**Committees**

Pursuant to Local Bankruptcy Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, no committee has been organized prior to the Commencement Date.

**Schedule 2**

**Consolidated List of 30 Largest Unsecured Claims (Excluding Insiders)[2]**

| No. | Creditor | Complete mailing address, telephone number, e-mail address, and name of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim | Amount of claim | Contingent, Unliquidated, Disputed, or Partially Secured |
|---|---|---|---|---|---|
| 1 | JENJO LLC | 5 GREAT JONES STREET #2 NEW YORK, NY 10012<br><br>Telephone: (617) 270-8555 E-mail: info@jenjo.com Contact: Legal/General Counsel | Trade Debt/Litigation | $2,091,908 | Contingent, Unliquidated, and Disputed |
| 2 | BRANDED ENTERTAINMENT NETWORK | 15250 VENTURA BLVD., STE. 300 SHERMAN OAKS, CA 91403<br><br>Telephone: (310) 342-1500 Contact: Ricky Ray Butler, CEO | Trade Debt | $322,817 | Disputed |
| 3 | 99 PARK AVENUE ASSOCIATES, L.P. | 410 PARK AVENUE, 20TH FLOOR NEW YORK, NY 10022<br><br>Telephone: (212) 661-3495 Contact: Accounts Receivable | Rent | $127,557 | |

---

[2]    The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

| No. | Creditor | Complete mailing address, telephone number, e-mail address, and name of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim | Amount of claim | Contingent, Unliquidated, Disputed, or Partially Secured |
|---|---|---|---|---|---|
| 4 | ZETAXCHANGE | 185 MADISON AVE., 5 FL<br>NEW YORK, NY 10016<br><br>Telephone: 212-660-2500<br>E-mail: info@zetaglobal.com<br>Contact: David A. Steinberg, CEO | Trade Debt | $115,822 | |
| 5 | APPNEXUS INC. | DEPT CH 19467<br>PALATINE, IL 60055-9467<br><br>Telephone: (646) 604-2406<br>Contact: Michael Rubenstein, President | Trade Debt | $102,217 | |
| 6 | ORION WORLDWIDE, LLC | 622 THIRD AVENUE<br>NEW YORK, NY 10017<br><br>Telephone: (212) 551-4017<br>E-mail: jason.chung@orionworldwide.com<br>Contact: Jason Chung, Sr. Financial Analyst | Trade Debt | $93,626 | |
| 7 | MIGHTYHIVE INC. | 394 PACIFIC AVE., FL. 5<br>SAN FRANCISCO, CA 94111<br><br>Telephone: (888) 727-9742<br>E-mail: questions@mightyhive.com<br>Contact: Peter Kim, CEO | Trade Debt | $78,492 | |
| 8 | DELOITTE & TOUCHE LLP | PO BOX 844708<br>DALLAS, TX 75284-4708<br><br>Telephone: (214) 840-7000<br>Contact: Accounts Receivable | Trade Debt | $75,000 | |

| No. | Creditor | Complete mailing address, telephone number, e-mail address, and name of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim | Amount of claim | Contingent, Unliquidated, Disputed, or Partially Secured |
|---|---|---|---|---|---|
| 9 | CLOUDERA, INC. | 395 PAGE MILL ROAD<br>PALO ALTO, CA 94306<br><br>Telephone: (650) 362-0488<br>E-mail: john.endo@cloudera.com<br>Contact: John Endo, Sr. AR Accountant | Trade Debt | $70,000 | |
| 10 | MOAT INC | 222 S ALBANY ST #2<br>ITHACA, NY 14850<br><br>Telephone: (910) 454-0780<br>Contact: Jonah Goodhard, CEO | Trade Debt | $56,375 | |
| 11 | INTERNAP NETWORK SERVICES | DEPT 0526<br>P.O. BOX 120526<br>DALLAS, TX 75312-0526<br><br>Telephone: (404) 681-7640<br>E-mail: billing@inap.com<br>Contact: Peter D. Aquino, CEO | Trade Debt | $30,441 | |
| 12 | DOUBLE VERIFY, INC | 575 8TH AVENUE, 8TH FLOOR<br>NEW YORK, NY 10018<br><br>Telephone: (212) 631-2150<br>E-mail: info@doubleverify.com<br>Contact: Wayne Gattinella, President & CEO | Trade Debt | $28,652 | Disputed |

