WILMER CUTLER PICKERING
 HALE AND DORR LLP
Andrew N. Goldman
Nancy L. Manzer
Benjamin W. Loveland (*pro hac vice* pending)
Christopher D. Hampson (*pro hac vice* pending)
7 World Trade Center
250 Greenwich Street
New York, New York  10007
Telephone:    (212) 230-8800
Facsimile:    (212) 230-8888

*Proposed Counsel to the Debtors*
*and Debtors in Possession*


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| COLLECTIVE, INC., *et al.*, | ) Case No. 18-13584 (SHL) |
| | ) |
| Debtors.[1] | ) (Joint Administration Requested) |
| | ) |
| | ) |


**DEBTORS' AMENDED MOTION, PURSUANT TO 11 U.S.C. §§ 105, 363, AND 365 AND FED. R. BANKR. P. 2002, 6004, AND 6006, FOR APPROVAL OF (I) (A) BIDDING PROCEDURES, (B) STALKING HORSE ASSET PURCHASE AGREEMENT AND BID PROTECTIONS, (C) FORM AND MANNER OF NOTICE OF AUCTION, SALE TRANSACTION, AND SALE HEARING, AND (D) ASSUMPTION AND ASSIGNMENT PROCEDURES; AND (II) (A) PURCHASE AGREEMENT, (B) SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, AND (C) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Collective, Inc. (2024) and CME Co-Op, LLC (N/A). The location of the Debtors' corporate headquarters and the Debtors' service address is: 72 Madison Ave, 3rd Floor, New York, NY 10016.

Collective, Inc. ("**Collective**") and CME Co-Op, LLC, as debtors and debtors in

possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), by and through

their undersigned counsel, hereby submit this motion (the "**Motion**") and respectfully state as

follows:

## PRELIMINARY STATEMENT

1.      The Debtors have commenced these chapter 11 cases — with the support and

financial backing of their prepetition secured creditor — to pursue an auction process and going

concern sale of the Debtors' assets.  To that end, the Debtors have entered into a stalking horse

asset purchase agreement (the "**Stalking Horse APA**")[2] with Zeta Global Holdings Corp.

("**Zeta**" or the "**Stalking Horse Bidder**") for the sale of substantially all of the Debtors' assets.

Zeta's offer consists of (a) 1,150,307 shares of Series F-2 Preferred Stock of Zeta, with a deemed

aggregate value of $15,000,000, (b) payment in cash of cure costs with respect to executory

contracts and unexpired leases to be assumed by the Stalking Horse Bidder, and (c) the

assumption of certain liabilities.  The Stalking Horse APA is attached hereto as **Exhibit B**, and it

is subject to higher or otherwise better offers as described herein.

2.      As set forth in more detail below and in the *Declaration of Kerry Bianchi*

*Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York*

(the "**Bianchi Declaration**"), filed contemporaneously herewith, the Debtors conducted an

extensive prepetition marketing process over the past 12 months.  Those efforts resulted in the

Debtors' entry into the Stalking Horse APA.

---

[2] Capitalized terms used but not defined herein shall have the meanings given to them in the Stalking Horse APA or
the Bidding Procedures Order, as applicable.

3.      The Debtors' prepetition secured lender, which holds a properly perfected "all asset" lien on substantially all of the Debtors' assets, has agreed to fund these chapter 11 cases through a postpetition debtor-in-possession financing facility (the "**DIP Facility**") to allow the Debtors to pursue the Stalking Horse Bid of its collateral, subject to higher or better offers. Given the Debtors' declining cash position, the immediate sale of the Debtors' assets as a going concern is the best possible way to maximize the value of the Debtors' assets for the benefit of all stakeholders.

4.      To that end, the Debtors have developed bidding and auction procedures for the sale of substantially all of their assets (the "**Bidding Procedures**").  Pursuant to the Bidding Procedures, prospective bidders may submit bids for the purchase and sale of substantially all of the Debtors' assets (the "**Purchased Assets**").  The Bidding Procedures are intended to preserve the business as a going concern and generate the greatest level of interest in purchasing the assets resulting in the highest or otherwise best offer for the Purchased Assets.  The Bidding Procedures also afford bidders the opportunity to bid for assets that are not included in the Stalking Horse Bid, including certain assets related to Collective's legacy managed services business, certain contracts, and equity in the Debtors' foreign subsidiaries (the "**Other Assets**").[3]

5.      By this Motion, the Debtors seek, among other things, an order approving the Bidding Procedures (the "**Bidding Procedures Order**") and a separate order (the "**Sale Order**") approving the sale of the Purchased Assets to the Stalking Horse Bidder or the bidder who submits the highest or otherwise best offer for the Purchased Assets (the "**Sale Transaction**").

---

[3]      It is possible that a competing bidder may wish to submit a bid for the Other Assets, whether in combination with or separate from a bid for all or substantially all of the Purchased Assets (any such bid, an "**Other Assets Bid**").  In this Motion, as applied to any Other Assets Bid, references to the Purchased Assets shall be interpreted to include the assets applicable to such bid.

## JURISDICTION AND VENUE

6.      The United States Bankruptcy Court for the Southern District of New York (the

"**Court**") has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the

*Amended Standing Order of Reference* from the United States District Court for the Southern

District of New York dated January 31, 2012.  This matter is a core proceeding within the

meaning of 28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III

of the United States Constitution.

7.      The statutory predicates for the relief sought herein are sections 105, 363, and 365

of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the

"**Bankruptcy Code**") and rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**").

8.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## GENERAL BACKGROUND

9.      On the date hereof (the "**Petition Date**"), the Debtors commenced voluntary cases

under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The Debtors continue to

operate their business and manage their properties as debtors-in-possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.

10.     No trustee, examiner, or statutory committee of creditors has been appointed in

these Chapter 11 Cases.

11.     Additional information regarding the Debtors' business operations, corporate and

capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases

is set forth in the Bianchi Declaration, which is incorporated herein by reference.

4

## RELIEF REQUESTED

12.    By this Motion, pursuant to sections 105, 363, and 365 of the Bankruptcy Code,

the Debtors seek entry of:

    a.    the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**:

        i.    authorizing and approving the Bidding Procedures, substantially in the form attached as **Exhibit 1** to the Bidding Procedures Order;

        ii.    authorizing and approving certain bidding protections in favor of the Stalking Horse Bidder, including a breakup fee and an expense reimbursement on the terms set forth in the Stalking Horse APA;

        iii.    scheduling the auction for the Purchased Assets (the "**Auction**") to be held on January 8, 2019, if necessary;

        iv.    scheduling a hearing with respect to the approval of the sale of the Purchased Assets (the "**Sale Hearing**") for January 10, 2019, or, if the Stalking Horse Bid is the only Qualified Bid received, promptly after the passage of the Bid Deadline (defined below) and all applicable objection deadlines (subject in each case to the Court's availability);

        v.    authorizing and approving the procedures included in paragraphs 17-27 of the Bidding Procedures Order (the "**Assumption and Assignment Procedures**") for the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases and the determination of cure costs;

        vi.    approving various deadlines in connection with the foregoing; and

        vii.    authorizing and approving (i) notice of the Auction and Sale Hearing in the form attached as **Exhibit 2** to the Bidding Procedures Order (the "**Sale Notice**") and (ii) notice of the proposed cure amounts and the assumption and assignment of certain contracts of the Debtors in the form attached as **Exhibit 3** to the Bidding Procedures Order (the "**Notice of Assumption and Assignment**"); and

    b.    the Sale Order, which shall be filed with the Court at least seven (7) days before the Sale Hearing and shall be in form and substance reasonably acceptable to the Debtors and the Stalking Horse Bidder, authorizing and approving:

        i.    the sale of the Purchased Assets free and clear of liens, claims, and interests;

> ii.  the assumption and assignment of certain executory contracts and unexpired leases of the Debtors in connection therewith; and
>
> iii. granting related relief.

## PREPETITION MARKETING PROCESS

13.     Prior to the Petition Date, the Debtors, with the assistance of their investment banker, Oaklins DeSilva & Phillips LLC, engaged in an extensive marketing process for a going concern sale of substantially all of their assets.  Approximately 70 potential acquirers were contacted; 15 executed non-disclosure agreements as part of the diligence process and received a Confidential Information Memorandum; and three submitted non-binding indications of interest for the Debtors' assets.  Unfortunately, none of those indications of interest were at a price that would pay off the secured creditor's claims in full or provide a meaningful benefit to the Debtors' estates.  Accordingly, the Debtors began preparations to file these Chapter 11 Cases, initially planning to conduct a "naked" auction, in the belief that a sale process through chapter 11, with the benefit of Bankruptcy Code section 363's "free and clear" provisions, would offer the opportunity to attract concrete and meaningful bids from parties not otherwise previously interested in pursuing an acquisition "outside of bankruptcy" that would inure to the benefit of the Debtors' stakeholders.

14.     On October 30, 2018, Zeta submitted a formal letter of intent for the purchase of substantially all of the Debtors' assets.  Following significant negotiations with Zeta, and in the absence of any competing bids, Collective agreed to enter into the Stalking Horse APA and determined that the bid reflected therein (the "**Stalking Horse Bid**") was the highest and best offer it received.  The Stalking Horse Bid contemplates an acquisition through a sale under section 363 of the Bankruptcy Code in a chapter 11 case.

6

15.     Considering these facts and the events that have occurred to date, the Debtors have concluded in the exercise of their business judgment and as fiduciary for all of their stakeholders that the relief requested in this Motion is the best path to maximize the value of the Debtors' assets.

## NEED FOR TIMELY SALE PROCESS

16.     The Debtors believe that the auction process and the time periods set forth in the Bidding Procedures are reasonable under the circumstances and will provide parties with sufficient time and information to submit a bid for the Purchased Assets.  The process set forth in the Bidding Procedures balances the need to provide adequate and appropriate notice to parties in interest and potential purchasers with the need to quickly and efficiently sell the Debtors' assets while they have realizable value and can be maintained as a going concern given the Debtors' current cash position.

17.     Completion of the sale process in an expedited manner will maximize the value of the Purchased Assets.  The time periods set forth in the Bidding Procedures have been negotiated at arms' length with the Stalking Horse Bidder and the Debtors' secured lender and DIP Facility lender.  Failure to adhere to the proposed time periods set forth in the Bidding Procedures could jeopardize the closing of a Sale Transaction, which the Debtors believe is the best means of maximizing the value of their assets and maintaining the business as a going concern.  Thus, the Debtors have determined that pursuing a Sale Transaction in the manner and with the procedures proposed is in the best interests of the Debtors' estates and provides interested parties with sufficient opportunity to participate.

18.     The Debtors believe that if they cannot achieve a sale of their assets within the time periods prescribed by, and as contemplated in, the Bidding Procedures, they will face the prospect of a piecemeal liquidation or foreclosure on their assets by their secured creditor.

## PROPOSED SALE TRANSACTION[4]

19.     The Stalking Horse APA represents a binding bid for substantially all of the Debtors' assets.  The total value consideration to be received by the Debtors, which consists of stock of Zeta, is estimated at $15 million based in part on the value that the Debtors believe NEBF would attribute to the equity in light of the previous recent transaction between Zeta and Collective where equity was the consideration, and in which NEBF agreed to reduce Collective's debt in exchange for the equity at a deemed share value of $13.04 per share.  In the absence of any material changes in Zeta's share value, which Collective is not aware of, Collective believes the same deemed value of $13.04 per share can be ascribed to the consideration offered under the Stalking Horse APA. The consideration also includes the assumption of certain liabilities.

20.     The assets proposed to be purchased include, among other things, certain executory contracts and unexpired leases (the "**Assumed Contracts**")[5] and certain equipment, deposits, rights to payment, intellectual property, books and records, and permits.  The Stalking Horse Bidder will also take, by assumption and assignment, certain Assumed Contracts (for which it will pay all cure costs (the "**Cure Costs**")). The Bidding Procedures provide for standard bid protections, such as an initial overbid amount and subsequent bidding increments. The Stalking Horse APA includes a breakup fee in the amount of $450,000 (the "**Breakup Fee**")

---

[4]     In the event of any inconsistency between the provisions of the Stalking Horse APA and the general description of such agreement in this Motion, the Stalking Horse APA shall control.
[5]     The Other Assets also include certain executory contracts and unexpired leases.  The term "Assumed Contracts" should be interpreted to refer to any such executory contracts and unexpired leases proposed to be assumed and assigned as part of any Other Assets Bid.

and a provision for the payment of expense reimbursement up to a cap of $250,000 (the

"**Expense Reimbursement**," together with the Breakup Fee, the "**Bid Protections**") in the event

that the Court enters an order approving an offer to purchase any Purchased Assets submitted by

a party other than the Stalking Horse Bidder.  The Bid Protections shall be paid from the

proceeds of any sale actually paid in cash by a successful bidder other than the Stalking Horse

Bidder, and then only paid at closing of such sale.[6]

21.     The Stalking Horse APA includes various customary 363 sale representations,

warranties, and covenants by and from the Debtors and the Stalking Horse Bidder, as well as

certain conditions to closing and rights of termination.  In particular, the Stalking Horse APA

contains certain covenants pursuant to which the Stalking Horse Bidder has agreed to offer

employment to certain of the Debtors' employees.

22.     The Stalking Horse APA also includes covenants, conditions, and termination

rights related to events in these Chapter 11 Cases.  The transactions contemplated by the Stalking

Horse APA are subject to approval by the Court and entry of the Bidding Procedures Order and

the Sale Order.

23.     Certain of the material terms of the Stalking Horse APA are described in greater

detail below:

    a.    Purchased Assets.  The Stalking Horse Bidder will acquire all of the Debtors' assets, other than the Excluded Assets, for Consideration (as defined in the Stalking Horse APA) estimated at approximately $15 million, plus the assumption of certain liabilities.

    b.    Breakup Fee and Expense Reimbursement.  The Stalking Horse APA includes a Breakup Fee in the amount of $450,000 and an Expense Reimbursement of up to $250,000 in the event that the Court enters an order approving an offer to purchase any Purchased Assets submitted by a party other than the Stalking Horse

---

[6]     For the avoidance of doubt, the Bid Protections do not apply with respect to any Other Assets Bid that does not include any of the Purchased Assets proposed to be acquired by the Stalking Horse Bidder.

Bidder, with such amounts to be paid from the proceeds of any sale actually paid in cash by a successful bidder other than the Stalking Horse Bidder, only after a closing of such sale.

c.    <u>Employees</u>.  The Stalking Horse Bidder has agreed to offer employment to certain of Debtors' employees, on the terms set forth in the Stalking Horse APA.

d.    <u>Bankruptcy Milestones</u>.  The Court must enter the Bidding Procedures Order by November 27, 2018.

e.    <u>Closing</u>.  Closing to occur no later than January 17, 2019.

f.    <u>Records Retention</u>.  The Stalking Horse Bidder will acquire certain books and records of the Debtors and, subject to the terms and conditions of the Stalking Horse APA, will allow reasonable access to such books and records, which shall be maintained for a period of six years following the Closing.

## BIDDING PROCEDURES

### A.    <u>Overview</u>

24.    The Bidding Procedures are designed to maximize value for the Debtors' estates and will enable the Debtors to review, analyze, and compare all bids received to determine which bid is the highest and best.  The Bidding Procedures describe, among other things, procedures for parties to access (or continue to access) due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of the Auction (if any), the selection and approval of the ultimately successful bidder, and the deadlines with respect to the foregoing.  The Debtors submit that the Bidding Procedures afford them the opportunity to pursue a sale process that will maximize the value of their estates.

25.    A description of certain key elements of the Bidding Procedures is set forth below:[7]

---

[7]    As described in the Bidding Procedures, any Other Assets Bid, and any bidder submitting such a bid, must comply with the Bidding Procedures, as applicable to such Other Assets and the consideration being offered in such Other Assets Bid; provided that, recognizing such differences between an Other Assets Bid and a bid for only the Purchased Assets, such Other Assets Bid should otherwise be in substantial conformance with the Bidding Procedures.

a.    Purchase Price; Minimum Bid.  Each Bid submitted must (a) be a Bid for all or a substantial portion of the Purchased Assets, (b) exceed the value of the consideration provided by the Stalking Horse Bid by the Minimum Overbid Amount plus the amount of the Bid Protections, and (c) propose an alternative transaction that provides substantially similar or better terms than the Stalking Horse Bid and can be consummated in the same timeframe as will be the Stalking Horse Bid.

b.    Cancellation of the Auction.  If no Qualified Bid other than the Stalking Horse Bid is received by the Bid Deadline, the Debtors will cancel the Auction and seek approval of a sale to the Stalking Horse Bidder.

c.    Determination and Announcement of Baseline Bids. The Debtors shall make a determination in their reasonable business judgment regarding (i) which bids have been determined to be Qualified Bids and (ii) the highest or best Qualified Bid for the Qualified Assets (the "**Baseline Bid**") to serve as the starting point at the Auction.

The Debtors shall, (i) as promptly as possible after the Bid Deadline, notify all Qualified Bidders that their bids have been deemed Qualified Bids and (ii) no later than the commencement of the Auction, identify the Baseline Bid.

**B.    Key Dates and Deadlines**

26.    The Bidding Procedures establish the following key dates for the sale process:

| January 3, 2019 at 5:00 p.m. (ET) | Deadline to Submit Bids |
|---|---|
| January 3, 2019 at 4:00 p.m. (ET) | Deadline to Object to Sale Transaction / Deadline to Object to Assumption and Assignment of Assumed Contracts to the Stalking Horse Bidder, Including Proposed Cure Costs[8] |
| January 8, 2019 at 10:00 a.m. (ET) | Auction, if necessary |
| January 9, 2019 | Deadline for Debtors to File Notice of Successful Bidder and Back-Up Bidder |
| January [10], 2019 at [  ] a.m. (ET) | Sale Hearing / Deadline to File Adequate Assurance Objections for Successful Bidder other than the Stalking Horse Bidder |

---

[8]    This objection deadline applies to all objections to the sale of the Purchased Assets, with the exception of objections related to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder.

27.     In addition, the Bidding Procedures provide for the following sale notice procedures, sale objection deadline, and Bid Deadline:

a.     <u>Notice of Sale, Auction, and Sale Hearing</u>:  Within one (1) business day after entry of the Bidding Procedures Order, the Debtors cause the Sale Notice to be filed with this Court and served by email, mail, facsimile, or overnight delivery on: (i) all Persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Purchased Assets in whole or in part during the past twelve (12) months; (ii) all entities known by the Debtors to have asserted any lien, claim, encumbrance, or other interest in the Purchased Assets (for whom identifying information and addresses are available to the Debtors); (iii) all non-Debtor parties to the Assumed Contracts (for whom identifying information and addresses are available to the Debtors); (iv) any Governmental Authority (as defined in the Stalking Horse APA) known to have a claim in the Chapter 11 Cases; (v) the United States Attorney for the Southern District of New York; (vi) the Office of the Attorney General in each state in which the Debtors operate; (vii) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (viii) the Debtors' known creditors and equity holders (for whom identifying information and addresses are available to the Debtors); (ix) all other Persons requesting notice under Bankruptcy Rule 2002 or as directed by this Court (for whom identifying information and addresses are available to the Debtors); (x) the Office of the United States Trustee for the Southern District of New York; (xi) the Internal Revenue Service, and (xii) the Official Committee of Unsecured Creditors, if any.

b.     <u>Objection Deadline for Sale Transaction</u>:  The Bidding Procedures Order establishes **January 3, 2019 at 4:00 p.m. (Eastern Time)** as the deadline to file and serve objections to the sale of the Purchased Assets (the "**<u>Sale Objection Deadline</u>**").

c.     <u>Bid Deadline</u>:  The Bidding Procedures establish **January 3, 2019 at 5:00 p.m. (Eastern Time)** as the deadline for the submission of any and all bids (the "**<u>Bid Deadline</u>**").