| No. | Creditor | Complete mailing address, telephone number, e-mail address, and name of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim | Amount of claim | Contingent, Unliquidated, Disputed, or Partially Secured |
|---|---|---|---|---|---|
| 13 | GRAPESHOT LTD | 9 DUKES COURT<br>54-62 NEWMARKET ROAD<br>CAMBRIDGE, CB5 8DZ<br>UNITED KINGDOM<br><br>Telephone: (440) 122-3790  Ext. 6600<br>E-mail: thedatahotline@oracle.com<br>Contact: Kurt Kratchman, COO | Trade Debt | $28,011 | |
| 14 | PROHASKA CONSULTING LLC | 99 MADISON AVENUE, 5TH FLOOR<br>NEW YORK, NY 10016<br><br>Telephone: (917) 597-6568<br>E-mail: matt@prohaskaconsulting.com<br>Contact: Matt Prohaska, Principal & CEO | Trade Debt | $25,400 | |
| 15 | BEESWAX.IO CORPORATION | 572 GRAND STREET #G1301<br>NEW YORK, NY 10002<br><br>Telephone: (917) 576-1488<br>E-mail: ramr@beeswax.io<br>Contact: Accounts Receivable | Trade Debt | $24,786 | |
| 16 | TARLOW & CO. CPA'S | 7 PENN PLAZA, STE 210<br>NEW YORK, NY 10001<br><br>Telephone: (212) 697-8540<br>E-mail: info@tarlow.com<br>Contact: Alexander Charitos, Accounting Dir. | Trade Debt | $23,242 | |

| No. | Creditor | Complete mailing address, telephone number, e-mail address, and name of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim | Amount of claim | Contingent, Unliquidated, Disputed, or Partially Secured |
|---|---|---|---|---|---|
| 17 | SILLS CUMMIS & GROSS P.C. | ONE RIVERFRONT PLAZA<br>NEWARK, NJ 07102<br><br>Telephone: (973) 643-7000<br>E-mail: sillsmail@sillscummis.com<br>Contact: Accounts Receivable | Trade Debt | $21,696 | |
| 18 | ZAPP360 | 135 MADISON, 8TH FLOOR<br>NEW YORK, NY 10016<br><br>Telephone: (646) 657-9060<br>E-mail: first@zapp360.com<br>Contact: Rosie O'Meara, CEO | Trade Debt | $19,050 | |
| 19 | DSTILLERY INC | 470 PARK AVE S.<br>NEW YORK, NY 10016<br><br>Telephone: (646) 278-4929<br>E-mail: contact@distillery.com<br>Contact: Michael Beebe, CEO | Trade Debt | $18,745 | |
| 20 | REIGER CONSULTING | 225 WEST WAYNE AVE.<br>WAYNE, PA 19087<br><br>Telephone: (214) 676-9804<br>E-mail: services@reigerconsulting.com<br>Contact: Accounts Receivable | Trade Debt | $18,600 | |
| 21 | COMERICA CREDIT CARD | DEPARTMENT #166901<br>PO BOX 55000<br>DETROIT, MI 48255<br><br>Telephone: (214) 462-4000<br>Contact: Accounts Receivable | Trade Debt | $16,295 | |

| No. | Creditor | Complete mailing address, telephone number, e-mail address, and name of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim | Amount of claim | Contingent, Unliquidated, Disputed, or Partially Secured |
|---|---|---|---|---|---|
| 22 | GARTNER INC | P.O. BOX 911319<br>DALLAS, TX 75391-1319<br><br>Telephone: (203) 964-0096<br>E-mail: inquiry@gartner.com<br>Contact: Eugene A. Hall, CEO | Trade Debt | $15,896 | |
| 23 | CLARITY | 110 GREENE STREET, SUITE 303<br>NEW YORK, NY 10012<br><br>Telephone: (646) 934-6924<br>Contact: Accounts Receivable | Trade Debt | $15,088 | |
| 24 | NSONE INC | 225 BROADWAY, SUITE 2901<br>NEW YORK, NY 10007<br><br>Telephone: (347) 560-8666<br>E-mail: nj@ns1.com<br>Contact: Kris Beevers, CEO | Trade Debt | $14,000 | |
| 25 | LINKEDIN CORPORATION | 62228 COLLECTIONS CENTER DRIVE<br>CHICAGO, IL 60693-0622<br><br>Contact: Accounts Receivable | Trade Debt | $11,862 | |
| 26 | RAMDASS KESHAVAMURTHY | 3688 13TH D MAIN 9TH CROSS<br>HAL II STAGE<br>BANGALORE, INDIA<br><br>Contact: Accounts Receivable | Trade Debt | $10,620 | |