28.     The Debtors believe that the time periods set forth in the Bidding Procedures are reasonable under the circumstances of these Chapter 11 Cases.  While abbreviated, these time periods will provide parties with sufficient time to formulate bids to purchase the Purchased Assets.  The Debtors' business has been extensively marketed to prospective bidders over the past 12 months, and information regarding the Debtors' business has been made available to many such prospective bidders during the process.  As a result, many parties that may have an

interest in bidding at the Auction likely already have conducted diligence and evaluated the

Debtors' business and will not be starting at square one.  In addition, prospective bidders who

have not previously conducted diligence on the Debtors' business will have immediate access to,

subject to the execution of an appropriate confidentiality agreement, a substantial body of

information regarding the Purchased Assets, including information gathered based upon specific

due diligence requests from the Stalking Horse Bidder and other prospective bidders during the

prepetition marketing process.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

29.     The Assumption and Assignment Procedures will, among other things, govern the

Debtors' provision of notice to non-Debtor parties to Assumed Contracts that such contracts may

be assumed and assigned to the Stalking Horse Bidder (or, if the Auction is held, the Successful

Bidder) and of the Cure Costs the Debtors believe are necessary pursuant to section 365 of the

Bankruptcy Code to assume and assign such Assumed Contracts.

30.     Pursuant to the Assumption and Assignment Procedures, within one business day

after the entry of the Bidding Procedures Order, the Debtors shall file with the Court and serve

by first class mail on each non-Debtor party to the Assumed Contracts the Notice of Assumption

and Assignment. Any objection to proposed Cure Costs set forth on the Notice of Assumption

and Assignment (a "**Cure Objection**") or to the Stalking Horse Bidder's provision of adequate

assurance of future performance (an "**Adequate Assurance Objection**") must be filed with the

Court and served on the Objection Notice Parties by **January 3, 2019 at 4:00 p.m. (Eastern

Time)**.

31.     If the Stalking Horse Bidder is outbid at the close of the Auction, the Debtors will

consummate the Sale Transaction with a party other than the Stalking Horse Bidder.  In such

event, the Debtors will provide additional notice and opportunity to object to the assumption and assignment of the Assumed Contracts.  Specifically, if a Successful Bidder other than the Stalking Horse Bidder prevails at the Auction, then as soon as possible, but not later than one business day, after the conclusion of the Auction, the Debtors shall file with this Court a notice that identifies the Successful Bidder and provides notice that the Debtors will seek to assume and assign the Assumed Contracts to the Successful Bidder, and the deadline to raise an Adequate Assurance Objection shall be extended  so that any such objection may be raised at or before the Sale Hearing; provided that the deadline to object to Cure Costs shall not be extended.

### **EXTRAORDINARY PROVISIONS UNDER LOCAL GUIDELINES**

32.    The Bidding Procedures and the Stalking Horse APA contain the following provisions, which the Guidelines for the Conduct of Asset Sales, adopted by General Order M-331, require to be separately disclosed:

a.    Sale to Insider.  While the Stalking Horse Bidder holds a substantial percentage of Collective's Series D preferred equity, it is not an "insider" of the Debtors as defined in section 101 of the Bankruptcy Code.  Zeta formerly had a director on Collective's board, but not as of the entry into the Stalking Horse APA.

b.    Agreements with Management.  While the Stalking Horse Bidder has agreed to offer employment to certain of the Debtors' employees, it has not discussed or entered into any agreements with management or key employees regarding compensation or future employment.

c.    Deadlines that Effectively Limit Notice. As is common for auctions in chapter 11 cases, the identity of a Successful Bidder will not be known until shortly before the Sale Hearing. The Debtors therefore request that the time for filing or raising an Adequate Assurance Objection be shortened to  the date and time of the Sale Hearing.

d.    Use of Proceeds. Other than payment of the Breakup Fee and the Expense Reimbursement from the cash proceeds of a sale transaction consummated with a Successful Bidder other than the Stalking Horse Bidder, the Stalking Horse APA does not contemplate an allocation of sale proceeds.

14

e.      Records Retention: As noted above, the Stalking Horse APA provides that the Stalking Horse Bidder will acquire the books and records related to the Purchased Assets. The Stalking Horse APA grants the Debtors reasonable access to such records, and the Debtors will be able to administer their bankruptcy cases, notwithstanding the sale of any books and records.

f.      Requested Findings as to Successor Liability: The Stalking Horse APA requires that the Sale Order contain findings of fact and conclusions of law limiting the Successful Bidder's successor liability.

g.      Requested Findings as to Fraudulent Conveyances or Transfers: The Stalking Horse APA requires that the Sale Order contain findings of fact and conclusions of law with respect to the consideration paid and the elements of a fraudulent transfer.

h.      Relief from Bankruptcy Rules 6004(h) and 6006(d): The Debtors seek relief from the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

## RELIEF IS WARRANTED AND IN BEST INTERESTS OF DEBTORS AND ECONOMIC STAKEHOLDERS

### A.      Sale of Purchased Assets

33.      Ample authority exists for approval of the sale envisioned by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Second Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor. *See Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Gen. Motors Corp.*, 407 B.R. 463, 493-94 (Bankr. S.D.N.Y. 2009). Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor has provided the interested parties with

15

adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *Gen. Motors*, 407 B.R. at 493-94; *Polvay v. B.O. Acquisitions (In re Betty Owens Sch.)*, No. 96 Civ. 3576, 1997 U.S. Dist. LEXIS 5877 (S.D.N.Y. Apr. 16, 1997); *accord In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *3 (D. Del. May 20, 2002).

34.   As described above and in the Bianchi Declaration, an orderly but expeditious sale of the Purchased Assets is critical to preserving and realizing their going concern value for the benefit of all stakeholders.  A prompt sale is also required by the express terms of the DIP Facility and by the Stalking Horse APA.  Pursuing the process described in this Motion represents a reasonable exercise of the Debtors' business judgment and is in the best interests of all parties.

35.   The notice to third parties that the Debtors propose to provide, as set forth in the Bidding Procedures Order and Bidding Procedures, is adequate and reasonable under the circumstances.  Such notice will ensure that actual notice of the Auction, Sale Hearing, and Sale Transaction will be provided to all known creditors of the Debtors.  Such notice, together with the authority pursuant to sections 363 and 365 of the Bankruptcy Code, will enable the Court to make findings at the Sale Hearing and in the Sale Order that the ultimate purchaser of the Purchased Assets shall not be liable under theories of successor liability in connection with such Purchased Assets.  The Debtors believe that the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder, will give substantial consideration in exchange for such release from successor liability.

36.   The Debtors believe that the value of the consideration under the Stalking Horse APA is fair and reasonable, but the Court and parties in interest will be assured at the Sale

16

Hearing, after an extended diligence period and marketing by the Debtors and their investment

banker, that the Debtors will have selected the party with the highest or best offer for the

Purchased Assets.  The Debtors' compliance with the Bidding Procedures Order and the Bidding

Procedures will provide the basis to find that any sale of the Purchased Assets does not constitute

a fraudulent transfer because the purchase price represents reasonably equivalent value and is

fair and reasonable.  It will also establish that the Debtors and the Stalking Horse Bidder, or any

other Successful Bidder, have proceeded in good faith.

**B.      Sale Free and Clear of Liens, Claims, and Interests**

       37.      In the interest of attracting the best offer, the sale of the Purchased Assets should

be free and clear of any and all liens, claims, and other interests in accordance with section

363(f) of the Bankruptcy Code, with any such liens, claims, and other interests attaching to the

proceeds of the sale.  Pursuant to section  363(f) of the Bankruptcy Code, a debtor in possession

may sell property of the estate "free and clear of any interest in such property of an entity other

than the estate" if applicable non-bankruptcy law permits the sale of such property free and clear

of such interest, if such entity consents, if such interest is a lien and the price at which such

property is to be sold is greater than the aggregate value of all liens on such property, if such

interest is in bona fide dispute, or if such entity could be compelled, in a legal or equitable

proceeding, to accept a money satisfaction of such interest. *See* 11 U.S.C. § 363(f)(1)-(5). With

respect to any party asserting a lien, claim, or other interest against the Purchased Assets, the

Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f).

**C.    <u>Protections as Good Faith Purchaser</u>**

38.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Section 363(m) fosters the "'policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'"  *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (citation omitted); *see also Reloeb Co. v. LTV Corp.* (*In re Chateaugay Corp.*), No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. LEXIS 6130, at *9 (S.D.N.Y. May 10, 1993); *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

39.    The selection of the Successful Bidder will be the product of arm's-length, good faith negotiations in an open and competitive sale process.  Based upon the record to be made at the Sale Hearing, the Debtors will request a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**D.    <u>Bidding Procedures</u>**

40.    The Debtors believe the Bidding Procedures are fair and reasonable and will ensure that the bidding process and the Auction (to the extent necessary) will yield the maximum

value for the Debtors' estates and creditors.  The Bidding Procedures allow all parties in interest

an opportunity to conduct expedited diligence.  The Bidding Procedures also provide an

appropriate framework for the Debtors to review, analyze, and compare all bids received to

determine which bid is in the best interests of the Debtors and their economic stakeholders. The

Bidding Procedures clearly set forth the participation requirements for Qualified Bidders and  bid

requirements for Qualified Bids.  Accordingly, approval of the Bidding Procedures, including the

dates established thereby for the Auction and the Sale Hearing, is warranted.

**E.**      **Breakup Fee, Expense Reimbursement, and Other Bid Protections**

41.      The Bidding Procedures contain certain bid protections for the Stalking Horse

Bidder, such as the initial overbid requirement and the subsequent bidding increments.  The

Stalking Horse APA contains additional bid protections in the form of the Breakup Fee and

Expense Reimbursement, which are payable on the terms and conditions set forth in the Stalking

Horse APA.

42.      Approval of breakup fees and expense reimbursements as a form of bidder

protection in connection with a sale of assets pursuant to section 363 of the Bankruptcy Code is

commonplace because it allows a debtor to ensure a sale to a contractually committed buyer for

consideration that the debtor believes is fair, while providing a debtor with the potential to

enhance its recovery through an auction process.

43.      These protections, individually, and collectively, were a material inducement for,

and express precondition of, the Stalking Horse Bidder's entry into the Stalking Horse APA. The

Stalking Horse Bidder is unwilling to commit to hold open its offer under the terms of the

Stalking Horse APA unless assured of payment of the Breakup Fee and Expense Reimbursement

under the conditions set forth in the Stalking Horse APA.  The Breakup Fee and Expense

Reimbursement promote more competitive bidding by inducing the Stalking Horse Bidder to hold its offer open as a minimum or floor bid on which other potential bidders — and the Debtors — can rely. The Stalking Horse Bid increases the likelihood that the price at which the Purchased Assets are sold will reflect their true worth. Such protections are regularly approved in circumstances like these. *See, e.g.*, Final Order Approving Global Procedures for Expedited Sale, *In re The Greater Atlantic & Pacific Tea Co.*, No. 15-23007 (RDD) (Bankr. S.D.N.Y. Aug. 11, 2015), ECF No. 493 (approving break-up fees and expense reimbursements).

44.    Courts have held that break-up fees should be approved so long as (i) the relationship between the parties is not tainted by self-dealing, (ii) the fee does not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the size of the transaction. See, e.g., *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014). The Debtors submit that the Breakup Fee and Expense Reimbursement should be approved under each of these factors. First, the Breakup Fee and Expense Reimbursement are the product of good faith, arm's length negotiations between the Debtors and the Stalking Horse Bidder. Second, the Debtors believe, based on their business judgment, that the Breakup Fee and Expense Reimbursement will enable them to maximize the value of the Purchased Assets without chilling bidding. The Breakup Fee and Expense Reimbursement were a material inducement for, and a condition of, the Stalking Horse Bidder's agreement to enter into the Stalking Horse APA, which in turn assures the Debtors of a sale to a committed bidder at a price that the Debtors believe is fair and reasonable, while providing the opportunity that the Debtors could receive a higher or otherwise better offer at the Auction. Third, the Debtors believe that the Breakup Fee and Expense Reimbursement are reasonable and appropriate relative to the size,

20

nature and complexity of the transaction and the commitments made and resources expended by the Stalking Horse Bidder.

45.    The foregoing bid protections will not deter or chill bidding and are reasonable, and the proposal of the same will enable the Debtors to maximize the value of the Purchased Assets for the benefit of their estates and stakeholders.  Accordingly, the Debtors respectfully request that the Bid Protections be approved.

## F.    <u>Assumption and Assignment of Contracts</u>

46.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  *See Nostas Assocs. v. Costich* (*In re Klein Sleep Prods.*, *Inc.*), 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.*), 4 F.3d 1095, 1099 (2d Cir. 1993).

47.    In connection with the Sale Transaction, the Debtors will assume and assign the Assumed Contracts (*i.e.*, the executory contracts or unexpired leases included in the Stalking Horse Bid).  In the Sale Transaction, the Debtors' assumption of the Assumed Contracts will be contingent upon payment of Cure Costs and effective only upon the closing.  Further, section 365(k) of the Bankruptcy Code provides that assignment by the debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment."  11 U.S.C. § 365(k).  Pursuant to section 365(k), the Debtors will therefore be relieved from any liability for any breach of any Assumed Contract

21

assigned to a Successful Bidder.  As such, the assumption of the Assumed Contracts constitutes an exercise of the Debtors' sound business judgment.

48.     Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  As set forth above, the Debtors propose to file with the Court, and serve on each non-Debtor party to an Assumed Contract, a Notice of Assumption and Assignment indicating the Debtors' calculation of the Cure Costs for each such Assumed Contract.  Non-Debtor parties to the Assumed Contracts shall have the opportunity to lodge any objections to the proposed assumption and assignment to the Successful Bidder and, if applicable, the proposed Cure Cost.

49.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-

22

06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; in the leasing context, chief determinant of adequate assurance is whether rent will be paid).

50.     At the Sale Hearing, to the extent necessary, the Debtors will be prepared to proffer testimony or present evidence to demonstrate the ability of the Successful Bidder to perform under the Assumed Contracts.  The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance, as required by section 365(b)(1)(C) of the Bankruptcy Code.  Accordingly, it is requested that at the conclusion of the Sale Hearing, the proposed assumption and assignment of the Assumed Contracts be approved.

51.     To facilitate the assumption and assignment of the Assumed Contracts, the Debtors further request that the Court find all anti-assignment provisions of the Assumed Contracts to be unenforceable under section 365(f) of the Bankruptcy Code.

**G.     Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)**

52.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property… is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

53.     In light of the current circumstances and financial condition of the Debtors, the Debtors believe that in order to maximize value, the sale of the Purchased Assets pursuant to the

Sale Transaction must be consummated as soon as practicable. Accordingly, the Debtors request that the Bidding Procedures Order and the Sale Order be effective immediately upon entry of each such order and that the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## **NOTICE AND NO PRIOR REQUEST**

54.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for Region 2; (ii) the holders of secured claims against the Debtors (on a consolidated basis); (iii) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (iv) counsel to the Prepetition Secured Parties and the Postpetition Secured Parties (each as defined in the Bianchi Declaration); (v) counsel to the Stalking Horse Bidder; (vi) the Internal Revenue Service; (vii) the United States Attorney's Office for the Southern District of New York; (viii) all parties that have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002; (ix) all entities known or reasonably believed to have asserted any lien, claim, or other interest in the Purchased Assets; and (x) all parties to executory contracts and unexpired leases with the Debtors (collectively, the "**Notice Parties**").  The Debtors submit that such notice is sufficient in view of the facts and circumstances of these Chapter 11 Cases and that no other or further notice need be provided.

55.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

24

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.


Dated:  November 19, 2018
New York, New York

*/s/ Andrew N. Goldman*
Andrew N. Goldman
Nancy L. Manzer
Benjamin W. Loveland (*pro hac vice* pending)
Christopher D. Hampson (*pro hac vice* pending)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York  10007
Telephone:      (212) 230-8800
Facsimile:      (212) 230-8888

*Proposed Counsel to the Debtors
and Debtors in Possession*

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| COLLECTIVE, INC., *et al.*,[1] | ) Case No. 18-_____ (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) |

**ORDER APPROVING (A) BIDDING PROCEDURES, (B) STALKING HORSE ASSET
PURCHASE AGREEMENT AND BID PROTECTIONS, (C) FORM AND MANNER OF
NOTICE OF AUCTION, SALE TRANSACTION, AND SALE HEARING, (D)
ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (E) DATE FOR AUCTION,
IF NECESSARY, AND SALE HEARING**

Upon the *Debtors' Motion, Pursuant to 11 U.S.C. §§ 105, 363, and 365 and Fed. R.
Bankr. P. 2002, 6004, and 6006, for Approval of (I) (A) Bidding Procedures, (B) Stalking Horse
Asset Purchase Agreement and Bid Protections, (C) Form and Manner of Notice of Auction, Sale
Transaction, and Sale Hearing, and (D) Assumption and Assignment Procedures; and (II) (A)
Purchase Agreement, (B) Sale of Substantially all of Debtors' Assets Free and Clear of Liens,
Claims, and Interests, and (C) Assumption and Assignment of Certain Executory Contracts and
Unexpired Leases*, dated November 19, 2018 [Docket No. [___]] (the "**Sale Motion**"),[2] filed by
the debtors and debtors in possession (collectively, the "**Debtors**") in the above captioned cases
(the "**Chapter 11 Cases**"), any responsive pleadings filed in connection with the Motion, the
record in the Chapter 11 Cases, including the *Declaration of Kerry Bianchi Pursuant to Rule
1007-2 of the Local Bankruptcy Rules for the Southern District of New York* [Docket No. [___]],

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, include: Collective, Inc. (2024) and CME Co-Op, LLC (N/A). The location of the Debtors'
corporate headquarters and the Debtors' service address is: 72 Madison Ave, 3rd Floor, New York, NY 10016.

[2]    Capitalized terms used but not defined in this Order shall have the meanings given to them in the Motion,
the Stalking Horse APA, or the Bidding Procedures, as applicable.

and the record at the hearing on the Motion (the "**Hearing**"), and the Court having determined that notice of the Motion was adequate and sufficient; and after due deliberation and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:**[3]

A.    The Court has jurisdiction over this matter and over the property of the Debtors and their respective bankruptcy estates pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief requested in the Sale Motion are sections 105, 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 6004-1 and 6006-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**").

C.    The entry of this Order and the relief granted herein is in the best interests of the Debtors, their estates, their stakeholders, and all other parties in interest.

D.    The notice of the Sale Motion, the Hearing, and the proposed entry of this Order was adequate and sufficient under the circumstances of these Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Accordingly, except as otherwise set forth herein, no further notice of the Hearing or this Order and the relief provided for herein is necessary or required.