| No. | Creditor | Complete mailing address, telephone number, e-mail address, and name of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim | Amount of claim | Contingent, Unliquidated, Disputed, or Partially Secured |
|---|---|---|---|---|---|
| 27 | FRAGOMEN, DEL REY, BERNSEN & LOEWY, LLP | 75 REMITTANCE DRIVE, SUITE 6072 CHICAGO, IL 60675-6072<br><br>Telephone: (602) 266-1825<br>E-mail: phoenixinfo@fragomen.com<br>Contact: Accounts Receivable | Trade Debt | $10,554 | |
| 28 | HEWLETT PACKARD ENTERPRISE COMPANY | PO BOX 101032 ATLANTA GA 30932<br><br>Telephone: (650) 687-5817<br>Contact: Accounts Receivable | Trade Debt | $10,500 | |
| 29 | NEUSTAR INC. | P.O. BOX 742000 ATLANTA, GA 30374<br><br>Telephone: (571) 434-5400<br>E-mail: billingsupport@team.newstar<br>Contact: Kevin Hughes, SVP & General Counsel | Trade Debt | $10,500 | |
| 30 | AD-JUSTER, INC. | 13280 EVENING CREEK DR. S, SUITE 100 ATTN: ACCOUNTS RECEIVABLE SAN DIEGO, CA 92128<br><br>Telephone: (858) 842-1386<br>Contact: Dennis Clarke, CEO | Trade Debt | $9,600 | |

**Schedule 3**

**Consolidated List of Holders of Five Largest Secured Claims**

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), to the best of the Debtors' knowledge, belief, and understanding, the following chart lists the creditors holding, as of the Commencement Date, the five largest secured claims against the Debtors, on a consolidated basis, excluding claims of insiders (as defined in 11 U.S.C. § 101).

| No. | Creditor | Contact, Mailing Address, Telephone Number/Fax Number, Email | Amount of Claim | Collateral Description and Value |
|---|---|---|---|---|
| 1. | RCP Advisors 2, LLC | 5425 Wisconsin Avenue, Suite 700 Chevy Chase, MD 20815 | $17,285,686.79 | Description: All assets of the Debtors<br><br>Collateral Value: Uncertain |
| 2. | Data Sales Co., Inc. | 3450 West Burnsville Parkway Burnsville, MN 55337<br><br>Telephone: (952) 890-8838 Contact: Paul C. Breckner, CEO and President | contingent | Description: Equipment leases<br><br>Collateral Value: Uncertain |
| 3. | Comerica Bank | 333 W. Santa Clara St. 12th Floor San Jose, CA 95113 M/C 4811<br><br>Telephone: (408) 962-5000 Contact: Alejandro Lee, Manager | contingent | Description: cash collateral for a letter of credit given to 99 Park Avenue Associates, L.P.<br><br>Collateral Value: $699,000 |