---

[3]    Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact whenever the context requires.

E.      All objections to the relief requested in the Sale Motion as it pertains to the relief granted herein that have not been withdrawn, waived, or settled as announced to the Court at the Hearing or by stipulation filed with the Court, are overruled except as otherwise set forth herein.

F.      The Debtors and their advisor, Oaklins DeSilva & Phillips LLC, engaged in a robust and extensive marketing and sale process before the Petition Date, to solicit and develop the highest and best offer for the Purchased Assets.

G.      Zeta Global Holdings Corp. ("**Zeta**") submitted a bid for the Purchased Assets (the "**Stalking Horse Bid**") as reflected in that certain Asset Purchase Agreement (together with the exhibits thereto, and as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "**Stalking Horse APA**"), dated as of November 19, 2018, and attached to the Sale Motion as Exhibit B.  The Stalking Horse Bid represents the highest or best offer the Debtors have received to date to purchase the Purchased Assets.

H.      Zeta shall act as the "**Stalking Horse Bidder**" under the Stalking Horse APA, and subject to higher or better offers in accordance with the Bidding Procedures.

I.      Pursuit of the Stalking Horse Bidder as a "stalking-horse" bidder and its Stalking Horse APA as a "stalking-horse" sale agreement is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment. The Stalking Horse APA provides the Debtors with the opportunity to sell the Purchased Assets in order to maximize and realize their going concern value.  Without the Stalking Horse APA, the Debtors would likely realize a lower price for the Purchased Assets; and, therefore, the contributions of the Stalking Horse Bidder have provided a substantial benefit to the Debtors and their estates and creditors.  The Stalking Horse APA will enable the Debtors to secure a fair and

adequate baseline price for the Purchased Assets at the Auction and, accordingly, will provide a clear benefit to the Debtors' estates, their creditors, and all other parties in interest.

J.        The Bid Protections, including, but not limited to, the Breakup Fee and the Expense Reimbursement (as such terms are defined in the Stalking Horse APA) (i) have been negotiated by the Stalking Horse Bidder and the Debtors and their respective advisors at arms' length and in good faith and (ii) are necessary to ensure that the Stalking Horse Bidder will continue to pursue the Stalking Horse APA and the Sale Transaction.  The Breakup Fee and Expense Reimbursement, to the extent payable under the Stalking Horse APA, (a) shall be paid from the proceeds of any sale actually paid in cash by a Successful Bidder only after a closing in the event that the Bankruptcy Court enters an order approving an offer to purchase any Purchased Assets submitted by a party other than the Stalking Horse Bidder, (b) are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidder, and (c) are fair, reasonable, and appropriate, including in light of the size and nature of the Sale Transaction, the necessity to announce a sale transaction for the Purchased Assets at the outset of these chapter 11 cases, and the efforts that have been and will be expended by the Stalking Horse Bidder.  Unless it is assured that the Bid Protections, including, but not limited to, the Breakup Fee and Expense Reimbursement, will be available, the Stalking Horse Bidder is unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under the Stalking Horse APA.

K.        The Bidding Procedures were negotiated in good faith and at arms' length and are reasonably designed to promote participation and active bidding and ensure that the highest or best value is generated for the Purchased Assets.

4

L.      The Stalking Horse Bidder is not an "insider" of any of the Debtors, as those

terms are defined in section 101 of the Bankruptcy Code, and no common identity of

incorporators, directors, or controlling stockholders exists between the Stalking Horse Bidder

and the Debtors.  The Stalking Horse Bidder and its advisors have acted in "good faith" within

the meaning of section 363(m) of the Bankruptcy Code in connection with the Stalking Horse

Bidder's negotiation of its Bid Protections and the Bidding Procedures and the Stalking Horse

Bidder's negotiation and entry into the Stalking Horse APA.

M.      The Debtors have articulated good and sufficient reasons for the Court to (i)

approve the bidding procedures attached hereto as **Exhibit 1** (the "**Bidding Procedures**"), (ii)

approve the Bid Protections, including but not limited to, the Breakup Fee and the Expense

Reimbursement (to the extent payable under the Stalking Horse APA), (iii) approve the form and

manner of notice of the Sale Motion, the Auction (as defined below), the Sale Hearing (as

defined below), and the procedures (the "**Assumption and Assignment Procedures**") for

assumption, assignment and sale of certain executory contracts and unexpired leases (the

"**Assumed Contracts**"),[4] and (iv) set the date of the Auction and the Sale Hearing.

N.      The proposed *Notice of Auction and Sale Hearing,* substantially in the form

attached hereto as **Exhibit 2** (the "**Sale Notice**"), and the proposed notice substantially in the

form attached hereto as **Exhibit 3** to be served on counterparties to the Assumed Contracts (the

"**Notice of Assumption and Assignment**"), including notice of proposed cure costs, are each

calculated to provide adequate notice concerning the proposed sale of substantially all of the

---

[4]      The Other Assets (defined below) also include certain executory contracts and unexpired leases.  The term
"Assumed Contracts" should be interpreted to refer to any such executory contracts and unexpired leases proposed
to be assumed and assigned as part of any Other Assets Bid (defined below).

Debtors' assets (the "**Purchased Assets**")[5] and the proposed assumption, assignment, and sale of the Assumed Contracts, will provide due and adequate notice of the relief sought in the Sale Motion, and are each hereby approved.

O.    The Bidding Procedures are reasonable and appropriate, and represent a fair and appropriate method for maximizing the realizable value of the Debtors' assets.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Sale Motion is granted as set forth herein.

2.    Any objections filed or asserted in response to the Sale Motion and the relief granted herein, to the extent not resolved as set forth herein or on the record at the Hearing, are hereby overruled.

**Notice of Sale Transaction**

3.    The Sale Notice, substantially in the form attached hereto as **Exhibit 2** is approved.

4.    All parties in interest shall receive or be deemed to have received good and sufficient notice of (i) the Sale Motion, (ii) the Assumption and Assignment Procedures, including the proposed assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse APA or to a Successful Bidder other than the Stalking Horse Bidder (and the proposed cure costs with respect thereto), (iii) the Auction, (iv) the Sale Transaction, including the sale of the Purchased Assets  free and clear of all liens,

---

[5]    The Bidding Procedures also afford bidders the opportunity to bid for assets that are not included in the Stalking Horse Bid, including certain assets related to Collective's legacy managed services business, certain contracts, and equity in the Debtors' foreign subsidiaries (the "**Other Assets**").  It is possible that a competing bidder may wish to submit a bid for the Other Assets, whether in combination with or separate from a bid for all or substantially all of the Purchased Assets (any such bid, an "**Other Assets Bid**").  In this Order, as applied to any Other Assets Bid, references to the Purchased Assets shall be interpreted to include the assets applicable to such bid.

claims, and interests, and (v) the Sale Hearing, and no further notice of the foregoing shall be

required, if:

(a)       As soon as practicable, but no later than one (1) business day after entry of

this Order, the Debtors cause the Sale Notice to be filed with this Court and served by email,

mail, facsimile, or overnight delivery on: (i) all Persons known by the Debtors to have expressed

an interest to the Debtors in a transaction with respect to the Purchased Assets in whole or in part

during the past twelve (12) months; (ii) all entities known by the Debtors to have asserted any

lien, claim, encumbrance, or other interest in the Purchased Assets (for whom identifying

information and addresses are available to the Debtors); (iii) all non-Debtor parties to the

Assumed Contracts (for whom identifying information and addresses are available to the

Debtors); (iv) any Governmental Authority (as defined in the Stalking Horse APA) known to

have a claim in the Chapter 11 Cases; (v) the United States Attorney for the Southern District of

New York; (vi) the Office of the Attorney General in each state in which the Debtors operate;

(vii) the Office of the Secretary of State in each state in which the Debtors operate or are

organized; (viii) the Debtors' known creditors and equity holders (for whom identifying

information and addresses are available to the Debtors); (ix) all other Persons requesting notice

under Bankruptcy Rule 2002 or as directed by this Court (for whom identifying information and

addresses are available to the Debtors); (x) the Office of the United States Trustee for the

Southern District of New York; (xi) the Internal Revenue Service; and (xii) the Official

Committee of Unsecured Creditors, if any.

**Bidding Procedures and Auction**

5.       The Bidding Procedures, attached hereto as **Exhibit 1**, are fully incorporated

herein and approved, and shall apply with respect to any bids for, and the auction and sale of, the

Purchased Assets. The procedures and requirements set forth in the Bidding Procedures, including those associated with submitting a Qualified Bid, are fair, reasonable and appropriate, and are designed to maximize recoveries for the benefit of the Debtors' estates, creditors and other parties in interest. The Debtors are authorized to take all actions, including incurring and paying costs and expenses as are necessary or appropriate to implement the Bidding Procedures.

6.    The deadline for submitting Qualified Bids (the "**Bid Deadline**") is **January 3, 2019 at 5:00 p.m. (Eastern Time)**.

7.    All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive core jurisdiction of this Court and to have waived any right to a jury trial with respect to all matters related to the Auction and the terms and conditions of the sale or transfer of the Purchased Assets. The Stalking Horse Bidder is a Qualified Bidder and the bid reflected in the Stalking Horse APA is a Qualified Bid for all purposes and requirements pursuant to the Bidding Procedures.

8.    If the Stalking Horse Bidder's bid, as reflected in the Stalking Horse APA, is the only Qualified Bid in respect of the Purchased Assets that is received by the Debtors by the Bid Deadline, no Auction will be conducted for the Purchased Assets, and the Qualified Bidder submitting the Stalking Horse Bidder will be the Successful Bidder for the Purchased Assets. In such circumstances, the Debtors shall notify the Court and promptly seek approval of the Stalking Horse Bid.

9.    To qualify as a Qualified Bid, each such bid must be accompanied by information supporting the bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the bidder's financial wherewithal and willingness to perform under any

Assumed Contracts that will be assumed and assigned to such bidder.  In addition to the other

requirements of a Qualified Bid as set forth in the Bidding Procedures, each such bid must be

accompanied by a written statement confirming that (i) the bidder has not engaged in any

collusion with respect to the submission of any bid, the bidding, or the Auction and (ii) its

Qualified Bid is a good faith bona fide offer that it intends to consummate if selected as the

Successful Bidder.

10.     Subject to the rights of the Stalking Horse Bidder under the Stalking Horse APA,

the Bidding Procedures, and this Order, the Debtors shall have the right as they may reasonably

determine to be in the best interests of their estates to carry out the Bidding Procedures,

including, without limitation, to: (i) determine which bidders are Qualified Bidders; (ii)

determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the Baseline Bid;

(iv) determine which bids are the Successful Bid and Back-Up Bid, each as it relates to the

Auction; (v) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the

requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or contrary

to the best interests of the Debtors and their estates; (vi) adjourn or cancel the Auction and/or the

Sale Hearing in open court without further notice or as provided in the Bidding Procedures; (vii)

modify the Bidding Procedures consistent with their fiduciary duties and bankruptcy law; and

(viii) withdraw the Sale Motion at any time with or without prejudice.

11.     The Debtors, in consultation with the Consultation Parties (as defined in the

Bidding Procedures), shall identify those bids that qualify as Qualified Bids, determine which

Qualified Bid shall serve as the Baseline Bid at the Auction, and promptly inform the Qualified

Bidders that their bids qualify as Qualified Bids.  If more than one Qualified Bid is timely

received, the Auction shall be conducted at the offices of Wilmer Cutler Pickering Hale and Dorr

9

LLP; 7 World Trade Center, 250 Greenwich Street, New York, New York 10007, on **January 8, 2019 at 10:00 a.m. (Eastern Time**).  Copies of the Baseline Bid shall be provided to all of the Qualified Bidders and each of the Consultation Parties prior to the start of the Auction.  All proceedings at the Auction shall be transcribed.

12.     Nothing contained herein shall prejudice or impair the right to credit bid, as set forth in the Bidding Procedures of (i) RCP Advisors 2, LLC, as successor-in-interest to Columbia Partners, L.L.C., Investment Management, as Investment Manager, and (ii) National Electrical Benefit Fund, as lender, under that certain Credit Agreement, dated as of June 9, 2016, and in their capacities as lender and agent under the debtor-in-possession financing facility, on such assets that are subject to their respective liens in their respective priorities.

## Sale Hearing and Sale Objection Deadline

13.     If more than one Qualified Bid is received for the Purchased Assets and the Auction is held, the Sale Hearing shall be held before this Court on **January [10], 2019 at ____.m. (Eastern Time**).  At the Sale Hearing, the Debtors will seek entry of the Sale Order.  The Debtors may (after consultation with the Consultation Parties or, if the Auction is held, the Successful Bidder and the Consultation Parties) seek an adjournment of the Sale Hearing as the Debtors deem appropriate in the exercise of their reasonable business judgment.

14.     The Successful Bidder (which may be the Stalking Horse Bidder) shall appear at the Sale Hearing and be prepared, if necessary, to have a representative(s) testify in support of the Successful Bid and the Successful Bidder's ability to close in a timely manner and provide

adequate assurance of its future performance under any and all executory contracts and unexpired leases to be assumed and assigned as part of the proposed Sale Transaction.

15.     Objections to the Sale Transaction and entry of the Sale Order (other than objections to the provision of adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder) (each, a "**Sale Objection**") must: (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Rules and the Local Rules; and (iii) be filed with this Court and served on (a) counsel to the Debtors, Wilmer Cutler Pickering Hale and Dorr LLP; 7 World Trade Center, 250 Greenwich Street, New York, New York 10007 (Attn: Andrew N. Goldman and Benjamin W. Loveland), (b) counsel to the official committee of unsecured creditors appointed in these chapter 11 cases, if any, and (c) counsel to the Stalking Horse Bidder, Manatt, Phelps & Phillips, LLP, 1050 Connecticut Ave., NW, Suite 600, Washington, DC 20036 (Attn: Douglas C. Boggs, Esq. and Alan M. Noskow, Esq.), (d) counsel the Prepetition Secured Parties, Troutman Sanders LLP, 875 Third Avenue, New York, NY 10022 (Attn: Brett D. Goodman) and Troutman Sanders LLP, 600 Peachtree Street, NE, Suite 3000, Atlanta, Georgia (Attn: Harris Winsberg and Matthew Roberts) (collectively, the "**Objection Notice Parties**") by **January 3, 2019 at 4:00 p.m. (Eastern Time)**. All Sale Objections will be heard by this Court at the Sale Hearing.

16.     The failure of any objecting person or entity to timely file and serve a Sale Objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion, or to the consummation and performance of the Sale Transaction contemplated by the Stalking Horse APA or, if the Auction is held, any purchase agreement with the Successful Bidder, free and clear of all liens, claims, and interests pursuant to section 363(f) of the Bankruptcy Code.

**Assumption and Assignment Procedures**

17.    The Assumption and Assignment Procedures are reasonable and appropriate under the circumstances, fair to all non-Debtor parties, comply in all respects with the Bankruptcy Code, and are approved.

18.    As soon as practicable, but not later than one (1) day after the entry of this Order, the Debtors shall file with this Court and serve by first class mail on each non-Debtor party to the Assumed Contracts the Notice of Assumption and Assignment, substantially in the form attached hereto as **Exhibit 3**, which shall: (i) provide a description of each such Assumed Contract, (ii) state the amount, if any, that the Debtors believe are necessary to cure, or compensate the non-Debtor party for, any and all defaults under such Assumed Contract pursuant to section 365 of the Bankruptcy Code (the "**Cure Costs**"); (iii) notify the non-Debtor party that such party's contract or lease may be assumed and assigned to a purchaser of the Purchased Assets; (iv) state the date of the Sale Hearing and that any unresolved objections to any Cure Costs or to assumption and assignment will be heard at the Sale Hearing or such later date as the Debtors and the Successful Bidder (which may be the Stalking Horse Bidder), may, in consultation with the Consultation Parties, determine, in accordance with this Order; and (v) state the appropriate deadline by which the non-Debtor party must file an objection to the Cure Costs or assumption and assignment of the Assumed Contracts.  Upon service of the Notice of Assumption and Assignment, all non-Debtor parties to the Assumed Contracts shall receive or be deemed to have received good and sufficient notice of the Cure Costs for, and the proposed assumption and assignment of, the Assumed Contracts. As soon as practicable, but not later than one (1) day after the entry of this Order, the Debtors shall also post a copy of

12

the Notice of Assumption and Assignment on the website for these chapter 11 cases maintained by the Debtors' claims and noticing agent.

19.    The Notice of Assumption and Assignment is hereby approved. It is reasonably calculated to provide sufficient notice to the non-Debtor parties to the Assumed Contracts of the Debtors' intent to assume and assign some or all of the Assumed Contracts in connection with the Sale Transaction and constitutes adequate notice thereof.

20.    All Objections to any proposed Cure Costs (each, a "**Cure Objection**") and to the provision of adequate assurance of future performance (each, an "**Adequate Assurance Objection**") must: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) with respect to a Cure Objection, state with specificity what Cure Costs the objecting party believes are required; and (iv) be filed with this Court and served on the Objection Notice Parties.

21.    Any Cure Objection or Adequate Assurance Objection in respect of an Assumed Contract must be filed and served by **January 3, 2019 at 4:00 p.m. (Eastern Time)**; *provided* that if a Successful Bidder other than the Stalking Horse Bidder prevails at the Auction, then (i) the deadline to file and serve an Adequate Assurance Objection in respect of an Assumed Contract shall be extended so that any such objection may be raised at or before the Sale Hearing and (ii) as soon as possible after the conclusion of the Auction, but not later than one (1) day, the Debtors shall file with the Court a notice that identifies the Successful Bidder and provides notice that the Debtors will seek to assume and assign the Assumed Contracts to the Successful Bidder.

22.    If a timely Cure Objection or Adequate Assurance Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale

13

Hearing or such later date as the Debtors and the Successful Bidder, may, in consultation with the Consultation Parties, determine.

23.    To the extent the Debtors identify, at any time after the Notice of Assumption and Assignment is served, additional Assumed Contracts to be assumed and assigned to the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder, the Debtors shall file with this Court and serve by first class mail on the non-Debtor party to such Assumed Contract a supplemental Notice of Assumption and Assignment (each, a "**Supplemental Notice of Assumption and Assignment**," the form of which shall be identical to the form of Notice of Assumption and Assignment); <u>provided</u> that a Supplemental Notice of Assumption and Assignment shall be served at least ten (10) days prior to any scheduled closing of the Sale Transaction.  Any related Cure Objection or Adequate Assurance Objection must be filed and served within seven (7) days after service of the Supplemental Notice of Assumption and Assignment.  If such a Cure Objection or Adequate Assurance Objection is timely received and cannot otherwise be resolved by the parties, the Debtors may, in their discretion (after consultation with the Consultation Parties and the Successful Bidder), schedule an emergency hearing to hear such objection prior to any scheduled closing of the Sale Transaction.