## Schedule 4

## Condensed Consolidated Balance Sheet (Unaudited) as of September 30, 2018

**COLLECTIVE, INC.** ☐

**CONSOLIDATED BALANCE SHEET**

**(In thousands, except share and per share data)**

|  | September 30, 2018 |
|---|---|
| **ASSETS** | |
| CURRENT ASSETS: | |
| CASH AND CASH EQUIVALENTS | $ 3,213 |
| ACCOUNTS RECEIVABLE — NET OF ALLOWANCE OF $43,713 | 1,232 |
| PREPAID EXPENSES AND OTHER CURRENT ASSETS | 1,274 |
| DEFERRED TAX ASSET — CURRENT, NET | 10,579 |
| TOTAL CURRENT ASSETS | 16,299 |
| RESTRICTED CASH | 787 |
| DEFERRED TAX ASSET — NON-CURRENT, NET | 95 |
| PROPERTY AND EQUIPMENT — NET | 286 |
| INTANGIBLE ASSETS — NET | |
| CAPITALIZED SOFTWARE — NET | 2,253 |
| GOODWILL | 11,285 |
| OTHER NON-CURRENT ASSETS | 8,927 |
| TOTAL ASSETS | $ 39,933 |
| **LIABILITIES, CONVERTIBLE PREFERRED STOCK AND STOCKHOLDERS' EQUITY** | |
| CURRENT LIABILITIES: | |
| ACCOUNTS PAYABLE | $ 3,121 |
| ACCRUED AND OTHER CURRENT LIABILITIES | 4,522 |
| DEFERRED REVENUE | 1,083 |
| CAPITAL LEASE OBLIGATION — CURRENT | (0) |
| CURRENT PORTION OF LONG-TERM DEBT | (0) |
| CONVERTIBLE NOTE | — |
| TOTAL CURRENT LIABILITIES | 8,727 |
| DEFERRED TAX LIABILITIES — NON-CURRENT | (38) |
| CAPITAL LEASE OBLIGATION — NON-CURRENT | |
| LONG-TERM DEBT — NET OF CURRENT PORTION | 12,942 |
| OTHER LONG-TERM LIABILITIES | 1,330 |
| NON-CURRENT LIABILITIES FROM DISCONTINUED OPERATIONS | |
| TOTAL LIABILITIES | $ 22,960 |
| COMMITMENTS AND CONTINGENCIES | |
| CONVERTIBLE PREFERRED STOCK: | |
| SERIES A, PAR VALUE $0.001 PER SHARE — AUTHORIZED, 4,117,870 SHARES; | 2,495 |
| SERIES B, PAR VALUE $0.001 PER SHARE — AUTHORIZED, 5,281,085 SHARES; | 2,881 |
| SERIES C, PAR VALUE $0.001 PER SHARE — AUTHORIZED, 1,674,529 SHARES; | 145 |
| SERIES D, PAR VALUE $0.001 PER SHARE — AUTHORIZED,          SHARES; | 22 |
| TOTAL CONVERTIBLE PREFERRED STOCK | 5,398 |
| STOCKHOLDERS' EQUITY: | |
| COMMON STOCK, PAR VALUE $0.001 PER SHARE — AUTHORIZED, 32,000,000 SHARES; | 18 |
| ADDITIONAL PAID-IN CAPITAL | 71,871 |
| COMMON STOCK WARRANTS | 2,355 |
| NOTE RECEIVABLE FROM STOCKHOLDER | — |
| RETAINED EARNINGS | (62,310) |
| ACCUMULATED OTHER COMPREHENSIVE INCOME/(LOSS) | (360) |
| TOTAL STOCKHOLDERS' EQUITY | 11,574 |
| TOTAL LIABILITIES, CONVERTIBLE PREFERRED STOCK AND STOCKHOLDERS' EQUITY | $ 39,933 |

\* Subject to change.  Includes certain items that remain under review and may be accounted for differently in future reports

## **Schedule 5**

### **Publicly Held Securities**

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), the Debtors do not have any publicly traded shares of stock, debentures, or other securities.

**Schedule 6**

**Debtors' Property Not In the Debtors' Possession**

Local Bankruptcy Rule 1007-2(a)(8) requires the Debtors to list property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

Such property includes without limitation the following:

| Name | Complete mailing address, telephone number, e-mail address, and name of contact | Description of Property | Court for any related proceeding |
|---|---|---|---|
| Comerica Bank | 333 W. Santa Clara St. 12th Floor San Jose, CA 95113, M/C 4811<br><br>Telephone: (408) 962-5000 Contact: Alejandro Lee, Manager | Cash collateral for letter of credit to secure lease ($699,000) | N/A |
| Comerica Bank | 333 W. Santa Clara St. 12th Floor San Jose, CA 95113, M/C 4811<br><br>Telephone: (408) 962-5000 Contact: Alejandro Lee, Manager | Security deposit for credit card ($100,000) | N/A |
| Comerica Bank | 333 W. Santa Clara St. 12th Floor San Jose, CA 95113, M/C 4811<br><br>Telephone: (408) 962-5000 Contact: Alejandro Lee, Manager | Operating Account | N/A |
| Zeta Global Holdings Corp. | 185 Madison Ave, 5th Floor New York, NY 10016<br><br>Telephone: (212) 660-2500 E-mail: Svine@zetaglobal.com Contact: Steven Vine, SVP and General Counsel | Holdback from Compass asset sale ($3.4mm) | N/A |

| American Association of Advertising Agencies | 1065 Avenue of the Americas 16th Floor New York, NY 10018<br><br>Telephone: (212) 682-2500 Contact: Marla Kaplowitz, President and CEO | Scholarship Fund ($109,500) | N/A |
|---|---|---|---|

## Schedule 7

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the property or premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.  The Debtors do not own any of the property or premises from which they operate their businesses.