24.    If no timely Cure Objection is filed and served in respect of an Assumed Contract, the Cure Cost identified on the Notice of Assumption and Assignment or a Supplemental Notice of Assumption and Assignment, as applicable, will be the only amount necessary under section 365(b) of the Bankruptcy Code to cure all defaults under such Assumed Contract.  Any party failing to timely file a Cure Objection shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtors, their estates, the Stalking Horse Bidder or, if the Auction is held, the

14

Successful Bidder.  If no timely Adequate Assurance Objection is filed and served with respect to a Contract, the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder, will be deemed to have provided adequate assurance of future performance for such Assumed Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code.  If no timely Cure Objection or Adequate Protection Objection is filed and served with respect to an Assumed Contract, the non-Debtor party to such Contract shall be deemed to have consented to the assumption and assignment of the Assumed Contract to the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder.

25.    The Debtors' assumption and assignment of the Assumed Contracts to the Successful Bidder is subject to approval of this Court and the consummation of the Sale Transaction.  Accordingly, absent the closing of such sale, the Assumed Contracts shall not be deemed assumed or assigned, and shall in all respects be subject to further administration under the Bankruptcy Code.

26.    The inclusion of a contract or other document or Cure Cost on the Notice of Assumption and Assignment or any Supplemental Notice of Assumption and Assignment shall not constitute or be deemed a determination or admission by the Debtors, the Stalking Horse Bidder, or any other party in interest that such contract or other document is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or that the stated Cure Cost is due (all rights with respect thereto being expressly reserved).  The Debtors reserve all of their rights, claims, defenses, and causes of action with respect to each contract or other document listed on the Notice of Assumption and Assignment or any Supplemental Notice of Assumption and Assignment.  The Debtors' inclusion of an executory contract or unexpired lease on the Notice of Assumption and Assignment or any Supplemental Notice of Assumption

15

and Assignment shall not be a guarantee that such executory contract or unexpired lease ultimately will be assumed or assumed and assigned.

27.    The Debtors shall provide written notice to the parties to all Assumed Contracts that are ultimately assumed and assigned to the Successful Bidder of such assumption and assignment and the identity of the Successful Bidder.

## Stalking Horse APA and Bid Protections

28.    The form of Stalking Horse APA is hereby approved.  All of the Debtors' pre-closing obligations under the Stalking Horse APA are authorized as set forth herein; provided that, for the avoidance of doubt, consummation of the Sale Transaction contemplated by the Stalking Horse APA shall be subject to entry of the Sale Order and the satisfaction or waiver of the other conditions to closing on the terms set forth in the Stalking Horse APA.

29.    The Bid Protections are approved in their entirety, including, without limitation, the Breakup Fee and Expense Reimbursement payable in accordance with, and subject to the terms of, the Stalking Horse APA, which Breakup Fee shall be in the amount of $450,000, and which Expense Reimbursement shall be the Stalking Horse Bidder's reasonable and documented expenses up to a maximum amount of $250,000.  Except as expressly provided for herein, no other termination payments are authorized or permitted under this Order.

30.    The Debtors are authorized and directed to pay the Breakup Fee and Expense Reimbursement, to the extent payable under the Stalking Horse APA, without further order of this Court.  The Breakup Fee and Expense Reimbursement, to the extent payable under the Stalking Horse APA, shall be paid from the proceeds of any sale actually paid in cash by a Successful Bidder only after a closing in the event that the Bankruptcy Court enters an order approving an offer to purchase any Purchased Assets submitted by a party other than the Stalking

Horse Bidder.  For the avoidance of doubt, the Breakup Fee and Expense Reimbursement do not apply with respect to any Other Assets Bid that does not include any of the Purchased Assets proposed to be acquired by the Stalking Horse Bidder.

### **General Provisions**

31.     All persons or entities (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily (i) consented to the entry of a final order by this Court in connection with the Sale Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution and (ii) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.  Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or any applicable provisions of the Local Rules or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this order.

32.     The requirements set forth in Local Rules 6004-1, 9006-1, and 9013-1 are hereby satisfied or waived.

33.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.


Dated: _____, 2018
　　　　New York, New York


　　　　　　　　　　　　　　　　　　**_____**
　　　　　　　　　　　　　　　　　　UNITED STATES BANKRUPTCY JUDGE

17

**<u>Exhibit 1</u>**

(Bidding Procedures)

## BIDDING PROCEDURES

### Overview

On November 19, 2018, Collective, Inc. ("**Collective**") and its affiliate, CME Co-Op, LLC ("**CME**"), as debtors and debtors in possession (collectively, the "**Debtors**"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

The Debtors are seeking to sell for the highest or best consideration, in one or more transactions, all or substantially all of their assets (the "**Sale Transaction**").  On [•], the Bankruptcy Court entered an order [Docket No. [•]], which, among other things, authorized the Debtors to solicit bids and approved these procedures (the "**Bidding Procedures**") for the consideration of the highest or otherwise best consideration for all or substantially all of the Debtors' assets, on the terms and conditions set forth herein.

Zeta Global Holdings Corp. ("**Zeta**" or the "**Stalking Horse Bidder**") submitted a stalking horse bid (the "**Stalking Horse Bid**") pursuant to that certain Asset Purchase Agreement (together with the exhibits thereto, and as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "**Stalking Horse APA**"),[1] dated as of November 19, 2018. The Stalking Horse APA contemplates, pursuant to the terms and subject to the conditions contained therein, the sale of substantially all of Collective's assets (the "**Purchased Assets**") to the Stalking Horse Bidder in consideration of (a) 1,150,307 shares of Series F-2 Preferred Stock of Zeta, with a deemed aggregate value of $15,000,000, (b) payment in cash of cure costs with respect to executory contracts and unexpired leases to be assumed by the Stalking Horse Bidder, and (c) the assumption of the Assumed Liabilities (as defined in the Stalking Horse APA). The Stalking Horse Bid is subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures.

The Stalking Horse Bid does not contemplate the purchase of certain of the Debtors' assets, including certain assets related to Collective's legacy managed services business, certain contracts, or equity in the Debtors' foreign subsidiaries (the "**Other Assets**").  It is possible that a competing bidder may wish to submit a bid for the Other Assets, whether in combination with or separate from a bid for all or substantially all of the Purchased Assets (any such bid, an "**Other Assets Bid**"). Any Other Assets Bid, and any bidder submitting such a bid, must comply with these Bidding Procedures, as applicable to such Other Assets and the consideration being offered in such Other Assets Bid; provided that, recognizing such differences between an Other Assets Bid and a bid for only the Purchased Assets, such Other Assets Bid should otherwise be in substantial conformance with these Bidding Procedures.  In these Bidding Procedures, as applied to any Other Assets Bid, references to the Purchased Assets shall be interpreted to include the assets applicable to such bid. The procedures set forth herein with respect to the Auction and Sale Hearing shall apply to any Other Assets Bids, with such modifications as are necessary to take into account the nature of and circumstances presented by any such Other Asset Bids received.

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in the Stalking Horse APA.

These Bidding Procedures describe, among other things, (i) the manner in which prospective bidders in respect of the Purchased Assets may gain or continue to have access to due diligence materials concerning the Purchased Assets, (ii) the procedures for bidders to submit bids for the Purchased Assets, (iii) the manner in which bidders and bids become Qualified Bidders and Qualified Bids (each as defined below), (iv) the negotiation of bids received, (v) the conduct of any auction with respect to the Purchased Assets (the "**Auction**"), (vi) the ultimate selection of the Successful Bidder (as defined below), and (vii) approval of the sale of the Purchased Assets to the Successful Bidder at a hearing before the Bankruptcy Court.

## Summary of Important Dates

| | |
|---|---|
| January 3, 2019 at 5:00 p.m. (ET) | Deadline to Submit Bids |
| January 3, 2019 at 4:00 p.m. (ET) | Deadline to Object to Sale Transaction / Deadline to Object to Assumption and Assignment of Assumed Contracts to the Stalking Horse Bidder, Including Proposed Cure Costs[2] |
| January 8, 2019 at 10:00 a.m. (ET) | Auction, if necessary |
| January 9, 2019 | Deadline for Debtors to File Notice of Successful Bidder and Back-Up Bidder |
| January [10], 2019 at [  ] a.m. (ET) | Sale Hearing / Deadline to File Adequate Assurance Objections for Successful Bidder other than the Stalking Horse Bidder |

## Access to Due Diligence

Any prospective bidder that wishes to conduct due diligence with respect to a potential bid for the Purchased Assets should contact the Debtors' advisors, Oaklins DeSilva & Phillips LLP, before the Bid Deadline (defined below) in writing, expressing interest in the Purchased Assets to Kerry Hatch (k.hatch@dp.oaklins.com).  To be granted access to all material information related to the Purchased Assets, a prospective bidder must submit to the Debtors or their advisors:

1. an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors (unless such party is already a party to an existing confidentiality agreement with the Debtors that is acceptable to the Debtors for this due diligence process, in which case such agreement shall govern, and such party must provide a statement extending the term of such agreement until January 17, 2019); and

2. sufficient information, as reasonably determined by the Debtors, to allow the Debtors, in consultation with the Consultation Parties, to determine that the prospective bidder has the financial wherewithal to close a sale for the Purchased Assets.

---

[2] This objection deadline applies to all objections to the sale of the Purchased Assets and the Other Assets, with the exception of objections related to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder.

A prospective bidder that meets the above requirements to the satisfaction of the Debtors, in consultation with the Consultation Parties, shall be a "**Potential Bidder**." As soon as practicable, the Debtors will provide such Potential Bidder access to the diligence materials; *provided* that such access may be terminated by the Debtors in their discretion at any time for any reason whatsoever, including that a Potential Bidder does not become a "Qualified Bidder" (as defined below) or these Bidding Procedures are terminated.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Purchased Assets to any person or entity who (i) is not a Potential Bidder, or (ii) in the case of competitively sensitive information, is a competitor of the Debtors.

The Debtors make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in any definitive agreement with any Successful Bidder executed and delivered by the Debtors.

### **Bidding and Auction Procedures**

Bid Deadline and Requirements

Any Potential Bidder that wishes to participate in the bidding process for the Purchased Assets must, no later than January 3, 2019 at 5:00 p.m. (ET) (the "**Bid Deadline**") deliver electronic copies of its bid to the Debtors, through their counsel Wilmer Cutler Pickering Hale and Dorr LLP, Attn: Andrew Goldman and Benjamin Loveland (andrew.goldman@wilmerhale.com; benjamin.loveland@wilmerhale.com).  Counsel to the Debtors shall promptly inform the Consultation Parties of all bids received and shall provide copies of all such bids to counsel to each of the Consultation Parties.

A bid is a signed document from a Potential Bidder received by the Bid Deadline that identifies the purchaser by its legal name (including any equity holders or other financial backers, if the Potential Bidder is an entity formed for the purpose of submitting bids or consummating a Sale Transaction), and any other party that will be participating in connection with the bid or the Sale Transaction, and includes, at a minimum, the following (a "**Bid**"):

1. Finalized Agreement. In both PDF and MS-WORD format, an executed copy of an asset purchase agreement (the "**APA**") and a copy of same that has been marked against the Stalking Horse APA.

2. Same or Better Terms.  A statement that the applicable Potential Bidder offers to purchase the Purchased Assets, pursuant to a sale transaction that is no less favorable to the Debtors' estates, as the Debtors may reasonably determine, than the transactions contemplated in the Stalking Horse APA.

3. Designation of Contracts and Leases. Each Bid must identify with particularity each and every executory contract and unexpired lease, the assumption and assignment of which is a condition to closing the Sale Transaction (subject to amendment provisions in the APA that are substantially identical to those contained in the Stalking Horse APA).

3

4.  Unconditional Offer. A statement that the Bid is formal, binding, and unconditional (except for those conditions expressly set forth in the APA) and is not subject to any due diligence or financing contingency and is irrevocable until the earlier of the first business day following the closing of the proposed Sale Transaction or January 17, 2019 (the "**Outside Date**"), except as otherwise provided in these Bidding Procedures.

5.  Form of Consideration. A statement of the consideration and value of the consideration of the Bid, *provided* that any Bid that includes a non-cash component shall also include (a) a cash component sufficient to pay all cure amounts under all executory contracts or unexpired leases proposed to be assumed and assigned to the purchaser pursuant to the APA, (b) a cash component sufficient to pay the Bid Protections (as defined in the Stalking Horse APA), and (c) a detailed analysis of the value of the non-cash component of the Bid and back-up documentation to support such value.

6.  Purchase Price; Minimum Bid. Each Bid submitted must (a) be a Bid for all or a substantial portion of the Purchased Assets, (b) exceed the value of the consideration provided by the Stalking Horse Bid by the Minimum Overbid Amount (defined below) plus the amount of the Bid Protections, and (c) propose an alternative transaction that provides substantially similar or better terms than the Stalking Horse Bid and can be consummated in the same timeframe as will be the Stalking Horse Bid.

7.  Proof of Financial Ability to Perform. Each Bid must contain such financial and other information that allows the Debtors, after consultation with the Consultation Parties, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Sale Transaction, including, without limitation, such financial and other information setting forth adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, and the Potential Bidder's willingness to perform under any contracts that are assumed and assigned to such party. Without limiting the foregoing, such information must include current financial statements or similar financial information certified to be true and correct as of the date thereof, proof of financing commitments, if needed to close the transaction, contact information for verification of such information, including any financing sources, and any other information reasonably requested by the Debtors necessary to demonstrate that such Potential Bidder has the ability to close the Sale Transaction.

8.  No Entitlement to Expense Reimbursement or Other Amounts. A statement that the Bid does not entitle the Potential Bidder to any breakup fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Purchased Assets.

A Potential Bidder must also accompany its Bid with: (a) a Deposit (as defined below); (b) the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the Bid submitted by the Potential Bidder; (c) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed and to

4

consummate the transaction contemplated by the APA; and (d) disclosure of any connections or agreements with the Debtors, any other known Potential Bidder, and/or any officer, director or direct or indirect equity security holder of the Debtors.

Deposit

Each Potential Bidder submitting a Bid must, by the Bid Deadline, make a good faith deposit in an amount not less than Twenty-Five Thousand U.S. Dollars ($25,000) (the "**Deposit**") in the form of a cashier's check or wire transfer into an escrow account (the "**Segregated Account**") that shall be opened or made available by the Debtors for this purpose.

Review of Bids; Designation of Qualified Bids

If a Potential Bidder delivers all of the materials described above, (including the Deposit) by the Bid Deadline, the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, will determine whether the Potential Bidder (i) has demonstrated the financial ability to consummate the purchase of the Purchased Assets, (ii) is reasonably likely to be able to and willing to consummate the contemplated transactions, and (iii) has otherwise satisfied all of the bidding requirements described above. If so, the Debtors shall designate the Potential Bidder as a "**Qualified Bidder**" and such bid as a "**Qualified Bid**." The Debtors shall promptly notify all Qualified Bidders that their Bids have been deemed Qualified Bids.[3]

The Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse Bid is a Qualified Bid.

The Prepetition Secured Parties and the Postpetition Secured Parties have a right to credit bid up to the entire outstanding amount of their claims, subject to section 365(k) of the Bankruptcy Code.[4] Should they decide to credit bid, the Prepetition Secured Parties and the Postpetition Secured Parties are Qualified Bidders and any such credit bid will be considered a Qualified Bid to the extent such bid is received by the Bid Deadline, complies with the requirements set forth in these Bidding Procedures, complies with section 363(k) of the Bankruptcy Code, and includes a cash component sufficient to pay, and earmarked exclusively for payment of, all obligations secured by senior liens on the Purchased Assets, all cure amounts under all executory contracts and unexpired leases proposed to be assumed and assigned to the purchaser pursuant to the APA, and the Bid Protections. The Prepetition Secured Parties and the Postpetition Secured Parties shall not be required to make any Deposit in connection with any Bid.

The Debtors reserve the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid. To the extent the APAs submitted by Qualified Bidders differ in any material respect, the Debtors, in consultation with the Consultation Parties, may assign relative values to such differences, taking into account the relative burdens and benefits resulting from such differences, and shall afford a Qualified

---

[3] The Debtors reserve the right to designate Other Asset Bids as Qualified Bids in their discretion on the basis of what assets are applicable to the Other Assets Bid and on what terms the purchase of such purchased assets is proposed.
[4] The "Prepetition Secured Parties" and the "Postpetition Secured Parties" are RCP Advisors 2, LLC, as successor-in-interest to Columbia Partners, L.L.C., Investment Management, as investment manager, and National Electrical Benefit Fund, as lender.

Bidder the opportunity to further modify such APA to reduce or eliminate any deduction in value assigned to such APA.

The term "**Consultation Parties**" as used in these Bidding Procedures shall mean (i) any official committee of unsecured creditors appointed in the Debtors' chapter 11 cases, if any, (ii) the Prepetition Secured Parties and the Postpetition Secured Parties, and (iii) the Stalking Horse Bidder.

The Debtors shall use their reasonable best efforts to consult and confer with the Consultation Party in respect of all material aspects of the bidding and Auction process in order to maximize value for all parties in interest. For the avoidance of doubt, however, the consultation rights provided to the Consultation Parties by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

The Debtors may not modify the consultation or consent rights of any of the Consultation Parties set forth herein without the consent of such affected party; provided, however, that the Debtors may, in the exercise of their business judgment, take such steps as are necessary to ensure a competitive and transparent bidding and Auction process, including, but not limited to, limiting (but not eliminating) the consultation rights of a Consultation Party that is or becomes a Qualified Bidder.

<u>Failure to Receive More Qualified Bids</u>

If no Qualified Bid other than the one submitted by the Stalking Horse Bidder is received by the Bid Deadline, the Debtors will not conduct an Auction, and shall file and serve, by January 4, 2019 at 4:00 p.m. (ET), a notice indicating that the Auction has been cancelled and that the Stalking Horse Bidder is the Successful Bidder.

<u>Sale Hearing and Sale Order</u>

At a hearing before the Bankruptcy Court (the "**Sale Hearing**"), the Debtors will seek the entry of an order authorizing and approving, among other things, the applicable sale transaction (the "**Sale Order**").  The Sale Order shall authorize and approve the applicable sale transaction:

1.  if no other Qualified Bid is received by the Debtors by the Bid Deadline, to the Stalking Horse Bidder pursuant to the terms and conditions set forth in the Stalking Horse APA; or

2.  if the Auction is held, to the Successful Bidder or, if the Successful Bid is not timely consummated, to the Back-Up Bidder.

In the Debtors' discretion (after consultation with the Consultation Parties or, if the Auction is held, the Successful Bidder and the Consultation Parties), the Sale Hearing may be adjourned or rescheduled without notice or with limited and shortened notice to parties, including by (i) an announcement of such adjournment at the Sale Hearing or at the Auction or (ii) the filing of a notice of adjournment with the Bankruptcy Court prior to the commencement of the Sale Hearing.

<u>Auction</u>[5]

If the Debtors receive at least two (2) Qualified Bids prior to the Bid Deadline, then the Debtors shall notify each Qualified Bidder that the Debtors intend to conduct an Auction to consider all Qualified Bids, subject to reasonable rules and regulations as may be established by the Debtors, in consultation with the Consultation Parties. The Auction to determine the successful bidder for the Purchased Assets shall be held on January 8, 2019 at 10:00 a.m. (Eastern Time) at the officers of Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007. Each Qualified Bidder shall be required to confirm, both before and after the Auction, that it has not engaged in any collusion with respect to the submission of any bid, the bidding, or the Auction.  Except as expressly provided herein, the Auction will be conducted openly and will be transcribed.  All creditors of the Debtors and representatives of the Office of the United States Trustee for the Southern District of New York are permitted to attend the Auction provided that they give one (1) business day's advance written notice to Debtors' counsel by email to Wilmer Cutler Pickering Hale and Dorr LLP, Attn: Andrew Goldman and Benjamin Loveland (andrew.goldman@wilmerhale.com; benjamin.loveland@wilmerhale.com).