### Leased Property[3]

| Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| **Collective, Inc.** | 72 Madison Ave, 3rd Floor | New York | NY | 10016 | USA |

---

[3]        The classification of the contractual agreements listed herein as real property leases or property held by other arrangements is not binding upon the Debtors.

## Schedule 8

### Location of Debtors' Assets, Books, and Records

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

As of September 30, 2018, the Debtors had assets of approximately $39,933,000, as provided in Schedule 4, with substantial assets located in the states of New York and New Jersey.

### Books and Records

The Debtors' books and records are located at 72 Madison Ave., Third Floor, New York, New York.

### Debtors' Assets Outside the United States

Collective, Inc. and CME Co-Op, LLC together own Collective Europe Holding Coöperatief, U.A., a cooperative organized under the laws of the Netherlands. Indirectly through that entity (and also directly, in the case of Collective, Inc.) the Debtors also own Collective (India) Pvt. Ltd., a limited company organized under the laws of India. Collective (India) Pvt. Ltd. acts as a service center for the Debtors and owns some computer equipment. For more information, please see the organizational chart attached to the Debtors' corporate ownership statement, filed with their voluntary petitions.

## **Schedule 9**

### **Litigation**

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), to the best of the Debtors' knowledge, belief, and understanding, there are no actions or proceedings pending or threatened against the Debtors or their property, as of the Commencement Date, where a judgment against the Debtors or a seizure of their property may be imminent.

## Schedule 10

### Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name & Position | Responsibilities & Experience |
|---|---|
| Joe Apprendi<br><br>*Founder & Executive Chairman* | Joe Apprendi founded Collective in 2007. As Executive Chairman, Joe is responsible for casting high-level vision and setting the strategic direction of the company. Joe is a recognized marketing thought leader with more than two decades' experience as an entrepreneur and investor in digital marketing technology. Before founding Collective, Joe served as CEO of North America at Falk eSolutions and as Executive Vice President of Eyeblaster (now Sizmek), where he was responsible for sales and marketing worldwide for its rich media ad management platform. Joe is a graduate of Oberlin College, where he received his BA in Economics. |
| Kerry Bianchi<br><br>*President & CEO* | Kerry Bianchi joined Collective in 2015 and held the roles of both Chief Operating Officer and President. In 2017, she assumed the role of Chief Executive Officer. As President and CEO, Kerry is responsible for driving strategic direction and business execution across the entire organization. She has over 25 years of experience in media, advertising and consulting. Prior to Collective, Kerry worked at E*Trade Financial overseeing the company's paid media, agencies, martech and analytics partners. She received her BA from Claremont McKenna College. |
| Michelle Nathan<br><br>*Chief Financial Officer* | Michelle Nathan joined Collective as Senior Vice President of Operations in 2010. After departing in 2014, she rejoined Collective in January 2017 as Chief Financial Officer. As CFO, Michelle oversees the financial, legal, and facilities departments at Collective. As a 20+ year veteran of the finance and media worlds, Michelle has served as Director of Finance at Blue Cross/Blue Shield; Vice President of Business Planning at Cablevision; Corporate Director of the Digital Business at Hachette Filipacchi Media; and Executive Director at The NPD Group. Michelle holds an Executive MBA from Hofstra University, a Bachelor of Science in Economics from Rider University, and has completed the CTAM Executive Management Program at Harvard Business School. |
| Jaisimha Muthegere<br><br>*Chief Technology Officer* | Jaisimha Muthegere joined Collective in June 2013. As Chief Technology Officer, Jaisimha oversees the production and delivery of Collective's online platforms. Jaisimha has over 25+ years of engineering leadership experience in directing, building, and delivering quality, scalable market-driven software products. He has served as head of Engineering at Komli Media and Director of Engineering at Yahoo!, where he was responsible for engineering for emerging markets and India-facing products. Jaisimha holds an M.S. in Computer Science from Iowa State University and a Bachelor of Engineering in Computer Science from the University of Mysore. |

**<u>Schedule 11</u>**

**Payroll**

Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-2(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors, and Stockholders)** | $71,000 |
| **Payments to Officers, Stockholders, and Directors** | $24,000 |
| **Payments to Financial and Business Consultants** | $20,000 |

## Schedule 12

**Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $449,000 |
| **Cash Disbursements** | $1,630,000 |
| **Net Cash Flow** | $(1,181,000) |
| **Unpaid Obligations** | $4,253,000 |
| **Uncollected Receivables** | $706,000 |