At the commencement of the Auction, and following the processes described in these Bidding Procedures, the Debtors shall identify the bid that they have determined to be the highest and best offer (the "**Baseline Bid**") and shall permit the Qualified Bidders to submit higher and better bids. Bidding will start at the purchase price and terms proposed in the Baseline Bid, and will proceed thereafter in minimum increments of at least $100,000 (a "**Minimum Overbid Amount**"). The Debtors reserve the right to and may, after consultation with the Consultation Parties, increase or decrease the Minimum Overbid Amount at any time during the Auction. The Stalking Horse Bidder is authorized to increase its bid at the Auction, including with cash, cash equivalents, or other forms of consideration. The Stalking Horse Bidder will also be entitled to a "credit" in the amount of the Breakup Fee plus the Expense Reimbursement to be counted towards its bid such that the cash, and other consideration proposed by the Stalking Horse Bidder, plus the Breakup Fee and Expense Reimbursement "credit," must exceed the most recent bid by at least the Minimum Overbid Amount.  The Debtors, in consultation with the Consultation Parties, shall conduct the Auction in such a manner as to provide the Qualified Bidders a full, fair, and equal opportunity to participate.

In evaluating a Qualified Bid submitted at the Auction, the Debtors may consider, among other things and without limitation, the amount of cash to be paid or delivered, the speed and certainty of consummating a transaction, the effect on employees and creditors of the Debtors, and any other relevant factor. Prior to the conclusion of the Auction, the Debtors, after consultation with the Consultation Parties, shall announce on the record that they have determined in their business judgment that they have received the highest or otherwise best Qualified Bid, and the Qualified Bidder that had submitted such Qualified Bid (the "**Successful Bid**") shall be declared the winning bidder (the "**Successful Bidder**"). The Debtors, after consultation with the Consultation Parties, shall also identify the Qualified Bidder that submitted the next highest or otherwise best Qualified Bid (the "**Back-Up Bid**"), and such bidder shall be declared the "**Back-**

---

[5] In the event the Debtors receive one or more Other Assets Bids, the Debtors reserve the right to modify the Auction procedures described herein to facilitate competing bids with the respect to the assets applicable to such Other Assets Bids.

**Up Bidder.**" The Back-Up Bid shall remain open and irrevocable until the earliest to occur of (i) the Outside Date, (ii) consummation of the transaction with the Successful Bidder, and (iii) the release of such bid by the Debtors in writing (such date, the "**Back-Up Bid Expiration Date**"). If a transaction with the Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid.

All Qualified Bidders at the Auction shall be deemed to have consented to the exclusive core jurisdiction of the Bankruptcy Court and to have waived any right to a jury trial in connection with any disputes relating to the Auction or the Purchased Assets. If a secured creditor (including the Prepetition Secured Parties or Postpetition Secured Parties) is declared a Successful Bidder, such Successful Bidder shall pay cash in the amount of such bid, less any amount of the secured creditor's permitted credit bid.

Post-Auction Process

By 10:00 a.m. the day after the Auction, the Successful Bidder shall submit to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid. The Debtors shall file (and post to the website of the Debtors' claims agent) a notice announcing the results of the Auction and the identity of the Successful Bidder and the Back-Up Bidder on the Court's docket as soon as practicable after conclusion of the Auction, but in any event not later than Noon (ET) the next business day after the conclusion of the Auction.

Within seven (7) business days after the Auction, the Debtors shall return the Deposit of any bidder, together with any interest accrued thereon, who is not declared the Successful Bidder or Back-Up Bidder. Within five (5) business days after the Back-Up Bid Expiration Date, the Debtors shall return the Deposit of such Back-Up Bidder, together with any interest accrued thereon. Upon the authorized return of any such deposit, the bid of such Potential Bidder or Qualified Bidder shall be deemed revoked and no longer enforceable. The Deposit of the Successful Bidder other than the Stalking Horse Bidder shall be applied against the cash purchase price of such bidder's Successful Bid upon the consummation of the Sale Transaction. The Deposit of the Stalking Horse Bidder shall be treated in accordance with the terms of the Stalking Horse APA.

In addition to the foregoing, the deposit of a Qualified Bidder will be forfeited to the Debtors if (i) the Qualified Bidder attempts to modify, or withdraw its Qualified Bid, except as permitted herein, during the time the Qualified Bid remains binding and irrevocable or (ii) the Qualified Bidder is selected as the Successful Bidder and fails to enter into the required definitive documentation or to consummate the Sale Transaction.

## **Modification of Procedures**

The Debtors reserve the right, in their discretion and subject to the exercise of their business judgment, after consultation with the Consultation Parties, to modify or terminate these Bidding Procedures (including to take into account the nature and circumstances of any Other Assets Bid), to waive terms and conditions set forth herein, to extend any of the deadlines or other dates set forth herein, to adjourn the Auction and/or Sale Hearing, and/or, subject to the terms of

8

the Stalking Horse APA, to terminate discussions with any and all prospective bidders (except for the Stalking Horse Bidder) at any time and without specifying the reasons therefor, in each case without further notice but in each case to the extent not materially inconsistent with these Bidding Procedures and/or the Bidding Procedures Order.

**<u>Exhibit 2</u>**

(Sale Notice)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| COLLECTIVE, INC., *et al.*, | ) |
|  | ) Case No. 18-_____ (___) |
| Debtors.[1] | ) |
|  | ) (Joint Administration Requested) |
|  | ) |
|  | ) |

## NOTICE OF SALE OF SUBSTANTIALLY ALL ASSETS

Collective, Inc. ("Collective") and its affiliate, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") are seeking to sell or assign substantially all of their assets (the "Purchased Assets") pursuant to a motion, dated November 19, 2018 (ECF No.[  ]) (the "Sale Motion").

A party has already submitted a binding bid (the "Bid") for the Purchased Assets, as set forth in a certain asset purchase agreement (the "Asset Purchase Agreement"). The Bid remains subject to higher and/or better offers.

By order, dated [   ], 2018 (ECF No. __) (the "Bidding Procedures Order"),[2] the Bankruptcy Court approved certain "Bidding Procedures" that govern the sale of the Purchased Assets to the highest or best bidder.  The Bidding Procedures also afford bidders the opportunity to bid for assets that are not included in the Asset Purchase Agreement, including certain assets related to Collective's legacy managed services business, certain contracts, and equity in the Debtors' foreign subsidiaries (the "**Other Assets**").

The Debtors have requested the Bankruptcy Court enter an order (the "Sale Order"), which provides, among other things, for the sale of the Purchased Assets (and the Other Assets) free and clear of liens, claims, and other interests, to the extent permissible by law, and the assumption by the successful bidder of certain liabilities. A separate notice will be provided to counterparties to executory contracts and unexpired leases with the Debtors that may be assumed and assigned.

Copies of the Asset Purchase Agreement, the Bidding Procedures Order, the Bidding Procedures, and the proposed Sale Order are available upon request to the Debtors' noticing agent, Epiq Corporate Restructuring, LLC, at (212) 225-9200, and are available for download at http://dm.epiq11.com/visto.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Collective, Inc. (2024) and CME Co-Op, LLC (N/A). The location of Debtors' corporate headquarters and the Debtors' service address is: 72 Madison Ave, 3rd Floor, New York, NY 10016.

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order or the Sale Motion.

**ANY INTERESTED BIDDER SHOULD CONTACT THE DEBTORS' ADVISORS AT:**

Oaklins DeSilva & Phillip LLC

Kerry Hatch at (212) 686-9700 or
k.hatch@dp.oaklins.com

**PLEASE TAKE NOTE OF THE FOLLOWING IMPORTANT DEADLINES:**

- The **deadline to submit a bid** for the Purchased Assets is **January 3, 2019 at 5:00 p.m. (Eastern Time)**. A bid must include a cash deposit in the amount of twenty-five thousand U.S. Dollars ($25,000). The failure to abide by the procedures and deadlines set forth in the Bidding Procedures Order and the Bidding Procedures may result in the denial of your bid.

- The deadline to lodge an objection with the Bankruptcy Court to the proposed sale of the Purchased Assets is **January 3, 2019 at 4:00 p.m. (Eastern Time)** (the "Sale Objection Deadline"). Objections must be filed and served in accordance with the Bidding Procedures Order.

- The Auction, if necessary, for the Purchased Assets has been scheduled for **January 8, 2019 at 10:00 a.m. (Eastern Time)**. The Auction may be canceled without notice if the Bid is the only Qualified Bid (as such term is defined in the Bidding Procedures) received.

- The Bankruptcy Court will conduct a hearing (the "Sale Hearing") to consider the proposed sale on **January [10], 2019 at____.m. (Eastern Time)**.

**THE FAILURE OF ANY PERSON OR ENTITY TO FILE AND SERVE AN OBJECTION BY THE SALE OBJECTION DEADLINE SHALL BE A BAR TO THE ASSERTION BY SUCH PERSON OR ENTITY OF ANY OBJECTION TO THE SALE MOTION, THE SALE ORDER, THE SALE TRANSACTION, OR THE DEBTORS' CONSUMMATION AND PERFORMANCE OF THE ASSET PURCHASE AGREEMENT (INCLUDING, WITHOUT LIMITATION, THE DEBTORS' TRANSFER OF THE PURCHASED ASSETS AND ASSUMPTION AND ASSIGNMENT OF THE PURCHASED CONTRACTS, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS).**

Dated:  November [●], 2018
          New York, New York

    _____

Andrew N. Goldman
Nancy L. Manzer
Benjamin W. Loveland (*pro hac vice* pending)
Christopher D. Hampson (*pro hac vice* pending)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York  10007
Telephone:     (212) 230-8800
Facsimile:     (212) 230-8888

*Proposed Counsel to the Debtors
and Debtors in Possession*

**<u>Exhibit 3</u>**

(Notice of Assumption and Assignment)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| COLLECTIVE, INC., *et al.*, | ) Case No. 18-_____ (___) |
| | ) |
| Debtors.[1] | ) (Joint Administration Requested) |
| | ) |
| | ) |

### NOTICE OF ASSUMPTION, ASSIGNMENT AND CURE AMOUNT WITH RESPECT TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF DEBTORS

Pursuant to procedures approved by order of the Bankruptcy Court for the Southern District of New York, dated_____, 2018 (ECF No. [   ]) (the "Bidding Procedures Order"), Collective, Inc. ("Collective") and its affiliate, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") are seeking to assume and assign certain of their executory contracts and unexpired leases in connection with the sale of substantially all of their assets (the "Purchased Assets"). A party (the "Bidder") has already submitted a binding bid (the "Bid") for the Purchased Assets, as set forth in a certain asset purchase agreement (the "Asset Purchase Agreement"), and the Debtors are seeking court approval of this Bid (or such higher and/or better bid) pursuant to a motion, dated November 19, 2018 (ECF No. [   ]) (the "Sale Motion").[2] The Bidding Procedures also afford bidders the opportunity to bid for assets that are not included in the Stalking Horse Bid, including certain assets related to Collective's legacy managed services business, certain contracts, and equity in the Debtors' foreign subsidiaries (the "Other Assets").

**You are receiving this Notice because you may be a party to an executory contract or unexpired lease that is proposed to be assumed and assigned to the Bidder (collectively, the "Assumed Contracts"), or to such other bidder that submits a higher or better offer for the Purchased Assets or Other Assets.**

The current Bidder is: Zeta Global Holdings Corp. A list of the Assumed Contracts is attached hereto as Exhibit A. A copy of the Asset Purchase Agreement is available for download at http://dm.epiq11.com/visto.

The Debtors have determined the current amounts owing (the "Cure Costs") under each Assumed Contract and have listed the applicable Cure Costs on Exhibit A. The Cure Costs are

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Collective, Inc. (2024) and CME Co-Op, LLC (N/A). The location of Debtors' corporate headquarters and the Debtors' service address is: 72 Madison Ave, 3rd Floor, New York, NY 10016.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order or the Sale Motion.

the only amounts proposed to be paid upon the assumption and assignment of the Assumed Contracts.

**To the extent that a non-Debtor party objects to (i) the assumption and assignment of such party's Assumed Contract (including on the basis of failure to provide adequate assurance of future performance) or (ii) the applicable Cure Costs, the non-Debtor party must file and serve an objection (each, an "<u>Objection</u>") by January 3, 2019 at 4:00 p.m. (Eastern Time). All Objections must be filed and served in accordance with the Bidding Procedures Order (ECF No. __), copies of which are available for download at <u>http://dm.epiq11.com/visto</u>.**

**If no Objection is timely received, (i) the non-Debtor party to an Assumed Contract shall be deemed to have consented to the assumption and assignment of the Assumed Contract and shall be forever barred from asserting any objection with regard to such assumption or assignment and (ii) the Cure Costs set forth on Exhibit A attached hereto shall be controlling, notwithstanding anything to the contrary in any Assumed Contract, or any other document, and the non-Debtor party to an Assumed Contract shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such Assumed Contract against the Debtors or the transferee, or the property of any of them.**

If no Qualified Bid (as such term is defined in the Bidding Procedures), other than that of the Bidder, is received for the Purchased Assets, the Debtors will seek to assume and assign the Assumed Contracts at a hearing before the Honorable _____, in the United States Bankruptcy Court for the Southern District of New York, 1 Bowling Green, New York, New York 10004 (the "<u>Sale Hearing</u>") on **January [10], 2019 at ___ _.m. (Eastern Time)**, or at a later hearing, as determined by the Debtors and in accordance with the Bidding Procedures Order. Objections, if any, will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors in accordance with the Bidding Procedures Order.

If one or more Qualified Bids are received, other than that of the Bidder, an auction for the Purchased Assets, including the Assumed Contracts, will be conducted on **January 8, 2019 at 10:00 a.m. (Eastern Time)** (the "<u>Auction</u>"). After the Auction, the Debtors will file, but not serve, in accordance with the Bidding Procedures Order, a notice that identifies the Successful Bidder at the Auction. If the Successful Bidder at the Auction is not the Bidder, then the deadline for a non-Debtor party to object to the assumption and assignment of its Purchased Contract to the Successful Bidder solely on the basis of such Successful Bidder's failure to provide adequate assurance of future performance will be extended so that any such objection may be raised at or before the Sale Hearing; *provided* that the deadline to object to the Cure Costs shall not be extended.

The inclusion of any contract or lease on Exhibit A shall not constitute or be deemed a determination or admission by the Debtors that such contract or other document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).

Notwithstanding the inclusion of any lease or contract on Exhibit A, neither the Bidder nor the Successful Bidder is bound to accept assignment of any Assumed Contract, and may amend the schedule of Assumed Contracts to remove any contract or lease at any time prior to the consummation of the Sale Transaction.

Dated:  November [●], 2018
        New York, New York

                            _____

Andrew N. Goldman
Nancy L. Manzer
Benjamin W. Loveland (*pro hac vice* pending)
Christopher D. Hampson (*pro hac vice* pending)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York  10007
Telephone:     (212) 230-8800
Facsimile:     (212 230-8888

*Proposed Counsel to the Debtors
and Debtors in Possession*

3

# **EXHIBIT B**

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of November 19, 2018 (the "Execution Date") by and among ZETA GLOBAL HOLDINGS CORP., a Delaware corporation ("Purchaser"), and COLLECTIVE, INC., a Delaware corporation, as Debtor and Debtor-in-Possession ("Seller") under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Capitalized terms used herein but not otherwise defined shall have the meanings set forth in Section 13.14 of this Agreement.

R E C I T A L S

WHEREAS, on November 19, 2018 (the "Petition Date"), Seller will have commenced the Bankruptcy Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court;

WHEREAS, Seller is engaged in the business of software sales and related managed services (such businesses, as presently conducted by Seller, shall be collectively referred to herein as the "Business"), as Debtor and Debtor-in-Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Seller wishes to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, all of the Purchased Assets (defined below), together with the Assumed Liabilities of Seller (defined below) upon the terms and subject to the conditions set forth in this Agreement (hereinafter collectively referred to as the "Transaction");

WHEREAS, Purchaser wishes to purchase and take delivery of such Purchased Assets and Assumed Liabilities upon such terms and subject to such conditions;

WHEREAS, the Purchased Assets will be sold pursuant to a Sale Order of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and such Sale Order may include the assumption and assignment of certain executory contracts and service agreements, unexpired leases of equipment and liabilities thereunder, under Section 365 of the Bankruptcy Code and pursuant to the terms and conditions of this Agreement; and

WHEREAS, all of the obligations of the parties under this Agreement are conditioned upon the approval of the Bankruptcy Court in accordance with Article III hereof.

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements herein set forth and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE

Except as otherwise provided and subject to the terms and conditions set forth in this Agreement and subject to Bankruptcy Court approval, Seller agrees to sell, convey, assign,

transfer and deliver to Purchaser, and Purchaser agrees to purchase from Seller at the Closing, all of Seller's right, title and interest in and to the Purchased Assets, free and clear of all Liens, claims or interests of any type or nature, whether known or unknown, of Seller or any other party.

## ARTICLE II
## DESCRIPTION OF PURCHASED ASSETS; EXCLUDED ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1    Purchased Assets.   Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase, acquire and take assignment and delivery from Seller, all of Seller's right and title to and interest in and to the assets, properties, and rights (contractual or otherwise) owned by Seller, excluding only the Excluded Assets (defined below) (the assets so included, the "Purchased Assets"). The Purchased Assets shall include, without limitation, all of Seller's right, title and interest in and to the following (in each case to the extent not included within the definition of Excluded Assets):

(a)    all equipment, machinery or other tangible personal property, including the items listed on Schedule 2.1(a) hereto and any warranty rights or claims associated therewith;

(b)    the contracts, agreements, contract rights, leases of real property, leases of equipment, machinery or other tangible personal property license agreements, customer contracts, purchase and sales orders (if any), financial instruments, royalty agreements, third party guaranties, indemnifications, arrangements and understandings, whether oral or written, to which Seller is a party (whether or not legally bound thereby) and which relate to the Purchased Assets and the operation of the Business, to the extent listed on Schedule 2.1(b) hereto as such schedule may be amended pursuant to Section 2.3(c) below (the "Assumed Contracts"), it being understood that the Purchaser shall be solely responsible for any "cure payments" required to be made under Section 365 of the Bankruptcy Code in connection with any assumption and assignment of an Assumed Contract to the Purchaser;

(c)    all Permits listed on Schedule 2.1(c) transferable to Purchaser pursuant to their terms and in accordance with applicable Laws;

(d)    all intellectual property owned by Seller, including but not limited to all domestic and foreign patents, patent applications (regardless of the applicant), trademarks, service marks and other indicia of origin, trademark and service mark registrations and applications for registrations thereof, copyrights, copyright registrations and applications for registration thereof, Internet domain names and universal resource locators (URLs), trade secrets, inventions (whether or not patentable), invention disclosures, moral and economic rights of authors and inventors (however denominated), technical data, customer lists, vendor lists, corporate and business names, trade names, trade dress, brand names, know-how, show-how, formulae, methods (whether or not patentable), designs, processes, procedures, technology, source codes, object codes, computer software programs, databases, data collectors and other proprietary information or material of any type, whether written or unwritten (and all goodwill

associated with, and all derivatives, improvements and refinements of, any of the foregoing), including the registered intellectual property listed on Schedule 2.1(d) hereto;

(e)    all prepaid items and or expenses listed on Schedule 2.1(e) hereto;

(f)    all books and records related to the Purchased Assets or the Business (other than those related to the Excluded Assets or the Excluded Liabilities), including customer or client lists, files, documentation, records and the related documentation;

(g)    other than the Excluded Assets, all of Seller's right, title and interest in and to all other assets, whether real or personal, tangible or intangible, used by Seller or useful in the operation of the Business;

(h)    all claims, indemnities, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent) related to the Purchased Assets or the Business (other than those (a) related to the Excluded Assets or the Excluded Liabilities, (b) claims on insurance policies of Seller, or (c) claims otherwise prosecutable by the chapter 11 estate for the benefit of unsecured creditors, as more fully described in Section 2.2(g) below); and

(i)    all deposits and prepayments held by third parties pursuant to any Assumed Contract.

Section 2.2    Excluded Assets.  The Purchased Assets shall include all assets, properties and/or rights of Seller except for those set forth in this Section 2.2 (collectively, the "Excluded Assets"):

(a)    all Cash and Cash Equivalents;

(b)    all Accounts Receivable;

(c)    the Stock Consideration (as defined in Section 5.1(b));

(d)    the Common Stock Consideration and the Preferred Stock Consideration, including the Common Stock Holdback Shares and the Preferred Stock Holdback Shares (as such terms are defined in that certain Asset Purchase Agreement, dated as of December 31, 2017, among Seller, Compass IQ, Inc., Compass Acquisition Corp. and Purchaser);

(e)    any Permits that are not transferable pursuant to their terms and in accordance with applicable Laws;

(f)    any Contracts that are not Assumed Contracts listed on Schedule 2.1(b) hereto (the "Excluded Contracts");

(g)    all claims and actions of the Seller arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code or similar state laws;

(h)     any of the following books and records: corporate seals, organizational documents, corporate governance agreements, minute books, stock books, tax returns, books of account or other records having to do with the corporate organization or governance of Seller, all employee-related or employee benefit-related files or records (other than personnel files of Transferred Employees), and any other books and records which Seller is prohibited from disclosing or transferring to Purchaser under applicable Law and is required by applicable Law to retain;

(i)     all insurance policies of Seller and all rights to applicable claims and proceeds thereunder;

(j)     equity securities or other ownership interest of any of Seller's subsidiaries; and

(k)     any adequate assurance deposit under Section 366 of the Bankruptcy Code.

Section 2.3     Assumed Liabilities; Excluded Liabilities.

(a)     At the Closing, Purchaser shall assume and agree to perform and discharge only the following Liabilities of Seller to the extent not previously performed or discharged, and no others: (i) all Liabilities of Seller which first accrue and are to be performed from and after the Closing under the Assumed Contracts, and which relate solely to periods of time on or after the Closing Date and (ii) liabilities and obligations relating to and arising from Purchaser's operation of the Purchased Assets after the Closing Date (items (i) and (ii) are collectively referred to herein as the "Assumed Liabilities").

(b)     Other than the Assumed Liabilities, Purchaser shall not assume or be bound by or be obligated or responsible for any duties, responsibilities, services, commitments, expenses, obligations or liabilities of Seller or relating to the Purchased Assets (or which may be asserted against or imposed upon Purchaser as a successor or transferee of Seller as an acquirer of the Purchased Assets as a matter of law) of any kind or nature, fixed or contingent, known or unknown, including, without limitation, the following (collectively, the "Excluded Liabilities"):

(i)     any Liability of Seller in respect of any Taxes;

(ii)     any Liability of Seller under any contract or lease that is not an Assumed Contract;

(iii)     any Liability of Seller which first accrued and was to be performed prior to the Closing under the Assumed Contracts or which otherwise relate to periods of time prior to the Closing Date;

(iv)     any Liability of Seller relating to and arising from Seller's operation of the Purchased Assets prior to the Closing;

(v)     any Liability of Seller arising out of or resulting from its compliance or noncompliance with any Law;

(vi)      any Liability of Seller arising out of or related to any Legal Proceeding against it or any Legal Proceeding which could reasonably be expected to have an adverse effect on the Purchased Assets and which was or could have been asserted on or prior to the Closing Date or to the extent the basis of which arose or accrued on or prior to the Closing Date;

(vii)      any Liabilities of Seller arising under or in connection with any Employee Plans of, or maintained or required to be maintained by, Seller;

(viii)      any Liability of Seller to pay any fees or commissions to any broker or finder in connection with the transactions contemplated by this Agreement; and

(ix)      any Liability of Seller that is not an Assumed Liability.

(c)      Purchaser may amend the Schedules setting forth the Purchased Assets and the Excluded Assets attached hereto at any time on or before five (5) business days prior to the Bid Deadline in order to exclude from the definition of Purchased Asset, and include in the definition of Excluded Asset, any other asset, lease or Contract not otherwise excluded from the definition of Purchased Asset.  The Assumed Contracts shall be assumed by Seller and assigned to Purchaser in accordance with the requirements of Section 365 of the Bankruptcy Code, and Purchaser shall be solely obligated to pay, on the Closing Date, all amounts needed to cure any defaults to the extent such defaults are required to be cured and such cure amounts are required to be paid as a condition to assumption and assignment of any such Assumed Contracts ("Cure Costs").

(d)      Purchaser acknowledges that the Sale Order will authorize the assumption and assignment of the Assumed Contracts without the requirement of any consent by the parties thereto. To the extent any Assumed Contract is not assumable and assignable by Seller to Purchaser under Section 365 of the Bankruptcy Code without the consent of the applicable counterparty thereto, Seller and Purchaser shall use their commercially reasonable efforts prior to Closing to obtain all such required consents of third parties which are necessary for the consummation of the transactions contemplated hereby (without conditions that are materially adverse to Purchaser) (the "Required Consents"). All such Required Consents shall be in writing and executed counterparts thereof shall be delivered to Purchaser on or before the Closing Date. If a Required Consent is not obtained, or if an attempted assignment thereof would be ineffective or would affect the rights thereunder so that Purchaser would not receive all such rights, Seller shall use its commercially reasonable efforts (which shall not require Seller to pay any amounts for such consent) after Closing to provide to Purchaser the benefits under any such Contract or any claim or right, including, without limitation, enforcement for the benefit of Purchaser of any and all rights of Seller against a third party thereto arising out of the default or cancellation by such third party or otherwise. Notwithstanding the foregoing, if Seller does not obtain a Required Consent, Purchaser shall not be required to assume (or deemed to have assumed) such Contract.

## ARTICLE III
## BANKRUPTCY COURT APPROVAL

Section 3.1    Entry of Sale Procedures Order.  No later than November 19, 2018, Seller shall file a motion in form and substance reasonably satisfactory to Purchaser (the "Sale Procedures Motion") with the Bankruptcy Court seeking, entry of an order in form and substance reasonably satisfactory to Purchaser by no later than November 27, 2018 which shall include all of the following provisions (the "Sale Procedures Order"):

(a)    Competing offers to acquire the Purchased Assets shall:

(i)    be submitted in writing to Seller and Purchaser and their respective counsel on or before 5:00 p.m. (Eastern Time) on January 3, 2019, or such other date as set by the Bankruptcy Court (the "Bid Deadline");

(ii)    provide for a purchase price to be paid to Seller that exceeds the Consideration by at least the amount of the Bid Protections (as defined below), with the amount of the Bid Protections to be paid in cash, plus the initial Overbid Increment (as defined below);

(iii)    be accompanied by a signed asset purchase agreement in form and substance substantially similar to this Agreement, together with a redlined, marked copy showing all changes to this Agreement (the "Competing Agreement");

(iv)    must not be subject to due diligence contingencies or other conditions beyond those imposed by Purchaser;

(v)    remain open until the conclusion of the Sale Hearing (as defined below);

(vi)    contain terms and conditions no less favorable to Seller than the terms and conditions of this Agreement;

(vii)    be accompanied by evidence establishing that the bidder is capable and qualified, financially, legally, and otherwise, of unconditionally performing all obligations under the Competing Agreement;

(viii)    be accompanied by a cashier's check or other good funds made payable to the order of Seller in an amount of Twenty-Five Thousand] U.S. Dollars ($25,000) (the "Overbidder's Deposit"), and further provide that (A) if the Bankruptcy Court approves a sale of the Purchased Assets to that bidder, Seller may retain the Overbidder's Deposit, and (B) if the Bankruptcy Court does not approve a sale of the Purchased Assets to that bidder, Seller will promptly return the Overbidder's Deposit to such overbidder;

(ix)    be for any of the Purchased Assets;

(x)    include a provision that any Cure Costs are final and binding upon the applicable counterparty and Seller is authorized to pay such Cure Costs directly from the sale proceeds; and

(xi)    include a provision that Purchaser shall be provided all Qualified Bids (as defined below) and the supporting documentation and evidence that each Qualified Bid satisfies the requirements of the Sale Procedures Order.

(b)    If any bidders have submitted a qualifying competing bid in accordance with the Sale Procedures Order hereof (each such bid, a "<u>Qualified Bid</u>"), then a public auction of the Purchased Assets (the "<u>Auction</u>") shall be held at 10:00 a.m. (Eastern Time) on January 8, 2019 (or such other date as set by the Bankruptcy Court) at the offices of Debtor's counsel, Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007.  The Auction shall be governed by the following procedures:

(i)    all bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to jury trial in connection with any disputes relating to the Auction or the sale of the Purchased Assets;

(ii)    bidding will commence at the amount of the highest Qualified Bid as determined by the Seller in its sole and absolute discretion; and

(iii)    each subsequent bid shall be in increments of no less than One Hundred  Thousand U.S. Dollars ($100,000) in consideration value (the "<u>Overbid Increment</u>"); and

(iv)    for the Purchaser, the amount of the Bid Protections shall be taken into account and added to the Purchaser's bid.

(c)    A hearing to approve the successful bid at the Auction, or, if no auction is held, to approve this Agreement, shall be scheduled for a date not later than January 10, 2019 (the "<u>Sale Hearing</u>");

(d)    The Breakup Fee in an amount of Four Hundred Fifty Thousand U.S. Dollars ($450,000) (the "<u>Breakup Fee</u>") plus an expense reimbursement up to a maximum of Two Hundred Fifty Thousand U.S. Dollars ($250,000) (the "<u>Expense Reimbursement</u>" and, together with the Breakup Fee, the "<u>Bid Protections</u>") is deemed approved and shall be paid to Purchaser from the proceeds of sale actually paid in cash by a successful bidder only after a closing in the event that the Bankruptcy Court enters an order approving an offer to purchase any Purchased Assets submitted by a party other than Purchaser or enters an order confirming a plan of reorganization of Seller (other than a plan under which Purchaser acquires the Purchased Assets) no later than the closing of the sale of any Purchased Assets to a third party or the date an order confirming a plan of reorganization of Seller (other than a plan under which Purchaser acquires the Purchased Assets) is entered, as applicable;

(e)    No other bidder for the Purchased Assets shall be entitled to payment of any breakup fee;

(f)    Except as otherwise provided in the Sale Procedures Order, any entity that fails to submit a timely, conforming Qualified Bid, as set forth above, shall be disqualified from bidding for the Purchased Assets at the Auction or the Sale Hearing, unless the Bankruptcy Court orders otherwise; and

(g)     If no timely, conforming Qualified Bid is submitted in accordance with the Sale Procedures Order, Seller shall request at the Sale Hearing that the Court approve the proposed sale of the Purchased Assets to Purchaser under this Agreement.

Section 3.2     Entry of Order Approving Sale.

(a)     In the event there is no Auction, or that Purchaser presents the winning bid at the Auction, then Seller shall use its reasonable best efforts to obtain entry of an order of the Bankruptcy Court approving the sale on the terms of this Agreement on the date previously set for the Sale Hearing, or such other date set by the Bankruptcy Court. The Sale Order shall be in accordance with the terms of this Agreement, shall be in a form reasonably satisfactory to Purchaser and Seller, and shall, among other things:

(i)     approve and direct the sale and assignment of the Purchased Assets to Purchaser and approve and direct the assumption and assignment of the Assumed Contracts to Purchaser free and clear of all Liens, claims or interests, based on appropriate findings and rulings pursuant to, inter alia, Sections 363(b), (f) and (m) and 365 of the Bankruptcy Code, including but not limited to Sections 365(h), (i), (l) and (n) and the release of Purchaser of any rights otherwise associated with, and which may otherwise be to the benefit of, any third parties; provided that notwithstanding anything to the contrary in this Agreement, Purchaser shall not be entitled to disapprove the Sale Order by reason of, and Purchaser's (or a successful overbidder's) obligation to consummate the transactions provided for herein shall not be conditioned upon the assumption and assignment of, any Assumed Contracts with respect to which the Bankruptcy Court determines that Purchaser (or a successful overbidder) has failed to provided adequate assurance of future performance pursuant to Section 365 of the Bankruptcy Code;

(ii)     include a finding that Purchaser is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code;

(iii)     include a finding that Purchaser is not deemed to be a successor to Seller, to have, de facto or otherwise, merged with or into Seller or to be a mere continuation of Seller;

(iv)     include a finding that the Consideration is a fair and reasonable price for the Purchased Assets;

(v)     include a finding confirming the adequacy of notice to all creditors and parties in interest and parties to any executory contract, unexpired lease or right of entry; and

(vi)     include provisions for the retention of jurisdiction in the Bankruptcy Court over matters relating to the transactions contemplated in this Agreement including matters relating to title to the Purchased Assets and claims against the Purchased Assets which arose or were based on facts or occurrences prior to the Closing. Furthermore, the Sale Order shall not have been reversed, stayed, modified or amended.

(b)     Seller shall provide notice of any hearing on the motion to approve the Sale Order or any other matter before the Bankruptcy Court relating to this Agreement or the Transaction Documents, in each case as required by the Bankruptcy Code, the Federal Rules of

Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York or as otherwise ordered by the Bankruptcy Court.

(c)     Notwithstanding anything to the contrary in this Section 3.2 or any other provision of this Agreement, in the event that a Qualified Bid of a third party (an "Alternative Purchaser," and the underlying agreement between the Alternative Purchaser and Seller, the "Alternative APA") is approved by the Bankruptcy Court at the hearing on the Sale Motion, this Agreement, may become an approved "back-up bid" in Purchaser's sole discretion and pursuant to the Sale Procedures Order, unless at the Auction, other higher and better bids are received and the Seller elects to make a different Alternative Purchaser the "back-up bidder."

Section 3.3     Certain Bankruptcy Undertakings by Seller.

(a)     On or before November 19, 2018, Seller shall file the Sale Motion. Except as ordered by the Bankruptcy Court or to the extent Seller's board of directors reasonably determines in good faith, in consultation with outside counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law, Seller shall neither take any action, nor fail to take any action, which action or failure to act would reasonably be expected to prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement; or (ii) result in (A) the reversal, avoidance, revocation, vacating or modification (in any manner that would reasonably be expected to materially and adversely affect Purchaser's rights hereunder), or (B) the entry of a stay pending appeal.

(b)     If the Sale Procedures Order, the Sale Order or any other order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Seller, with the cooperation and support of Purchaser, shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion, and shall endeavor to obtain an expedited resolution of such appeal.

**ARTICLE IV**
**INSTRUMENTS OF TRANSFER AND ASSUMPTION**

Section 4.1     Transfer Documents.  At the Closing, Seller will deliver to Purchaser (a) one or more Bills of Sale in substantially the form attached hereto as Exhibit A (the "Bill of Sale"), and (b) all such other good and sufficient instruments of sale, transfer and conveyance consistent with the terms and provisions of this Agreement, including, without limitation, the Purchased Assets, and any other assignments as shall be reasonably necessary to vest in Purchaser all of Seller's right and title to, and interest in, the Purchased Assets.

Section 4.2     Assignment and Assumption Documents.  At the Closing, Purchaser and Seller will execute and deliver an Assignment and Assumption Agreement in substantially the form attached hereto as Exhibit B (the "Assumption Agreement") in order to effect the assignment and assumption of the Assumed Liabilities.

**ARTICLE V**
**CONSIDERATION; ALLOCATION**

Section 5.1    Consideration. In exchange for the sale, assignment, transfer, conveyance and delivery from Seller of the Purchased Assets, Purchaser shall provide consideration (collectively, the "Consideration"), consisting of:

(a)    The assumption of the Assumed Liabilities pursuant to this Agreement; and

(b)    One Million One Hundred Fifty Thousand Three Hundred and Seven (1,150,307) shares of Series F-2 Preferred Stock of Purchaser (the "Stock Consideration") with a deemed aggregate value as of the Closing Date of Fifteen Million Dollars ($15,000,000).

Section 5.2    Deposit. Purchaser has provided in good faith a cash deposit in the amount of Twenty-Five Thousand U.S. Dollars ($25,000) (the "Deposit"). If the Closing occurs, the Deposit shall be returned to Purchaser at the Closing. If the Closing does not occur, then the Deposit shall be disbursed as follows: (i) in the event of a termination of this Agreement by Seller pursuant to Section 12.2(d), Seller shall be entitled to retain the Deposit as liquidated damages; (ii) in the event of a termination of this Agreement for any reason other than by Seller pursuant to Section 12.2(d), the Deposit shall be returned to Purchaser; or (iii) in the event of a termination of this Agreement and the Deposit has not been disbursed in accordance with clauses (i) or (ii) of this Section 5.2, then the Deposit shall be disbursed as any court of competent jurisdiction may direct. Purchaser and Seller shall cooperate to select or establish an account designated to hold the Deposit prior to its disbursement, and to implement the provisions of this Section 5.2.

Section 5.3    Allocation of Consideration. Within ninety (90) days following the Closing, Purchaser shall deliver to Seller a statement allocating the Consideration among the Purchased Assets in accordance with Section 1060 of the Code (the "Allocation Statement").

## ARTICLE VI
## CLOSING

Section 6.1    Closing Date. Subject to the terms and conditions hereof, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place via email, at the offices of Wilmer Cutler Picker Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007, or at such other location as may be mutually agreed upon between the Parties on the date which is not later than the first (1st) business day following the date on which all conditions to Closing set forth in Articles X and XI hereof have been satisfied or waived (the "Closing Date"). The Closing shall be effective as of 12:01 a.m. Eastern Time on the Closing Date.

## ARTICLE VII
## SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Purchaser that the statements contained in this Article VII are true and correct as of the date of this Agreement, subject to the disclosures and exceptions set forth in the Disclosure Schedules attached hereto:

Section 7.1    Organization, Qualification and Corporate Power.  Seller is a corporation duly organized, validly existing and in good standing under the Laws of the state of Delaware and is in good standing under the Laws of each jurisdiction where such qualification is required, except where the lack of such qualification would not reasonably be expected to have a Material Adverse Effect.  Seller has all necessary power and authority to own and operate its properties and to carry on its business as it is now being conducted. Subject to entry of the Sale Order, Seller has the power and authority to execute and deliver and perform its obligations under this Agreement and the other Transaction Documents, and to undertake the transactions contemplated hereby and thereby. As used herein, the term "Transaction Documents" means this Agreement and all other agreements, documents and instruments executed in connection herewith or required to be executed and/or delivered by Seller in accordance with the provisions of this Agreement.

Section 7.2    Authorization, Execution and Delivery of Agreement and Transaction Documents. Subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and the other Transaction Documents by Seller and the transfer or assignment of the Purchased Assets to Purchaser have been duly and validly authorized and approved by all necessary corporate action. Subject to entry of the Sale Order and pursuant thereto, Seller will have full power, right and authority to sell and convey to Purchaser the Purchased Assets owned by Seller.

Section 7.3    Title to and Condition of Assets.  Seller has title to, or a valid leasehold interest in, all of the properties and assets included in the Purchased Assets, and subject to entry of the Sale Order and upon the consummation of the transactions contemplated hereby and by the Transaction Documents, Purchaser will acquire title to all of the Purchased Assets, free and clear of all Liens. The Purchased Assets include, without limitation, all material tangible and intangible assets necessary for the conduct of the Business as it is currently conducted and such assets are sufficient for the continued conduct of the Business after the Closing in all material respects in substantially the same manner as conducted by the Seller as of the Closing.

Section 7.4    Legal Proceedings.  Except as set forth on Schedule 7.4, there is no Legal Proceeding pending or, to the Knowledge of Seller, threatened in writing against Seller or the Purchased Assets (or to the Knowledge of Seller, pending or threatened, against any of the officers, directors or employees of Seller with respect to their business activities related to the Purchased Assets) (a) that as of the date hereof challenges or that as of the date hereof is reasonably expected to have the effect of preventing, making illegal, delaying or otherwise interfering with any of the transactions contemplated by this Agreement; or (b) that is related to the Purchased Assets to which Seller is otherwise a party.

Section 7.5    Real Property.  Seller does not own any real property.  Schedule 7.5 sets forth the street addresses of all real property used or held for use in the Business which Seller leases, operates, occupies, or subleases in connection with the Business or upon which any tangible Purchased Assets are located and all instruments, easements, leases, subleases, options and other material agreements (including all amendments thereto) creating any interest or right in Seller or any other party in any of the real property specifying the name of the lessor or sublessor (as applicable).

Section 7.6    No Violation of Laws or Agreements.  Subject to order of the Bankruptcy Court, the execution and delivery by Seller of this Agreement and the Transaction Documents contemplated hereby, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated herein and therein will not violate, (i) any Laws or any judgment, decree, order, regulation or rule of any court or Governmental Authority to which Seller is subject; (ii) result in any breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, or give to any Person any rights of termination, amendment, acceleration or cancellation of, or result in the creation of any Lien on any of the Purchased Assets, any note, bond, mortgage, indenture, contract, agreement, lease, license, Permit, franchise or other instrument to which Seller is a party and which relates to any of the Purchased Assets; and (iii) contravene, conflict with or result in a violation of any provision of any organizational documents of Seller, except in the cases of clauses (i) and (ii) above, for such violations which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 7.7    Employee Benefits; ERISA Matters.  Seller has made available to Purchaser summaries of all material Employee Plans covering employees, directors or consultants or former employees, directors or consultants in, or related to, the Business. Seller has made available to Purchaser true and complete summaries of all such material Employee Plans, including summaries of written descriptions thereof which have been distributed to Seller's employees and for which Seller has copies, all annuity contracts or other funding instruments relating thereto, and a summary description of all Employee Plans which are not in writing.  To the Knowledge of Seller, neither Seller nor any ERISA Affiliate has incurred any liability with respect to any Employee Plan, which may create, or result in any liability to Purchaser.

Section 7.8    Labor Matters.  Except as set forth on Schedule 7.8 and except for "at-will" offer letters that do not contain post-termination obligation on Seller, there are no employment, consulting, severance or indemnification contracts between Seller and any of its employees.  Seller (i) is not party to or bound by any collective bargaining or similar agreement with any labor organization; (ii) has no employees that are represented by any labor organization; and (iii) has no Knowledge of any union organizing activities among the employees of Seller.

Section 7.9    Brokers.  Except for those set forth in Schedule 7.9, for whom Seller shall be solely responsible for any fees or commissions owing, Seller has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of Seller which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets.

Section 7.10    Permits.  Seller is and at all times has been in compliance in all material respects with all Permits applicable to it, or applicable to the conduct and operations of the Business, or relating to or affecting the Purchased Assets.  Seller has not received any written notice from any Governmental Authority specifically alleging (i) any actual, alleged, possible or potential material violation of, or failure to comply with, any such Permits or (ii) any actual, alleged, possible or potential revocation, withdrawal, suspension, cancellation or termination of, or any modification to, any Permit.

Section 7.11    Insurance.    Seller is not in material default under any of its insurance policies or binders, and Seller has not failed to give any notice or to present any claim under any such policy or binder in a due and timely fashion.

Section 7.12    Taxes; Tax Returns.    Seller has not received any outstanding notice of audit, and is not undergoing any audit, of Tax Returns relating to the Business and has never received any written notice of deficiency or assessment from any taxing authority with respect to liability for Taxes relating to the Business which has not been fully paid or finally settled. Seller has complied in all material respects with all applicable Laws, rules and regulations relating to the payment and withholding of Taxes and has withheld all amounts required by law to be withheld from the wages or salaries of employees and independent contractors of the Business and is not liable for any Taxes with respect to the employees and independent contractors of the Business for failure to comply with such laws, rules and regulations.

Section 7.13    Compliance with Laws.    Seller and the conduct of the Business are and at all times have been in compliance in all material respects with all Laws applicable to them or to the conduct and operations of the Business or relating to the Purchased Assets. Except as set forth on Schedule 7.13, Seller has not received any written notice to the effect that, or otherwise been advised of and to the Knowledge of Seller there has not occurred with respect to the Purchased Assets or the Business (a) any actual, alleged, possible or potential violation of, or failure to comply with, any such Laws, or (b) any actual, alleged, possible or potential obligation on the part of Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

## ARTICLE VIII
## PURCHASER'S REPRESENTATIONS

Purchaser represents and warrants to Seller that the statements contained in this Article VIII are true, correct and complete as of the date of this Agreement.

Section 8.1    Organization; Qualification and Corporate Power.    Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.  Purchaser has all necessary power and authority to (a) own and operate its properties, carry on its business as it is now being conducted, (c) perform its obligations under this Agreement and the other Transaction Documents, and to undertake and carry out the transactions contemplated hereby and thereby, and (d) own and operate the Purchased Assets and Business.

Section 8.2    Authorization, Execution and Delivery of Agreement and Transaction Documents. All necessary consents and approvals have been obtained by Purchaser for the execution and delivery of this Agreement and the Transaction Documents. The execution, delivery and performance of this Agreement and the other Transaction Documents in accordance with their terms by Purchaser have been duly and validly authorized and approved by all necessary corporate action. Purchaser has full power, right and authority to acquire the Purchased Assets. This Agreement is, and each of the other Transaction Documents when so executed and delivered will be, a valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors.

Section 8.3    <u>Brokers</u>.    Purchaser has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of Purchaser which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets.

Section 8.4    <u>No Violation of Laws or Agreements</u>.    The performance by Purchaser of its obligations contemplated hereunder and the consummation by Purchaser of the transactions contemplated herein will not violate, (i) any Laws or any judgment, decree, order, regulation or rule of any court or Governmental Authority to which Purchaser is subject; or (ii) contravene, conflict with or result in a violation of any provision of any organizational documents of Purchaser.

Section 8.5    <u>Stock Consideration</u>.    The Stock Consideration to be issued hereunder has been duly authorized and when issued will be valid and legally issued, fully paid and nonassessable, and, other than Liens and restrictions contained in Purchaser's Certificate of Incorporation, its amended and restated stockholders' agreement, its amended and restated registrations rights agreement or its senior debt facilities, free and clear of Liens (other than restrictions on transfer or pursuant to applicable securities Laws) and not in violation of any preemptive or similar rights or any applicable securities Laws.

Section 8.6    <u>Purchaser Experience</u>.    Purchaser is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement.    In consultation with experienced counsel and advisors of its choice, Purchaser has conducted its own independent review and analysis of the Purchased Assets, the Assumed Liabilities and the rights and obligations it is acquiring and assuming under the Transaction Documents.    Purchaser acknowledges that it and its representatives have been permitted such access to the books and records, contracts and other properties related to the Purchased Assets as it required to complete its review.

Section 8.7    <u>Adequate Assurances Regarding Assumed Contracts</u>.    As of the Closing, Purchaser will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts

## ARTICLE IX
## SELLER'S AND PURCHASER'S COVENANTS AND AGREEMENTS

Section 9.1    <u>Conduct of Business</u>.    Except as otherwise expressly contemplated by this Agreement or with the prior written consent of Purchaser or except as described on <u>Schedule 9.1</u>, from the date hereof until the Closing Date, Seller shall use commercially reasonable efforts to preserve the Purchased Assets.    Without limiting the generality of the foregoing Seller will, other than in the Ordinary Course of Business or with Purchaser's written consent, refrain from doing any of the following in respect of the Purchased Assets: (i) disposing of, or transferring, any Purchased Asset, (ii) transferring any tangible Purchased Asset to any other location to the extent that such other location is not otherwise part of the Purchased Assets, or (iii) except as otherwise provided or required in this Agreement, terminating, amending or modifying the material terms of any of the Assumed Contracts; <u>provided</u>, <u>however</u>, notwithstanding anything to the contrary in the preceding sentence, Seller may, in its reasonable discretion and upon prior written notice to

Purchaser take such actions in connection with or as a result of the consequences (adverse or otherwise) of filing the Bankruptcy Case, if any, to cure defaults in respect of the Assumed Contracts.

Section 9.2    Mutual Covenants.  The parties hereto mutually covenant (and subject to the other terms of this Agreement):

(a)    from the date of this Agreement to the Closing Date, to cooperate with each other in determining whether filings are required to be made or consents (including any Required Consents) required to be obtained in any jurisdiction in connection with the consummation of the transactions contemplated by this Agreement and in making or causing to be made any such filings promptly and in seeking to obtain timely any such consents including any Required Consents (each party hereto shall furnish to the other and to the other's counsel all such information as may be reasonably required in order to effectuate the foregoing action), which consents shall not, in any event, include any consent the need for which is obviated by the Sale Order or otherwise by the provisions of the Bankruptcy Code; and

(b)    from the date of this Agreement to the Closing Date, to advise the other parties promptly if such party determines that any condition precedent to its obligations hereunder will not be satisfied in a timely manner.

Section 9.3    Access to Information.  Prior to and through the date on which the Closing occurs or this Agreement is terminated, Seller shall cooperate with Purchaser and shall give Purchaser and its representatives (including Purchaser's accountants, consultants, counsel and employees), upon reasonable notice and during normal business hours, full access to the properties, contracts, leases, equipment, employees, affairs, books, documents, records and other information of Seller to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement and shall cause their respective officers, employees, agents and representatives to furnish to Purchaser all available documents, records and other information (and copies thereof), to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement, in each case, as Purchaser may reasonably request. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Seller to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which Seller is bound.

Section 9.4    Public Announcement.  Subject to the provisions of the Bankruptcy Code and Seller's right to make such filings, disclosures, and statements as it in good faith deems necessary or appropriate in connection with the Bankruptcy Case (including in connection with the marketing and auction process contemplated by the Sale Procedures Order), neither party shall not make or issue, or cause to be made or issued, any public announcement or written statement concerning this Agreement or the transactions contemplated hereby without making reasonable and good faith efforts to consult with and seek input from the other party prior to release about the content of any such announcement or statement or unless counsel to such party advises that such announcement or statement is required by law (such as an obligation to disclose under federal securities laws of the United States) (in which case the parties hereto shall make reasonable efforts to consult with each other prior to such required announcement).

Section 9.5    <u>Preservation of Records</u>.  From and after the Closing Date, upon request by Seller, Purchaser will permit Seller and its representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Purchaser, to all premises, properties, personnel, books and records, contracts, and documents of or related to the Purchased Assets or the Assumed Liabilities for the purposes of (a) preparing any Tax Returns, (b) enforcing rights or obligations of Seller under this Agreement or any of the Transaction Documents, or (c) complying with the requirements of, or responding to inquiries by, any Governmental Authority; <u>provided</u>, <u>however</u>, that, for the avoidance of doubt, the foregoing shall not require Purchaser to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege or conflict with any confidentiality obligations to which Seller is bound, or (ii) such action could reasonably be expected to result in violation of applicable law or order.  Purchaser agrees to maintain the files or records which are contemplated by the first sentence of this <u>Section 9.4</u> for six (6) years following the Closing.

Section 9.6    <u>Taxes</u>.

(a)    Seller shall be responsible for all Taxes in connection with, relating to or arising out of the Business or the ownership of the Purchased Assets, or the Assumed Liabilities attributable to taxable periods, or portions thereof, ending on or before the Closing, which Taxes shall be an Excluded Liability. All state and local sales and use Taxes, to the extent attributable to periods prior to the Closing, shall be paid or otherwise discharged by Seller.

(b)    Purchaser shall be responsible for (and shall indemnify and hold harmless Seller and its directors, officers, employees, Affiliates, agents, successors and permitted assigns against) any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement ("<u>Transfer Taxes</u>").  To the extent that any Transfer Taxes are required to be paid by Seller (or such Transfer Taxes are assessed against Seller), Purchaser shall promptly reimburse Seller in cash, as applicable, for the full amount of such Transfer Taxes.  Seller and Purchaser shall cooperate and consult with each other prior to filing any Tax Returns in respect of Transfer Taxes.  Seller and Purchaser shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

(c)    Seller and Purchaser shall (i) provide the other with such assistance as may reasonably be requested by either of them in connection with the preparation of any Tax Return, any audit or other examination by any taxing authority or any judicial or administrative proceeding with respect to Taxes, (ii) retain and provide the other with any records or other information which may be relevant to such return, audit, examination or proceeding, and (iii) provide the other with any final determination of any such audit or examination proceeding or determination that affects any amount required to be shown on any Tax Return of the other for any period (which shall be maintained confidentially).

Section 9.7    <u>Good Faith Efforts</u>.  Without limiting the specific obligations of any party hereto under any covenant or agreement hereunder, each party hereto shall use its good faith

efforts to take all action and do all things necessary to consummate the transactions contemplated in this Agreement as soon as reasonably practicable.

Section 9.8    Employees.

(a)    Subject to and in accordance with the provisions of this Section 9.8, Purchaser shall, effective upon the Closing, offer employment to the employees who are employed by Seller as of the Closing and are listed on Schedule 9.8 hereto (the "Employees"). Purchaser shall hire all of the Employees who accept such offer. Employees who accept such offers and become either full-time or part-time employees of Purchaser, consistent with their employment status with Seller, upon the Closing are hereinafter referred to as "Transferred Employees." Seller shall use reasonable commercial efforts to assist Purchaser in securing the employment of the Employees.

(b)    The employment of each Transferred Employee by Seller shall end effective as of the close of business on the day before the Closing and the employment of the Transferred Employees by Purchaser shall commence at or after 12:01 a.m. on the day of the Closing.

Section 9.9    Further Assurances.    From time to time after the Closing and without further consideration, Purchaser and Seller, at the request of the other, will execute and deliver such other instruments of conveyance and transfer or other instruments or documents, and take or arrange for such other actions, as may reasonably be required to effect any of the transactions contemplated by this Agreement or to provide any party hereto with the benefits intended to be conferred and conveyed by this Agreement; provided that, notwithstanding anything to the contrary in this Section 9.8 or any other provision of this Agreement, neither Purchaser nor Seller shall be required to execute any document or take any action that would (i) increase the liability or obligation of the party of whom such document or action is requested beyond that such party would have pursuant to the other provisions of this Agreement, (ii) require or cause the party of whom such action or document is requested to initiate, join in or otherwise become a party to any Legal Proceeding, or (iii) cause such party to incur any material cost or expense that is not already imposed upon it by another provision of this Agreement.

Section 9.10    Confidentiality.

(a)    Each party acknowledges that it currently has and will directly or indirectly disclose Confidential Information to the other party in the course of negotiation of and performance of this Agreement.    All such Confidential Information disclosed hereunder shall remain the sole property of the disclosing party (or other third party), and the receiving party shall have no interest in, or rights with respect thereto, except as set forth herein.    For avoidance of doubt, any Confidential Information of Seller relating to the Purchased Assets and the Assumed Contracts shall be deemed to be Confidential Information of Purchaser as of the Closing ("Deemed Purchaser Confidential Information"), notwithstanding the fact that Seller or any of its officers, directors, employees or representatives have knowledge of such Deemed Purchaser Confidential Information obtained prior to the negotiation and performance of this Agreement. Each party agrees to treat such Confidential Information with the same degree of care and security as it treats its Confidential Information and, in any event, no less degree of care

and security than a reasonably prudent business person would utilize to protect from disclosure and keep confidential its Confidential Information. Each party may disclose such Confidential Information only to those employees and agents who require such knowledge to perform services under this Agreement and each party shall be liable for the acts of such employees and agents in breach of this <u>Section 9.9</u>. Except as otherwise contemplated by this Agreement, neither party shall disclose the Confidential Information of the other party to any third party without the prior written consent of the disclosing party, and the duty of confidentiality created by this section shall survive any termination of the Agreement for a period of five (5) years.

(b)    As used herein, "<u>Confidential Information</u>" means all information or data relating to a party and its affiliates, operations, employees, products or services, clients, customers or potential customers. Confidential Information shall include vendor and customer information, pricing information, and the terms and conditions of this Agreement. Information shall not be considered Confidential Information to the extent, but only to the extent, that such information is: (i) not Deemed Purchaser Confidential Information and is already lawfully known to the receiving party as of the Closing Date as evidenced by reasonable documentary proof, free of any restriction at the time it is obtained; (ii) subsequent to the Closing Date is learned of by the receiving party from an independent third party free of any restriction and without breach of this Agreement; (iii) becomes publicly available through no wrongful act of or breach of this Agreement by the receiving party; (iv) independently developed by the receiving party without reference or access to any Confidential Information of the disclosing party; or (v) required to be disclosed by law.

Section 9.11    <u>Survival of Representations and Warranties</u>. None of the representations and warranties of Seller or Purchaser contained in this Agreement or made in any other documents or instruments delivered pursuant to this Agreement shall survive the Closing hereunder other than the representations and warranties of Purchaser in <u>Section 8.5</u> which shall survive the Closing for a period of 12 months.

Section 9.12    "<u>AS IS</u>" <u>Transaction; Disclaimer of Implied Warranties</u>. Except as expressly provided in <u>Article VII</u> above, Purchaser hereby acknowledges and agrees that Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets (including income to be derived or expenses to be incurred in connection with the Purchased Assets, the physical condition of any personal property comprising a part of the Purchased Assets or which is the subject of any Assumed Contract, the environmental condition or other matter relating to the physical condition of any real property or improvements, the zoning of any such real property or improvements, the value of the Purchased Assets (or any portion thereof), the transferability of the Purchased Assets, the terms, amount, validity, collectability or enforceability of any Assumed Liabilities, Assumed Contracts, the title of the Purchased Assets (or any portion thereof), the merchantability or fitness of the personal property comprising a portion of the Purchased Assets or any other portion of the Purchased Assets for any particular purpose, or any other matter or thing relating to the Purchased Assets (or any portion thereof). Without in any way limiting the foregoing, except as otherwise expressly provided in <u>Article VII</u> above, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets.

# ARTICLE X
# CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO CLOSE

The obligation of Purchaser under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Purchaser:

Section 10.1    Accuracy of Representations and Warranties; Performance of this Agreement. Each of the representations and warranties made by Seller shall be true and correct on and as of the date hereof (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and at and as of the Closing Date, except for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect. Seller shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by it on or prior to the Closing.

Section 10.2    Officer's Certificate. Seller shall have delivered to Purchaser a certificate executed by an executive officer of Seller (including incumbency certificates) as Purchaser may reasonably request in order to evidence compliance with the conditions set forth in Section 10.1.

Section 10.3    Bill of Sale; Assumption Agreement. Seller shall have delivered to Purchaser an executed Bill of Sale and Assumption Agreement pursuant to Sections 4.1 and 4.2 hereof.

Section 10.4    Joinder Agreements. Seller or its designee will execute and deliver a joinder to Purchaser's Amended and Restated Stockholders' Agreement and a joinder to Purchaser's/Zeta's Amended and Restated Registration Rights Agreement  in substantially the form attached hereto, respectively, as Exhibit C and Exhibit C-1 (the "Joinder Agreements").

Section 10.5    Bankruptcy Matters. The Sale Order shall have been entered by the Bankruptcy Court. All such orders must be in effect and must not have been reversed or stayed or modified in any material respect.

Section 10.6    Required Consents.  Purchaser shall have received all Required Consents set forth on Schedule 10.6 hereto.

Section 10.7    No Material Adverse Effect.  Since the date of this Agreement, there shall have been no Material Adverse Effect to the Purchased Assets or the Business.

# ARTICLE XI
# CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE

The obligations of Seller under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Seller:

Section 11.1    Accuracy of Representations and Warranties; Performance of this Agreement. Each of the representations and warranties made by Purchaser in this Agreement shall be true and correct on and as of the date hereof (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and at and as of the Closing Date, except for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect on the ability of Purchaser to timely consummate the transactions contemplated hereunder (including issuance of the Consideration and any other cash payments, fees or expenses contemplated hereby).  Purchaser shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by it on or prior to the Closing.

Section 11.2    Authorizing Resolutions. Purchaser shall have delivered to Seller copies of the authorizing resolutions of its Board of Directors authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and all instruments and documents to be delivered in connection herewith and the transactions contemplated hereby or thereby.

Section 11.3    Assumption Agreement. Purchaser shall have delivered to Seller an executed Assumption Agreement pursuant to Section 4.2 hereof.

Section 11.4    Joinder Agreements and Certificate. Purchaser will execute and deliver the Joinder Agreements, and will issue a stock certificate representing the Stock Consideration as provided in the Sale Order.

Section 11.5    Bankruptcy Matters. The Sale Order shall have been entered by the Bankruptcy Court. The Sale Order must be in effect and must not have been reversed or stayed or modified in any material respect.

# ARTICLE XII
# TERMINATION

Section 12.1  <u>Breaches and Defaults; Opportunity to Cure</u>.  Prior to the exercise by a party of any termination rights afforded under <u>Sections 12.2 (c) or (d)</u> of this Agreement, if either party (the "<u>Non- Breaching Party</u>") believes the other (the "<u>Breaching Party</u>") to be in breach hereunder, the Non- Breaching Party shall provide the Breaching Party with written notice specifying in reasonable detail the nature of such breach, whereupon if such breach is curable the Breaching Party shall have ten (10) calendar days from the receipt of such notice to cure such breach to the reasonable satisfaction of the Non-Breaching Party. If the breach is not cured within such time period, then the Non-Breaching Party's sole remedy shall be to terminate this Agreement if the breach is such that the condition set forth in <u>Section 10.1</u> or <u>11.1</u>, as applicable, shall not be satisfied (as provided in <u>Section 12.2</u>); <u>provided</u>, <u>however</u>, that the Non-Breaching Party shall not be entitled to terminate this Agreement if it is in material breach of this Agreement.

Section 12.2  <u>Termination</u>. This Agreement may be terminated and the transactions contemplated herein may be abandoned, by written notice given to the other party hereto, at any time prior to the Closing:

(a)  by mutual written consent of Seller and Purchaser;

(b)  by Seller or Purchaser if (i) the Sale Procedures Order is not approved by the Bankruptcy Court at the initial hearing on the Sale Procedures Motion, or (ii) the Bankruptcy Court enters an Order approving the sale of the Purchased Assets to a third-party purchaser following the entry of the Sale Procedures Order, in either case unless due to the failure of the party seeking to terminate this Agreement to perform in any material respect its obligations under this Agreement required to be performed by it at or prior to the Closing;

(c)  subject to the right to cure set forth in <u>Section 12.1</u> at any time prior to the Closing Date, by Purchaser if Seller is in breach of any covenant, representation, undertaking or warranty such that the condition set forth in <u>Section 10.</u>1 shall not be satisfied, and Purchaser has not waived such condition in writing on or before the Closing Date;

(d)  subject to the right to cure set forth in <u>Section 12.1</u>, at any time prior to the Closing Date by Seller if Purchaser is in breach of any covenant, representation or warranty such that the condition set forth in <u>Section 11.1</u> shall not be satisfied, and Seller has not waived such condition in writing on or before the Closing Date;

(e)  at or prior to the Bankruptcy Court hearing regarding approval of this Agreement, by either Seller or Purchaser, if an Alternative Bid is accepted and approved by the Bankruptcy Court; or

(f)  by Seller or Purchaser if the Closing shall not have occurred on or before January 17, 2019 unless the failure to have the Closing shall be due to the failure of the party seeking to terminate this Agreement to perform in any material respect its obligations under this Agreement required to be performed by it at or prior to the Closing.

## ARTICLE XIII
## MISCELLANEOUS

Section 13.1    Notices. All notices and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, sent by telecopier, electronic mail, recognized overnight delivery service or registered or certified mail, return receipt requested, postage prepaid, to the following addresses:

If to Purchaser:

c/o Zeta Global Holdings Corp.
185 Madison Ave., 5 fl.
New York, NY 10016
Attention: Steven Vine, SVP and General Counsel

E-mail: Svine@zetaglobal.com

with a required copy to:

Manatt, Phelps & Phillips, LLP
1050 Connecticut Ave., NW, Suite 600
Washington, DC 20036
Attention:        Douglas C. Boggs and Alan Noskow
Facsimile:        (202) 637-1540
Email:            DBoggs@manatt.com and ANoskow@manatt.com

If to Seller:

Collective, Inc.
72 Madison Ave., 3rd Floor
New York, NY 10016
Attention: Kerry Bianchi and Michelle Nathan
Email: kbianchi@vistohub.com; mnathan@vistohub.com

with a required copy to:

Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Attention: David Haber, Andrew Goldman, and Benjamin Loveland
Facsimile: (212) 230-8888
Email: david.haber@wilmerhale.com; andrew.goldman@wilmerhale.com;
benjamin.loveland@wilmerhale.com

Notices delivered personally shall be effective upon delivery against receipt. Notices transmitted by telecopy shall be effective when received, provided that the burden of proving notice when notice is transmitted by telecopy shall be the responsibility of the party providing

such notice. Notices transmitted by electronic mail (with hard copy to follow) shall be effective when sent. Notices delivered by overnight mail shall be effective when received. Notices delivered by registered or certified mail shall be effective on the date set forth on the receipt of registered or certified mail, or seventy-two (72) hours after mailing, whichever is earlier.

Section 13.2   Expenses. Except to the extent that Purchaser is otherwise entitled thereto in accordance with the provisions of this Agreement or the Sales Procedures Order, each party shall bear its own expenses and costs, including the fees of any attorney retained by it, incurred in connection with the preparation of this Agreement and the consummation of the transactions contemplated hereby.

Section 13.3   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without application of principles of conflicts of law). In connection with any controversy arising out of or related to this Agreement, Seller and Purchaser hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Case declines or may not accept jurisdiction over a particular matter, the United States District Court for the Southern District of New York, or if, and only if, the United States District Court for the Southern District of New York declines or may not accept jurisdiction over a particular matter, the courts of the State of New York. Seller and Purchaser each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts.

Section 13.4   Assignment. This Agreement binds and benefits the parties and their respective successors and assignees. Other than Purchaser's right to assign its rights to a wholly owned subsidiary, no  party hereto shall have the right to freely assign any of its rights under this Agreement, without the prior written consent of the other parties.  No party may delegate any performance of its obligations under this Agreement other than Purchaser to a wholly owned subsidiary other than with respect to the issuance of the Stock Consideration.

Section 13.5   Successors and Assigns. All agreements made and entered into in connection with this transaction shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns.

Section 13.6   Amendments; Waivers. No alteration, modification or change of this Agreement shall be valid except by an agreement in writing executed by the parties hereto. Except as otherwise expressly set forth herein, no failure or delay by any party hereto in exercising any right, power or privilege hereunder (and no course of dealing between or among any of the parties) shall operate as a waiver of any such right, power or privilege. No waiver of any default on any one occasion shall constitute a waiver of any subsequent or other default. No single or partial exercise of any such right, power or privilege shall preclude the further or full exercise thereof.

Section 13.7   Entire Agreement. This Agreement (including the Exhibits and Disclosure Schedules which are hereby incorporated by reference into and made a part of this Agreement for all purposes) merges all previous negotiations and agreements between the parties hereto,

either verbal or written, and constitutes the entire agreement and understanding between the parties with respect to the subject matter of this Agreement.

Section 13.8  Counterparts. This Agreement may be executed in two or more counterparts, each of which when so executed shall be an original, but all of which together shall constitute one agreement.  Facsimile and/or PDF signatures shall be deemed original signatures.

Section 13.9  Severability. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law, but only as long as the continued validity, legality and enforceability of such provision or application does not materially (a) alter the terms of this Agreement, (b) diminish the benefits of this Agreement or (c) increase the burdens of this Agreement, for any person.

Section 13.10  Section Headings. The section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

Section 13.11  Interpretation. As both parties have participated in the drafting of this Agreement, any ambiguity shall not be construed against either party as the drafter. Unless the context of this Agreement clearly requires otherwise, (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," (b) "including" has the inclusive meaning frequently identified with the phrase "including, but not limited to" and (c) references to "hereof," "hereunder" or "herein" or words of similar import relate to this Agreement.

Section 13.12  Third Parties. Nothing herein, expressed or implied, is intended to or shall confer on any person other than the parties hereto any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 13.13  Specific Performance.  The Parties agree that irreparable damage would occur and that the Parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the Bankruptcy Court without proof of actual damages or otherwise (and, to the fullest extent permitted by Law, each Party hereby waives any requirement for the securing or posting of any bond in connection with such remedy), this being in addition to any other remedy to which they are entitled at law or in equity.

Section 13.14  Definitions.  For purposes of this Agreement (including the Disclosure Schedules hereto) the terms defined in this Agreement shall have the respective meanings specified herein, and, in addition, the following terms shall have the following meanings:

"Accounts Receivable" means (i) any and all accounts receivable, trade accounts and other amounts (including overdue accounts receivable) owed to Seller relating to, or arising in connection with the operation and conduct of, the Business or otherwise and any other similar rights of Seller to payment from third parties and the full benefit of all security for such accounts

or rights to payment, including all trade accounts receivable representing amounts receivable in respect of services rendered, in each case owing to Seller; (ii) all other accounts or notes receivable of Seller and the full benefit of all security for such accounts or notes receivable; and (iii) any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon, in each case that have not been satisfied or discharged prior to the close of business on the day immediately preceding the Closing Date or have not been written off or sent to collection prior to the close of business on the day immediately preceding the Closing Date (it being understood that the receipt of a check prior to the close of business on the day immediately preceding the Closing Date shall constitute satisfaction or discharge of the applicable account or note receivable to the extent of the payment represented thereby).

"Affiliate" means, as to any Person, any other Person, which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other direct or indirect ownership interest, by Contract or otherwise.

"Bankruptcy Code" means 11 U.S.C. Section 101, et. seq., and any amendments thereof.

"Cash and Cash Equivalents" means all of Seller's cash (including petty cash but excluding any checks that remain uncashed or uncleared prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper and government securities and other cash equivalents.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any written or oral contract, agreement, lease, license, financial instrument, or other document or commitment, arrangement, undertaking, practice or authorization that is binding on any Person or its property under any applicable Law.

"Disclosure Schedule" means the schedule executed and delivered by Seller to Purchaser as of the Execution Date setting forth the exceptions to the representations and warranties contained in Article VII and certain other information called for by this Agreement. Unless otherwise specified, each reference in this Agreement to any numbered schedule is a reference to the corresponding numbered schedule that is included in the Disclosure Schedule (unless, and to the extent, the relevance to other representations and warranties is readily apparent from the actual text of the disclosures).

"Employee Plans" means any employment, consulting, severance or other similar contract, plan, arrangement or policy, and each plan, arrangement (written or oral), program, agreement or commitment providing for insurance coverage (including any self-insured arrangements), workers' compensation, disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, life, health, disability or accident benefits or for deferred

compensation, profit-sharing bonuses, stock options, stock purchases or other forms of incentive compensation or post-retirement insurance, compensation or benefits which is entered into, maintained, contributed to or required to be contributed to, by Seller or an ERISA Affiliate or under which Seller or any ERISA Affiliate may incur any liability including under any "employee pension benefit plan" as defined in Section 3(2) of ERISA and any "employee welfare benefit plan" as defined in Section 3(1) of ERISA which Seller or any ERISA Affiliate maintains, administers, contributes to or is required to contribute to, or has maintained, administered, contributed to or was required to contribute to, or under which Seller or any ERISA Affiliate may incur any liability.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

"Governmental Authority" means any federal, state, provincial, municipal and foreign governmental entity, authority, or agency, or any other political subdivision, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"Knowledge" means in the case of Seller, the actual, current knowledge of Kerry Bianchi, in her capacity as Chief Executive Officer and Michelle Nathan, in her capacity as Chief Financial Officer, after reasonable inquiry.

"Laws" means any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, order or other requirement or rule of law.

"Legal Proceeding" means any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Liability" means any liability, indebtedness, obligation, expense, claim, loss, cost, damage, obligation, responsibility, guaranty or endorsement of or by any Person, absolute or contingent, accrued or unaccrued, known or unknown, due or to become due, liquidated or unliquidated, whether or not secured.

"Liens" means any security interests, mortgages, interests, liens, pledges, charges, defects of title, options and other rights of third parties, rights of first refusal, claims (as defined in Section 101 of the Bankruptcy Code), or any other encumbrance or restriction on ownership provided such encumbrance or restriction on ownership can be overridden by Section 363 of the Bankruptcy Code.  "Liens" shall not include Permitted Liens.

"Material Adverse Effect" means any event or change or circumstance, in respect of the operation of the Business and Purchased Assets that, individually or when aggregated with any one or more of the other such changes, events or circumstances, has had or could reasonably be expected to have a material adverse effect on (i) the Purchased Assets, taken as a whole, or (ii) the ability of Purchaser to own or use the Purchased Assets after the Closing; provided, however, that none of the following events, changes or circumstances (individually or when aggregated with any one or more of the other such changes, events or circumstances) shall be deemed to be or constitute a Material Adverse Effect, and none of the following changes, events or

circumstances (individually or when aggregated with any one or more of the other such changes, events or circumstances) shall be taken into account when determining whether a Material Adverse Effect has occurred: (a) war, acts of nature, general strike, acts of terror, (b) general economic, market or political changes or conditions, (c) events, changes or circumstances which generally affect the industries in which Seller conducts business, (d) changes in Laws, unless such Laws or conditions apply solely or principally to the Business or Seller, (e) actions or omissions taken or not taken by or on behalf of Seller in compliance with a specific request from or consented to in writing by Purchaser following the execution of this Agreement, or in compliance with an order from the Bankruptcy Court, and (f) events, changes or circumstances arising from or caused by the announcement of this Agreement or commencement of the Bankruptcy Case or the events, changes or circumstances that substantially contributed to, or resulted in, the commencement of the Bankruptcy Case, or the reasonably anticipated effects of the Bankruptcy Case.

"Ordinary Course of Business" means the ordinary course of business of Seller consistent with the current custom and practice of Seller (including with respect to quantity and frequency) in light of the Seller's current financial condition, financial distress and pending Bankruptcy Case.

"Permitted Liens" means (i) liens for Taxes on that are not yet due and payable, (ii) easements, covenants, conditions, restrictions and other matters of record affecting real property, leasehold estates or personalty or any interest therein that do not in any material respect detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the use, ownership or operation of the property subject thereto in the Business, excluding Liens that will be removed and stricken as against the Purchased Assets pursuant to the Sale Order, (iii) the effect of any building and zoning regulations, now existing or hereafter in effect, (iv) oil, mineral and/or water rights, and claims of title thereto, shown by the public records, and (v) discrepancies, conflicts in boundary lines, shortages in area or encroachments which an inspection or survey would disclose.

"Person" means any corporation, partnership, limited liability company, joint venture, business association, entity or individual.

"Sale Motion" means the motion to be filed with the Bankruptcy Court by Seller seeking (a) approval of the terms and conditions of the Transaction Documents, and (b) authorization for (i) the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code and the assumption and assignment of the Purchased Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code, free and clear of all Liens.

"Sale Order" means the order of the Bankruptcy Court granting the relief requested in the Sale Motion and authorizing the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code and the assumption and assignment of the Purchased Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code, free and clear of all Liens, claims and interests.

"Sale Procedures Motion" means the motion to be filed with the Bankruptcy Court seeking approval of the bidding procedures as contemplated pursuant to Article III hereof.

"<u>Sale Procedures Order</u>" means the order entered by the Bankruptcy Court with respect to the Sale Procedures Motion and more fully described in <u>Section 3.1</u> hereof.

"<u>Taxes</u>" means taxes, charges, fees, levies, penalties or other assessments imposed by any federal, state, territorial, local or foreign taxing authority, including income, gross receipts, excise, property, sales, transfer, franchise, payroll, withholding, social security and other taxes, and shall include any interest, penalties or additions attributable thereto.

"<u>Tax Return</u>" means any return, report, information return or other document (including any related or supporting information).

*[Remainder of Page Intentionally Left Blank; Signature Pages Follows]*

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase Agreement to be executed by its duly authorized representative as of the day and year first above written.

SELLER:

COLLECTIVE, INC., Debtor and Debtor in Possession

By: _Kerry Bianchi_
Name: Kerry Bianchi
Title: President and Chief Executive Officer

PURCHASER:

ZETA GLOBAL HOLDINGS CORP.

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase Agreement to be executed by its duly authorized representative as of the day and year first above written.

SELLER:

COLLECTIVE, INC., Debtor and Debtor in Possession

By: _____
Name: _____
Title: _____

PURCHASER:

ZETA GLOBAL HOLDINGS CORP.

By: _____
Name: Steven Vine
Title: EVP